**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

VENTURA COASTAL, LLC,

                          **Plaintiff,**

              v.

UNITED STATES,

                          **Defendant,**

**and**

**LOUIS DREYFUS COMPANY SUCOS S.A.,**

                          **Defendant-Intervenor.**

Court No. 23-00009

Before: Hon. Claire R. Kelly

**PLAINTIFF'S MOTION**
**FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Ventura Coastal, LLC ("Plaintiff" or "Ventura"), hereby moves for judgment upon the agency record with respect to the determination of the U.S. Department of Commerce ("Commerce") in the antidumping duty investigation on Certain Lemon Juice from Brazil. *See Certain Lemon Juice from Brazil*, 87 Fed. Reg. 78,939 (Dep't Commerce Dec. 23, 2022) (final affirm. deter. of sales at less than fair value) and accompanying Issues and Decision Memorandum. Plaintiff respectfully moves, for the reasons explained in the accompanying Memorandum, that this Court find that agency findings, conclusions, and/or determinations with respect to this decision are unexplained, not supported by substantial evidence, or otherwise not in accordance with law.

Plaintiff further moves that the Court remand this determination to the Department of Commerce for disposition consistent with the Court's final opinion.

Respectfully submitted,

/s/ Daniel B. Pickard

Daniel B. Pickard, Esq.
Mert E. Arkan, Esq.
David B. Sessions, Esq.

**BUCHANAN INGERSOLL & ROONEY PC**
1700 K Street, NW
Suite 300
Washington, D.C. 20006
Telephone: (202) 438-0070
Email: daniel.pickard@bipc.com

*Counsel to Ventura Coastal, LLC*

Dated: August 3, 2023

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

VENTURA COASTAL, LLC,

                Plaintiff,

      v.

UNITED STATES,

                Defendant,

      and,

LOUIS DREYFUS COMPANY SUCOS S.A.,

                Defendant-Intervenor.

Court No. 23-00009
Before: Hon. Claire R. Kelly

**PUBLIC VERSION**

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>PLAINTIFF'S 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>**

Daniel B. Pickard, Esq.
Mert E. Arkan, Esq.
David B. Sessions, Esq.

**BUCHANAN INGERSOLL & ROONEY PC**
1700 K Street, NW
Washington, D.C. 20006
(202) 438-0070

*Counsel to Ventura Coastal, LLC*

Dated: August 3, 2023

*PUBLIC VERSION*

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................ 1

II. STATEMENT PURSUANT TO RULE 56.2 .............................................................. 1

    A. Administrative Determination Under Review ................................................ 1

    B. Issues Presented for Review .......................................................................... 2

III. STATEMENT OF FACTS .......................................................................................... 2

    A. Facts Related to Commerce's Determination of Non-Affiliation Between LDC and [      ] .................................................................................................... 4

    B. Facts Related to Commerce's Use of LDC's FY 2021 Financial Statements to Calculate LDC's Cost of Production .................................................................. 10

    C. Facts Related to Commerce's Exclusion of Certain Administrative Expenses from LDC's G&A Expense Rate Calculation ........................................................ 15

IV. ARGUMENT .............................................................................................................. 21

    A. Standard of Review ........................................................................................ 21

    B. Commerce's Affiliation Determination Was Contrary to Law and Unsupported by Substantial Evidence ........................................................................................ 23

        1. Commerce's Finding of No Affiliation Under Section 771(33)(G) of the Act Was Contrary to Law and Not Supported by Substantial Evidence ................................... 23

            a. Commerce's Assessment of Affiliation Under 771(33)(G) of the Act Was Contrary to Law Because Commerce Failed to Consider [      ] Reliance on LDC and LDC's Ability to Control [     ]

               i. Commerce's Analysis of Affiliation Under 771(33)(G) Was Not  Supported By Substantial Evidence .......................................................................... 26

        2. Commerce's Affiliation Analysis Under 771(33)(G) Was Contrary to Law Because Commerce Failed to Consider the Temporal Aspect of the Parties' Relationship ...................................................................................................... 30

            a. Commerce's Determination that LDC and [     ] Were Not Affiliated Under Section 771(33)(C) of the Act Was Contrary to Law and Not Supported by Substantial Evidence ................................................................................ 32

               i. Commerce's Use of LDC's FY 2020 Financial Statements for Some Purposes But Not Others Was Arbitrary and Capricious ................................................ 36

               ii. Commerce's Exclusion of Certain Administrative Expenses from LDC's G&A Expense Rate Calculation Was Not Supported by Substantial Evidence and Is Contrary to Law ............................................................................................ 39

V. CORRECTION OF ALL ERRORS .......................................................................... 42

VI. CONCLUSION .......................................................................................................... 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altx, Inc. v. United States*,
 25 CIT 1100, 167 F. Supp. 2d 1353 (2001) ....................................................................22, 29

*Bando Chem. Indus., Ltd. v. United States*,
 16 CIT 133, 787 F. Supp. 224 (1992), aff'd, 26 F.3d 139 (Fed. Cir. 1994) ......................22, 26

*China First Pencil Co. v. United States*,
 34 CIT 1284, 721 F. Supp. 2d 1369 (2010) .............................................................................22

*China Steel Corp. v. United States*,
 264 F. Supp. 2d 1339 (Ct. Int'l Trade 2003) .........................................................................30

*China Steel Corp. v. United States*,
 306 F. Supp. 2d 1291 (Ct. Int'l Trade 2004) ...................................................................30, 31

*Hamdan v. Rumsfeld*,
 548 U.S. 557 (S. Ct. 2006) .........................................................................................................35

*Hontex Enters., Inc. v. United States*,
 248 F. Supp. 2d 1323 (Ct. Int'l Trade 2003) .........................................................................30

*Mid Continent Steel & Wire, Inc. v. United States*,
 940 F.3d 662 (Fed. Cir. 2019) ....................................................................................................24

*Mitsubishi Heavy Indus., Ltd. v. United States*,
 15 F.Supp.2d 807 (Ct. Int'l Trade 1998) .................................................................................33

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983) .......................................................................................................................22

*New Am. Keg v. United States, No. 20-00008*,
 slip. op. 21-30 (Ct. Int'l Trade Mar. 23, 2021) ......................................................................22

*Russello v. United States*,
 464 U.S. 16 (S. Ct. 1983) .............................................................................................................35

*SKF USA, Inc. v. United States*,
 263 F.3d 1369 (Fed. Cir. 2001) .................................................................................................22

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
 44 F.3d 978 (Fed. Cir. 1994) .....................................................................................................21

*Ta Chen Stainless Steel Pipe Co. v. United States*,
 31 Ct. Int'l Trade 794 (2007) ..........................................................................................33, 34, 36

*Tension Steel Indus. Co. v. United States*,
179 F. Supp. 3d 1185 (Ct. Int'l Trade 2016) ....................................................23

*TIJID, Inc. v. United States*,
366 F. Supp. 2d 1286 (Ct. Int'l Trade 2005) ...............................................23, 24

*Union Steel v. U.S.*,
755 F. Supp. 2d 1304 (Ct. of Int'l Trade 2011) .................................................36

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951) ............................................................................................21

**Statutes**

19 U.S.C. § 1516a .................................................................................................21

19 U.S.C. § 1677 ...............................................................8, 24, 26, 32, 33, 35, 36

**Regulations**

19 C.F.R. § 351.102 .........................................................................23, 24, 30, 31

19 C.F.R. § 351.102 .............................................................................................23

19 C.F.R. § 351.224(f) .........................................................................................43

**Agency Decisions and Guidance**

*Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed.
Reg. 49,950 (Dep't Commerce July 29, 2019) ..................................................41

*Large Diameter Welded Pipe from Canada*, 84 Fed. Reg. 6,378 (Dep't Commerce
Feb. 27, 2019) ....................................................................................................20

**Other Authorities**

H.R. 5110, H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess. (1994), reprinted in
1994 U.S.C.C.A.N. 4175 ....................................................................................24

Military Commissions Act of 2006, Pub. L. No. 109-366, § 7 (b), 120 Stat. 2600,
2636 (2006) ........................................................................................................35

## I.    INTRODUCTION

On behalf of Ventura Coastal, LLC ("Ventura" or "Plaintiff"), we respectfully submit the following brief in support of Plaintiff's motion for judgment on the agency record.

## II.    STATEMENT PURSUANT TO RULE 56.2

### A.  Administrative Determination Under Review

The administrative determination under review is the U.S. Department of Commerce's ("Commerce") Final Determination in the antidumping duty investigation of *Lemon Juice from Brazil*.  The Final Determination was issued on December 19, 2022 and published in the Federal Register on December 22, 2022.  *See Lemon Juice from Brazil*, 87 Fed. Reg. 78,939 (Dep't Commerce Dec. 22, 2022) (final affirm. deter. of sales at less than fair value), P.R. 301 ("Final Determination") and accompanying Issues and Decision Memorandum, P.R. 294 ("I&D Memo").[1]

---

[1] "P.R." denotes the Public Record document item number identified in the Index to Administrative Record filed in this action on March 28, 2023; "C.R." denotes the Confidential Record document item number.

### B. Issues Presented for Review

1. Was Commerce's affiliation determination, which did not address the supplier's reliance on the purchaser and failed to consider both material evidence and temporal factors in analyzing affiliation through a close supplier relationship, and which imposed non-statutory requirements to find partners as non-affiliated, unsupported by substantial evidence or otherwise not in accordance with law?

2. Was Commerce's reliance on LDC's FY2020 financial statements for certain parts of LDC's cost of production calculation but not for other parts, arbitrary and capricious?

3. Was Commerce's calculation of LDC's G&A expense rate, which was based on factually incorrect statements regarding evidence that was not on the record, unsupported by substantial evidence and otherwise not in accordance with law?

## III.   STATEMENT OF FACTS

On December 30, 2021, Ventura filed a petition with Commerce and the International Trade Commission ("Commission") alleging that the lemon juice industry in the United States was materially injured or threatened with material injury by reason of dumped lemon juice imports from Brazil and South Africa.  *See* Petition for the Imposition of Antidumping Duties, *Lemon Juice from Brazil and South Africa* (Dec. 30, 2021), C.R. 1-23, P.R. 1-13 ("Petition for the Imposition of Antidumping Duties, *Lemon Juice from Brazil and South Africa*").  On January 19, 2022, Commerce published its notice of initiation of an antidumping duty investigation into imports of lemon juice from Brazil.  *See Lemon Juice from Brazil and South Africa*, 87 Fed. Reg. 3,768 (Dep't Commerce Jan. 19, 2022) (initiation of less-than-fair-value investigation), P.R. 56.  The period of investigation ("POI") was from October 1, 2020, through September 30, 2021.  I&D Memo at 1,

P.R. 294.  Commerce selected Citrus Juice Eireli ("Citrus Juice") and Louis Dreyfus Company

Sucos S.A ("LDC") as mandatory respondents.[2]  *See* Commerce Memorandum, re: *Antidumping*

*Duty Investigation of Certain Lemon Juice from Brazil: Respondent Selection Memorandum* (Feb.

8, 2022), C.R. 63, P.R. 58 ("Respondent Selection Memorandum").

On August 4, 2022, Commerce published its preliminary determination in the antidumping

duty investigation.  *See Certain Lemon Juice From Brazil*, 87 Fed. Reg. 47,697 (Dep't Commerce

Aug. 4, 2022) (prelim. affirm. deter. of sales at less than fair value, postponement of final deter.,

and ext. of provisional measures), P.R. 228 ("Preliminary Determination") and accompanying

Preliminary Determination Memorandum, P.R. 219.  In part as a result of the findings discussed

below, Commerce calculated a preliminary dumping margin of 21.49% for Citrus Juice, 4.45% for

LDC, and 12.97% for all non-individually examined companies.  Prelim. Determination at 47,697,

P.R. 228.

On December 23, 2022, Commerce published its Final Determination in the antidumping

duty investigation.  *See* Final Determination at 78,939, P.R. 301.  In part as a result of the findings

discussed below, Commerce calculated a final antidumping margin of 22.31% for Citrus Juice,

0.00% for LDC, and 22.31% for all non-individually examined companies.  *Id.* at 78,940, P.R.

301; *see also* I&D Memo, P.R. 294.

---

[2] Commerce incorrectly refers to LDC as "Louis Dreyfus Citrus" in the Respondent Selection
Memorandum.  Commerce uses LDC's correct legal name in the subsequently issued Initial DOC
Questionnaire.   *See* Letter from Sec'y of Commerce to LDC, re:  *Less-Than-Fair-Value*
*Investigation of Certain Lemon Juice from Brazil: Request for Information* (Feb. 14, 2022), P.R.
59 ("Initial Questionnaire" or "Initial DOC Questionnaire").

**A. Facts Related to Commerce's Determination of Non-Affiliation Between LDC and [       ]**

Section A of Commerce's Initial Questionnaire requested a list of all the production facilities involved in the production, sale and/or distribution of the subject merchandise operated by LDC and its affiliates.  *See* Initial DOC Questionnaire at A-4, P.R. 59.  LDC identified its direct material supplier, [                                             ], for the first time in its Suppl. Section A QR:

> {O}n page A-10 of its AQR, LDC { } identified its affiliate, [
>
>                               ]. The lemons were instead produced on
> [
>
>
>
>
>                          ].

Letter from White & Case LLP to Sec'y Commerce re: *Certain Lemon Juice from Brazil: Response to the Supplemental Section A of the Antidumping Duty Questionnaire* (Apr. 8, 2022) at Supp. A-5, C.R. 94, P.R. 114 ("Suppl. Section A QR").

Shortly thereafter, LDC submitted its Section D QR, which included a copy of the [                                             ] between LDC and [        ], as well as a "Major Inputs Purchase from Affiliated Parties Chart" that listed [       ] as LDC's [                                   ].  *See* Letter from White & Case LLP, to Sec'y Commerce, re: *Certain lemon Juice from Brazil: Response to Section D of the Antidumping Duty*

4

*Questionnaire* (Apr. 11, 2022) at D-5-6, D-11, Exhibit D3, Exhibit D7, C.R. 104-114, P.R. 116

("LDC Section D QR"); *see also* Letter from White & Case LLP, to Sec'y Commerce, re: *Certain*

*lemon Juice from Brazil: Response to the Supplemental Section D of the Antidumping Duty*

*Questionnaire* (June 3, 2022) at Supp. D-17, Exhibit Supp. D15, C.R. 159-177, P.R. 155-156

("LDC Suppl. Section D QR"). The underlying commercial documents establishing the

relationship between LDC and [      ] explicitly describe it as a [               ]. *See e.g.*,

LDC Section D QR, Exhibit D3, C.R. 104-114, P.R. 116.

 In response to a supplemental questionnaire, LDC presented the following information

about its relationship with [      ]:

> LDC produces and purchases lemons through the [
>                                                  ]. The [
>    ] is owned by [      ] and LDC has [
>       ]. The [
>        ]. The effectively farmed areas of the property are
> [      ] hectares for lemons and [      ] hectares for oranges
> (i.e. [      ] farmed hectares). The remaining hectares are areas
> not effectively farmed (i.e., areas specially protected by legislation,
> such as areas of legal reserve or permanent preservation, eucalyptus
> planting, etc.). LDC Sucos compensates [      ] for its ownership
> with an amount of the production. LDC then purchases the portion
> of the [                                     ] . . . Only the
> [                    ] is associated with the [      ]{,}
> and{,} during the POI, only the [      ] produced
> lemons for lemon juice. Although some lemons were produced on
> the [            ], they were not harvested or used for lemon
> juice.
>
> [
>                                                                      ]
>
> [
>    ] . . . sets forth the terms and conditions under which [
>                                                           ] . . . Pursuant
> to the [            ] between LDC and
> [      ], LDC Sucos must purchase [            ] the fruit.
> Under the same [
>     ].

> LDC confirms that [              ] sold lemons to LDC Sucos during the POI.
>
> [          ] did not incur {} any expense related to the land and the citrus groves during the POI.
>
> LDC incurs costs for its own fruit grown at the farm and for [          ] fruit grown at the farm. [          ] does not incur any operation costs.

LDC Suppl. Section D QR at Supp. D-1-3, Supp. D-5, Supp. D-8, Supp. D-17-18, C.R. 159-177, P.R. 155-156.

Ventura submitted Pre-Preliminary Comments in advance of Commerce's Preliminary Determination.  *See* Letter from Buchanan, Ingersoll & Rooney PC, to Sec'y of Commerce, re: *Lemon Juice from Brazil: Petitioner's Comments in Advance of the Preliminary Determination – Louis Dreyfus Company Sucos S.A.* (June 29, 2022), C.R. 184-185, P.R. 174-175 ("Ventura Pre-Preliminary Comments").  In addressing LDC's affiliated party transactions, Ventura explained that LDC and [          ] represent affiliated parties by reason of their partnership or close supplier relationship and that *all* purchases of lemons originating from [

                                                                              ] should be considered affiliated purchases.  *See* Ventura Pre-Preliminary Comments at 2, C.R. 184-185, P.R. 174-175.  Ventura urged Commerce to adjust the reported transfer prices of LDC's affiliated purchases to reflect the higher of market price or cost of production, in accordance with Section 773(f)(3) of the Act, given that lemons constitute a major input in the production of subject merchandise.  *Id.*, C.R. 184-185, P.R. 174-175.

For its Preliminary Determination, Commerce "relied upon the cost of production (COP) and constructed value (CV) information reported by Louis Dreyfus Company Sucos S.A. . . . except in the following instances where the data was not appropriately quantified or valued."

Commerce Memorandum, re: *Antidumping Duty Investigation of Certain Lemon Juice from Brazil: Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – Louis Dreyfus Company Sucos S.A* (July 28, 2022) at 1, C.R. 231, P.R. 222 ("Preliminary COP and CV Memorandum").  Consequently, in accordance with "section 773(f)(2) of the Act (*i.e.*, the transactions-disregarded rule)," Commerce "adjusted the price of the lemons LDC {} purchased from [          ]" upon finding that "the average transfer price of the lemons LDC {} purchased from [          ] were below the market price" (*i.e.*, not "made on an arm's-length basis"), and "increased {LDC's} reported TOTCOM by [          ] percent." *Id.* at 2, C.R. 231, P.R. 222.  Thus, Commerce preliminarily determined that LDC and [          ] constitute affiliated parties and that LDC's purchases of [          ] lemons should therefore be disregarded to reflect fair market value.  *See id.* at 2 ("{W}e analyzed LDC Sucos's purchases of lemons from its agricultural partner, [                              ] to determine whether the purchases have been made on an arm's length basis . . . Based on our analysis, the average transfer price of lemons LDC Sucos purchased from [          ] were below the market price, therefore, we adjusted the price of the lemons . . . purchased from [          ]."), Attachment 3, C.R. 231, P.R. 222.  In explaining this adjustment, Commerce noted that "{l}emon fruit as an input represents [     ] percent of total cost of manufacturing (TOTCOM) of the merchandise under consideration (MUC)" and that "{LDC's lemon} purchases from [          ] represent [     ] percent of LDC Sucos's total lemon purchases." *Id.* at 2, C.R. 231, P.R. 222.

Following its Preliminary Determination, Commerce verified LDC's cost response.  *See* Commerce Memorandum, re: *Verification of the Cost Response of Louis Dreyfus Company Sucos S.A. in the Lower-Than-Fair-Value Investigation of Certain Lemon Juice from Brazil*, C.R. 295, P.R. 259 ("Cost Verification Report").  At verification, Commerce "reviewed the listing of {}

7

lemon fruit purchases LDC {}made from [          ] . . . and from unaffiliated suppliers" and "recalculated the average affiliated and average unaffiliated contract prices as follows: Reported transfer price {of affiliated purchases} [          ] BRL/box; Market price based on unaffiliated purchases [          ] BRL/box. *See* Cost Verification Report at 19, C.R. 295, P.R. 259.   In tracing the amounts listed for the purchase of materials from both affiliated and unaffiliated suppliers to company records, Commerce observed that "LDC Sucos maintains separate ledgers for {} affiliated and unaffiliated lemon fruit purchases" in its normal books and records. *Id*. at 20, C.R. 295, P.R. 259.   Based upon its review of LDC's reported per-unit costs of affiliated party purchases, Commerce stated that, "{f}or the final determination, consistent with the preliminary determination, it may be appropriate to adjust LDC Sucos' transfer price of lemon fruit obtained from [          ] to reflect the average market price of lemon fruit." *Id*. at 19-20, C.R. 295, P.R. 259.

Ventura and LDC submitted case and rebuttal briefs addressing, in part, the nature of the of the [                              ] between LDC and [          ] and the appropriate cost adjustment for LDC's purchases of lemon fruit from [          ]. *See* Letter from Buchanan, Ingersoll & Rooney PC, to Sec'y of Commerce re: *Certain Lemon Juice from Brazil: Petitioner's Case Brief as to Louis Dreyfus Company Sucos S.A.* (Nov. 2, 2022) at 2-6, C.R. 297-298, P.R. 270 ("Ventura Case Brief"); Letter from White & Case LLP to Sec'y of Commerce, re: *Certain Lemon Juice from Brazil: Rebuttal Brief of LDC Sucos* (Nov. 10, 2022) at 1-7, C.R. 304, P.R. 287 ("LDC Rebuttal Brief").

Ventura argued that LDC's "Agricultural Partnership" with [          ] rendered the two entities as affiliated parties pursuant to Commerce's statutory definition of the term under 19 U.S.C. § 1677(33), and that accordingly, the cost of lemon procured from [          ], or otherwise

grown on the [                                    ], should be adjusted pursuant to the major input

rule.  *See* Ventura Case Brief at 2-6, C.R. 297-298, P.R. 270.  Notably, Exhibit 1 of Ventura Case

Brief [


                                    ].  Ventura Case Brief at Exhibit 1, C.R. 297-298, P.R.

270.  In response, LDC argued that it has no affiliation with [        ] because the [

                ] does not [                                    ], rather the two

entities are "contractual parties," regardless, a significant portion of the lemon procured from the

[                                    ] is self-produced, and, therefore, no cost adjustment would be

appropriate under the major input rule.  LDC Rebuttal Brief at 1-7, C.R. 304, P.R. 287.

     In its Final Determination, Commerce reversed course from its Preliminary Determination,

"find{ing} that LDC and its supplier are <u>not</u> affiliated under any provision of the Act."  I&D Memo

at 11 (emphasis added), P.R. 294; *see also* Commerce Memorandum, re: *Antidumping Duty

Investigation of Certain Lemon Juice from Brazil: Cost of Production and Constructed Value

Calculation Adjustments for the Final Determination – Louis Dreyfus Company Sucos S.A* (Dec.

19, 2022) at 1 ("As discussed in the Issues and Decisions Memorandum (IDM), we do not find

that LDC Sucos is affiliated with [                                    ]."), C.R. 336, P.R. 300

("Final COP and CV Memorandum").  In rejecting affiliation through a close supplier relationship

under Section 771(33)(G) of the Act, Commerce "agree{d} with LDC that when a buyer has other

supply options, the buyer is not reliant on its supplier."  I&D Memo at 12, P.R. 294.  Commerce

then explained the basis for its decision to abandon its earlier finding:

> Record evidence supports finding that LDC had other sources for
> purchasing {this} major input other than this particular supplier.
> Furthermore, contractual terms between LDC and its supplier
> recognize the sovereignty of the parties and indicate no obligation

> toward each other beyond those spelled out by the terms of the contract. Finally, neither cost nor sales verifications found any evidence of affiliation or non-arm's-length transactions between those two parties. We find that LDC's and its supplier's relationship is market-based and the transactions between them are at arm's length. Therefore, for the final determination we found that LDC and its supplier are not affiliated pursuant to section 771(33)(G) of the Act.

I&D Memo at 12-13, P.R. 294.

Commerce also found that "LDC and its supplier are not affiliated as partners within the meaning of section 771(33)(C) of the Act," reasoning that "{r}ecord evidence supports that this is a contractual relationship" and "LDC and its supplier do not jointly own anything pursuant to the terms of their contract and do not engage in joint selling activities." I&D Memo at 13, P.R. 294. As a result of Commerce's final affiliation determination, Commerce concluded that neither the transactions disregarded rule nor the major input rule applied – in the latter case because "LDC had other sources for purchasing {the} major input other than this particular supplier" – and reversed the earlier adjustment made in the Preliminary Determination to the cost of lemons that LDC purchased from [        ]. *See* I&D Memo at 13, P.R. 294.

> **B. Facts Related to Commerce's Use of LDC's FY 2021 Financial Statements to Calculate LDC's Cost of Production**

Section D of Commerce's Initial Questionnaire requested information regarding LDC's cost of production ("COP"). *See* Initial DOC Questionnaire at D-12-D-13, P.R. 59. LDC's response to Commerce's Section D questionnaire included a reconciliation worksheet which reconciled its financial statements to its reported costs – this reconciliation worksheet included a reconciling item titled [

]. Section D QR at D-31-35, Exhibit D15, C.R. 104-114, P.R. 116.

*PUBLIC VERSION*

In a supplemental questionnaire, Commerce asked that LDC "{e}xplain the nature of the reconciling item . . . you have reported for [

].  LDC Suppl. Section D QR at Supp. D-25, Supp. D-27, C.R. 159-177, P.R. 155-156.  In response, LDC explained that the reconciling line item in question reflected certain accounts which [                              ] that were properly classified as [                    ], and thereby [                              ].  *Id*. at Supp D-25, C.R. 159-177, P.R. 155-156. The excluded accounts included account [                                        ].  *See* LDC Section D QR at Exhibit D-15, C.R. 104-114, P.R. 116.

Ventura submitted Pre-Preliminary Comments in advance of Commerce's Preliminary Determination.  *See* Ventura Pre-Preliminary Comments, C.R. 184-185, P.R. 174-175. Addressing, in part, the explanation provided by LDC in its Suppl. Section D QR regarding the excluded costs included in the reconciling line item titled [

] – which, as described above, encompassed the expenses associated with the [                                    ] account – Ventura argued that "{c}ontrary to LDC Sucos's claims, these costs are {not all} [                    ].  *See* Ventura Pre-Preliminary Comments at 3-4, C.R. 184-185, P.R. 174-175.  Ventura recommended that "{f}or the Preliminary Determination, Commerce . . . include {those} costs in the reported cost of manufacturing."  *Id*. at 4, C.R. 184-185, P.R. 174-175.

In its Preliminary Determination, Commerce stated that it "relied on the COP data submitted by LDC, except . . . {w}e revised {the} G&A expense rate to include additional G&A expenses that were excluded from the fiscal year cost of goods sold in the overall cost reconciliation."  Preliminary Determination Memorandum at 15, P.R. 219.  Commerce's adjustment added the entirety of the excluded costs accumulated under the account labeled

11

[                                                ] to LDC's G&A expense rate calculation.  *See id.* at 7, P.R. 219.

Commerce verified the cost response of LDC from September 12, 2022, through September 16, 2022.  *See* Cost Verification Report, C.R. 295, P.R. 259.  In presenting its cost reconciliation to Commerce, LDC stated that "the annual fruit cost adjustments . . . accumulated in account [                                                ] {were} mistakenly excluded from the reported cost of manufacturing."  *Id*. at 8, C.R. 295, P.R. 259.  LDC explained that the [                                                ] account captured cost adjustments for "certain raw fruit purchase contracts {which} include a variable price component that is based on the sales price of the finished juice . . . {T}he final price for these contracts is determined at year end after the company's auditors have confirmed the fiscal year sales revenues {outside the ordinary course of business}."  *Id*. at 8, C.R. 295, P.R. 259.[3]  Specifically, through verifying LDC's cost reconciliation, Commerce identified that the [                                                ][4] reflected, in part, the difference in COGS as listed in LDC's FY2020 income statement and COGS as recorded in LDC's financial accounting system. *See id*. at 8, C.R. 295, P.R. 259.  Notably, LDC had earlier provided Commerce with its FY2021 financial statements on the last day of its sales verification (*i.e.*, August 26, 2022) – however, Commerce's cost verification relied on the figures included in LDC's FY2020 financial

---

[3] In effect, LDC's purchases of lemon are valued at the time of delivery based on projected lemon juice pricing at the time of sale.  However, if lemon juice pricing over the course of the year is higher or lower than LDC's projection at the time of delivery, the price actually paid to the supplier at the year-end settlement will differ from the cost recorded in the regular course of business.  The reconciling item used to reconcile this difference between recorded cost and actual cost is recorded in the "LDM material price difference" account.

[4] Commerce describes the [                                        ] as the "Annual Fruit . . . cost adjustment" in its table "summarize{ing} the reconciliation from the total costs in the company's fiscal year 2020 (FY2020) audited income statement to the total cost of goods sold (COGS) for finished goods from the financial accounting system."

statements.  *See* LDC Case Brief at 10-11, C.R. 299-300, P.R. 271; Cost Verification Report at 7-12, C.R. 295, P.R. 259.  Ultimately, in light of the information provided by LDC at verification, Commerce's Cost Verification Report recommended "reclassify{ing the [

] from G&A expenses to manufacturing cost . . . this will impact the FY2020 G&A and financial expense rates (remove from G&A numerator and add to COGS denominators for both calculations), while the POI company-wide cost of manufacturing would increase by [      ] percent."  Cost Verification Report at 8-9 (emphasis added), C.R. 295, P.R. 259.

Ventura and LDC submitted case and rebuttal briefs addressing, in part, the classification, source, and amount of the appropriate [                                  ] adjustment to LDC's COP.  *See* Ventura Case Brief, C.R. 297-298, P.R. 270; Letter from White & Case LLP to Sec'y of Commerce, re: *Certain Lemon Juice from Brazil: Case Brief* (Nov. 2, 2022), C.R. 299-300, P.R. 271 ("LDC Case Brief"); Letter from Buchanan, Ingersoll & Rooney PC, to Sec'y of Commerce re: *Certain Lemon Juice from Brazil: Petitioner's Rebuttal Brief as to Louis Dreyfus Company Sucos S.A.* (Nov. 10, 2022), C.R. 303, P.R. 282 ("Ventura Rebuttal Brief"); LDC Rebuttal Brief, C.R. 304, P.R. 287.

The parties agreed that the [                                    ] cost adjustment should be reclassified from a G&A expense to a production cost, and included as part of LDC's COP.  *See* Ventura Case Brief at 9, C.R. 297-298, P.R. 270; LDC Case Brief at 8, C.R. 299-300, P.R. 271. However, the parties differed with respect to the source and amount of the appropriate [

] adjustment to LDC's COP: Ventura argued that Commerce should base the cost adjustment on LDC's FY2020 financial statements, while LDC argued that Commerce should use its FY2021 financial statements.  *See* Ventura Case Brief at 9-10, C.R. 297,

P.R. 270; LDC Case Brief at 7-13, C.R. 299-300, P.R. 271; Ventura Rebuttal Brief at 7-8, C.R.

303, P.R. 282; LDC Rebuttal Brief at 8-9, C.R. 304, P.R. 287.

Commerce's Final Determination addressed the parties' outstanding arguments regarding

the classification, source, and amount of the appropriate [                                    ]

adjustment to LDC's COP.  *See* I&D Memo at 16-18, P.R. 294.  Commerce agreed with the parties

"{r}egarding the classification of the material price difference between COM and G&A

expenses…the adjustment should be included in the COM and likewise in the COGS denominator

used to calculate the G&A and financial expense rates."  *See* I&D Memo at 16, P.R. 294.  On the

issues where the parties differed, Commerce: "agree{d in principle} with Petitioner and . . . relied

on the FY 2020 financial statement as the basis for the G&A expense rate calculation" – but

subsequently, calculated the [                                    ] adjustment based on the "<u>POI</u>

fruit material price difference," *i.e.*, using data derived from LDC's FY2021 financial statements.

*See* I&D Memo at 15 (emphasis added), P.R. 294.  Commerce consequently adjusted LDC's COP

by [                                                                ] amount included in

Exhibit CVE-6 of LDC's Cost Verification Exhibits.[5]  *See* Final COP and CV Memorandum at 5,

C.R. 336, P.R. 300; Letter from White & Case LLP, to Sec'y Commerce, re: *Certain Lemon Juice*

*from Brazil: Cost Verification Exhibits* (Sept. 23, 2022) at Exhibit CVE-6, C.R. 263-276, P.R. 242

("Cost Verification Exhibits").

---

[5] LDC's reconciliation of its financial statements to its Section D cost data listed the POI "Annual
fruit (lemon/orange) cost adjustment" as equaling BRL-R$ [              ] – the POI total expenses
recorded in LDC's [                                    ] account equaled
BRL-R$ [              ].  *See* Cost Verification Exhibits at Exhibit CVE-6, pg. 1, 17, C.R. 263-
276, P.R. 242.  Commerce's adjustment to LDC's COP production used the POI "Lemon Total"
expense included in the non-reconciled [                                    ] account with the
orange- and lemon-specific expenses broken out.  *Compare id.*, C.R., P.R. *and* Final COP and CV
Memorandum at 5, C.R. 336, P.R. 300.

### C. Facts Related to Commerce's Exclusion of Certain Administrative Expenses from LDC's G&A Expense Rate Calculation

Section A and D, respectively, of Commerce's Initial Questionnaire requested information regarding LDC's corporate structure and certain affiliated persons, and calculation worksheets supporting LDC's reported G&A expense ratio. *See* Initial DOC Questionnaire at A-3-A-4, D-15, D-19, P.R. 59.

LDC submitted a response to Commerce's Section A questionnaire which included five organizational charts illustrating LDC's legal operating structure. *See* Letter from White & Case, to Sec'y Commerce, re: *Certain Lemon Juice from Brazil: Response to Section A of the Antidumping Duty Questionnaire* (Mar. 14, 2022) at A-7, Exhibit A2, C.R. 65-69, P.R. 77 ("LDC Section A QR"). The first of these organizational charts, which LDC described as reflecting the "legal corporate structure involved in the fruit juice line of business," shows that a [

] with the legal name of [

] held a [                                        ] in LDC. *See id.*, at A-7, Exhibit A2, pg. 1, C.R. 65-69, P.R. 77. In turn, [

] held a 100 percent ownership stake in [                          ]. *See id.*, at A-7, Exhibit A2, pg. 1, C.R. 65-69, P.R. 77.

LDC's first organizational chart at Exhibit A2 [

] or [                ] as an "affiliate{} involved in the development, production, sales and distribution of the merchandise under consideration," however LDC reported [      ] entities among the "list of the facilities and offices involved in the development, production, sale and/or distribution of the merchandise under consideration" at Exhibit A3. *See id.*, at A-7-A-8, Exhibit A2, Exhibit A3, C.R. 65-69, P.R. 77. In response to Commerce's request that it provide "financial

statements . . . of affiliates involved in the production or sale of the subject merchandise . . . and

of the parent(s) of these affiliates," LDC provided financial statements for [

] but did not provide a financial statement for [                           ].  *See id.*, at A-26-27,

Exhibit A15-A16, C.R. 65-69, P.R. 77.  LDC did not provide a direct qualitative description of the

services provided by [                           ] or [                     ], but noted that the accounting

process [

].  *See id.*, at A-

10-A-12, A-26, C.R. 65-69, P.R. 77.

LDC submitted a response to Commerce's Section D questionnaire which included a

calculation worksheet illustrating its computation of the reported G&A expense rate, inclusive of

costs incurred "for administrative services performed on your company's behalf by its parent

company or other affiliated party."  *See* LDC Section D QR at D-37, Exhibit D14, C.R. 104-114,

P.R. 116.  LDC stated that the G&A expenses used to calculate its G&A expense rate "are taken

directly from LDC Sucos' financial statements."  *See* LDC Section D QR at D-30, C.R. 104-114,

P.R. 116.  The G&A expense calculation worksheet provided by LDC [

].  *See* LDC Section D QR at Exhibit D14, C.R.

104-114, P.R. 116.

In a supplemental questionnaire, Commerce asked that LDC "describe how you have

reported the cost of the accounting services provided by your parent company" and "ensure that

all service incurred on behalf of LDC Sucos by its parent company have been included in the G&A

expenses."  *See* LDC Suppl. Section D QR at Supp. D-23-D-24, C.R. 159-177, P.R. 155-156.  In

response, LDC explained that "administrative and accounting services {were} provided by [

] {} an affiliate . . . {these services are} subject

to a Cost-Sharing Agreement between the companies," and otherwise, "{a}ll service expenses

incurred on behalf of LDC Sucos by its parent company have been included in the G&A expenses.

Compare account number [              ] with its description ([                        ]) under

the G&A accounts." *Id*. at Supp. D-23-D-24, C.R. 159-177, P.R. 155-156.  LDC did not provide

financial statements for [              ] or for [                ] parent company.  In addition,

[                ] was not listed in any of the five organizational charts illustrating LDC's legal

operating structure.  *See* LDC Section A QR at Exhibit A2, C.R. 65-69, P.R. 77.

       In its Preliminary Determination, Commerce stated that it "relied on the COP data

submitted by LDC, except as follows . . . We revised LDC's G&A expense rate to include

additional G&A expenses that were excluded from the fiscal year cost of goods sold in the overall

cost reconciliation."  Preliminary Determination Memorandum at 15, P.R. 219.   As described

above in greater detail, while Commerce made over a [              ] upward revision in its

Preliminary Determination to LDC's reported G&A expense rate due to unreported expenses, this

adjustment related solely to "{certain} costs {excluded from LDC's cost reconciliation which

were} related to [                                ], and therefore pertain to

general and administrative (G&A), financial and selling expenses."  Preliminary COP & CV

Memorandum at 2, C.R. 231, P.R. 222.

       Commerce identified additional unreported G&A expenses during its cost verification –

however, these expenses did not relate to administrative services provided by LDC from its parent

company or other affiliated parties.  *See* Cost Verification Report at 9-10, 20-22, C.R. 295, P.R.

259.  These unreported expenses added [          ] percent to LDC's G&A expense rate.  *See* Cost Verification Report at 20-22, C.R. 295, P.R. 259.

The Cost Verification Exhibits submitted by LDC following the conclusion of its verification included [

                                                                          ].  *See* Cost Verification Exhibits at Exhibit CVE-1, C.R. 263-276, P.R. 242.   This [                                    ] revealed, for the first time, that [

        ] was [                                                    ] – rather, [                          ] was  subject  to  [                                        ]  involving  at  least  [

            ]:

**PUBLIC VERSION**

[

]

*Id.* at Exhibit CVE-1, C.R. 263-276, P.R. 242.  None of [                    ] were made known to

either Commerce or Ventura prior to verification.   In summary, [

] exercised ultimate ownership over [                ] – and by extension were LDC's

legal parents.  *See* Cost Verification Exhibits at Exhibit CVE-1, C.R. 263-276, P.R. 242.

Ventura and LDC submitted case and rebuttal briefs addressing, in part, adjustments to

LDC's G&A expense rate to include potentially unreported expenses associated with

administrative services provided to LDC by LDC-affiliated entities and/or parents of LDC-

affiliated entities.  *See* Ventura Case Brief at 11-14, C.R. 297-298, P.R. 270; LDC Rebuttal Brief

at 11-16, C.R. 304, P.R. 287.  The parties agreed that Commerce's established practice with respect to calculating the G&A expense rate is to include "a portion of the parent company's {or other affiliated parties'} G&A expenses if the parent {or other affiliated party} performed administrative services on behalf of the respondent."  *See* Ventura Case Brief at 13-14, C.R. 297-298, P.R. 270; LDC Case Brief at 10, C.R. 299-300, P.R. 271.   In particular, Ventura's Case Brief cited to Commerce's determination in *Large Diameter Welded Pipe from Canada*, finding that even where a parent and/or affiliated company "does not provide services to the respondents directly {and} exists solely for the benefit of its subsidiaries by holding shares and overseeing investments in companies it owns {*e.g.*, a holding company} . . . its administrative costs should be borne by the companies of the group."  *See Large Diameter Welded Pipe from Canada*, 84 Fed. Reg. 6,378 (Dep't Commerce Feb. 27, 2019) (final affirm. deter. of sales at less than fair value), and accompanying Issues and Decision Memorandum at 28 ("*LDWP from Canada* I&D Memo").  However, the parties differed with respect to: (1) whether any such administrative services were in fact provided by LDC-affiliated entities and/or parents of LDC-affiliated entities, or if the provision of services could be inferred from the record; (2) the extent and appropriateness of any related adjustment to LDC's G&A expense rate.  *See* Ventura Case Brief at 11-14, C.R. 297-298, P.R. 270; LDC Rebuttal Brief at 11-16, C.R. 304, P.R. 287.

Commerce's final determination addressed the parties' outstanding arguments regarding an adjustment to LDC's G&A expense rate to include potentially unreported expenses associated with administrative services provided to LDC by LDC-affiliated entities and/or parents of LDC-affiliated entities.  *See* I&D Memo at 18-21, P.R. 294.  Specifically, Commerce "agreed with LDC that no adjustments are required to LDC's G&A expenses to incorporate expenses incurred by its parent or other holding companies {because} {t}here is no record evidence that the ultimate parent

company or any other LDC holding companies provided any services to LDC." *See* I&D Memo at 20, P.R. 294. Commerce found that while an "affiliated company . . . provided {certain} SG&A services . . . LDC companies charge each other where services are provided to other LDC companies . . . LDC's affiliated service provider charged for its services and operated at profit . . ." *See* I&D Memo at 20, P.R. 294. Accordingly, Commerce concluded that "{b}ased on the foregoing analysis of the record evidence, *we find there is no necessary information missing from the record* . . . {and} there are no parent company G&A costs incurred for the benefit of LDC that were excluded from the reported costs." *See* I&D Memo at 20, (Emphasis added) P.R. 294. Commerce did not appear to make a specific finding regarding whether there was any necessary information missing from the record regarding a non-parent affiliated company's G&A costs incurred for the benefit of LDC that were excluded from the reported costs.

## IV.   ARGUMENT

### A.  Standard of Review

This Court will "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B).

Substantial evidence "is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Corp. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence is measured by the entire record, and Commerce "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994).  "{I}t is not enough for

21

Commerce simply to 'determine' . . . that the record does not support a particular conclusion without addressing the evidence both in support of and in derogation of that conclusion, and it is likewise not enough for Commerce to 'continue to find' something that is unsupported by a discussion of the evidence in the first instance." *New Am. Keg v. United States, No. 20-00008*, slip. op. 21-30 at 48-49 (Ct. Int'l Trade Mar. 23, 2021). Although Commerce need not address every single piece of evidence, "it must address significant arguments and evidence which seriously undermines its reasoning and conclusions." *Altx, Inc. v. United States*, 25 CIT 1100, 1117, 167 F. Supp. 2d 1353, 1374 (2001).

Commerce "may not act arbitrarily in reaching its decision." *China First Pencil Co. v. United States*, 34 CIT 1284, 1289, 721 F. Supp. 2d 1369, 1375 (2010). If Commerce has a routine practice for addressing similar situations, it must either apply that practice or provide a reasonable explanation regarding why Commerce has deviated from that practice. *See SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("An agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently."). Commerce's determinations "must have a reviewable, reasoned basis" to be affirmed. *Bando Chem. Indus., Ltd. v. United States*, 16 CIT 133, 136, 787 F. Supp. 224, 227 (1992), aff'd, 26 F.3d 139 (Fed. Cir. 1994). "{T}he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

**B. Commerce's Affiliation Determination Was Contrary to Law and Unsupported by Substantial Evidence**

Commerce's determination that LDC and [          ] were not affiliated under subsections (C) and (G) of Section 771(33) of the Tariff Act of 1930, as amended ("the Act"), was contrary to law and not supported by substantial evidence.

1. Commerce's Finding of No Affiliation Under Section 771(33)(G) of the Act Was Contrary to Law and Not Supported by Substantial Evidence

Section 771(33)(G) of the Act defines "affiliated persons" as "*{a}ny* person who controls *any* other person and such other person" and states that "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person." 19 U.S.C. § 1677(33)(G) (emphasis added). The term "person" includes "any interested party as well as any other individual, enterprise, or entity, as appropriate." 19 C.F.R. § 351.102(b)(37). When analyzing affiliation under Section 771(33)(G) of the Act, Commerce will consider, among other factors, "close supplier relationships." 19 C.F.R. § 351.102(b)(3).

In determining whether parties are affiliated through a close supplier relationship, Commerce first considers whether "the buyer or supplier has become reliant on the other." *Tension Steel Indus. Co. v. United States*, 179 F. Supp. 3d 1185, 119 (Ct. Int'l Trade 2016) (citing Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 at 838 (1994) ("SAA")). If the record indicates that one or more parties is reliant on the other, Commerce then considers whether the parties' relationship has "the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." 19 C.F.R. § 351.102(b)(3); *see also TIJID, Inc. v. United States*, 366 F. Supp. 2d 1286, 1299 (Ct. Int'l Trade 2005). Finally, in determining whether two parties are affiliated through a close supplier relationship, "{Commerce} will

23

consider the temporal aspect of a relationship in determining whether control exists."  19 C.F.R. § 351.102(b)(3).

In this case, Commerce's analysis under Section 771(33)(G) of the Act was legally defective because (a) Commerce failed to consider whether [          ] was reliant upon LDC, and, consequently, whether LDC had the ability to control [          ], and because (b) Commerce failed to consider the temporal aspect of the parties' relationship, in contravention of 19 C.F.R. § 351.102(b)(3).   Additionally, Commerce's determination that the parties were not affiliated under Section 771(33)(G) of the Act was unsupported by substantial evidence.

> b. *Commerce's Assessment of Affiliation Under 771(33)(G) of the Act Was Contrary to Law Because Commerce Failed to Consider [          ] Reliance on LDC and LDC's Ability to Control [          ]*

The SAA defines a "close {supplier} relationship" as a relationship where "the supplier or buyer becomes reliant upon the other." H.R. 5110, H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess., at 838 (1994), underline reprinted in 1994 U.S.C.C.A.N. 4175.  Additionally, Commerce has expressly stated that it "will look at whether the supplier has become reliant on the {purchaser}" in evaluating affiliation through a close supplier relationship. *TIJID, Inc. v. United States*, 366 F. Supp. 2d 1286, 1299 (Ct. Int'l Trade 2005); *see also Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 668-669 (Fed. Cir. 2019) (affirming Commerce's finding of no affiliation based on evidence of the suppliers' ability to sell to other purchasers, the suppliers' previous independent business operations, and a lack of long-term contracts or debt-financing agreements between the respondent-purchaser and its suppliers, among other things). Commerce therefore identified the correct legal standard in explaining that "the threshold issue" with respect to close supplier relationships "is whether either the buyer *or* seller has… become reliant on the other." I&D Memo at 12 (emphasis added), P.R. 294.

Commerce's reliance analysis in the I&D Memo only discusses LDC's potential reliance on [    ] and fails to consider or acknowledge [      ] reliance on LDC.  *See* I&D Memo at 12 ("We agree with LDC that when a buyer has other supply options, the buyer is not reliant on its supplier. Record evidence supports finding that LDC had other sources for purchasing major input other than this particular supplier."), P.R. 294.   In doing so, Commerce plainly misapplied the applicable legal standard.  Indeed, while the record evidence suggests mutual reliance among the parties – [    ] percent of LDC's total purchases of lemon during the POI were procured from [    ], or otherwise grown on the [          ] – Commerce failed to address the material evidence demonstrating [    ] reliance on LDC, rendering its analysis and consequent determination contrary to law.  *See* Ventura Case Brief at Exhibit 1, C.R. 297-298, P.R. 270; I&D Memo at 11-13, P.R. 294.

Commerce dedicated, at most, one generally-worded sentence to convey its sweeping conclusion: "contractual terms between LDC and its supplier recognize the sovereignty of the parties and indicate no obligation toward each other beyond those spelled out by the terms of the contract."  *See* I&D Memo at 12, P.R. 294.  Commerce cited to LDC's Section D QR at Exhibit D3 (*i.e.*, 110 pages of commercial documents consisting of the Partnership Agreement, Sale and Purchase of Citric Fruit Agreement, and Memorandum of Understanding between LDC and [     ]), without any further commentary or explanation, as self-evident documentary support. In effect, Commerce determined that neither party had the ability to control the other without ever analyzing, much less addressing, the nature and extent of LDC's control over [    ] under the terms of their agricultural partnership and [        ] agreements.  *See generally* I&D Memo at 12, P.R. 294.

Not only was this analysis contrary to the plain language and clear intent of the statute, *see* 19 U.S.C. § 1977(33)(G) (emphasis added) (defining affiliated parties as "*{a}ny* person who controls *any* other person and such other person"), but it was also inconsistent with Commerce's practice of finding that control can exist by virtue of either "the supplier or buyer becom{ing} reliant upon the other." I&D Memo at 12, n.71, P.R. 294. Yet Commerce provides no explanation for why it deviated from its practice. *See* I&D Memo at 12, P.R. 294. Accordingly, Commerce's affiliation determination was contrary to law because Commerce failed to analyze [          ] reliance on LDC—and, thus, LDC's control of [          ]—in evaluating their close supplier relationship under Section 771(33)(G) of the Act.

           i.   Commerce's Analysis of Affiliation Under 771(33)(G)
               Was Not Supported by Substantial Evidence

In support of its determination that the parties were not affiliated under 771(33)(G) of the Act, Commerce noted that "contractual terms between LDC and its supplier . . . indicate no obligation toward each other beyond those spelled out by the terms of the contract." I&D Memo at 12, P.R. 294. It is axiomatic that contractual obligations are contained within the four corners of the contract. This tautology cannot support Commerce's decision.

Commerce also alleges that "contractual terms between LDC and its supplier recognize the sovereignty of the parties." I&D Memo at 12, P.R. 294. Yet Commerce provides no support or explanation for this conclusion, much less a reasonably discernible decisional path. Therefore, Commerce failed to provide a "reviewable, reasoned basis" for its determination that LDC and [          ] were not affiliated through a close supplier relationship. *See Bando Chem. Indus., Ltd.*, 787 F. Supp. at 227 (1992).

Additionally, Commerce rejected the application of the major input rule to adjust LDC's lemon procurement cost because the "{r}ecord evidence supports finding that LDC had other sources for purchasing {this} major input other than this particular supplier." I&D Memo at 12, P.R. 294. On its face, this outcome is absurd – Commerce's I&D Memo concluded that the primary supplier of *lemons* to a *lemon juice* processor did not constitute a major input. This determination is further unsupported by the underlying quantitative data – lemons made up [      ] percent of LDC's COP and lemons grown on the [                              ], represented [      ] percent of LDC's total purchases of lemon during the POI. *See* Ventura Case Brief at Exhibit 1, C.R. 297-298, P.R. 270. The record evidence cited by Commerce to support this outcome, somewhat ironically, consists of two exhibits provided by LDC in which LDC reported [      ] as an "affiliated supplier" of lemons. *See* I&D Memo at 12 n.79, P.R. 294 (citing LDC Section D QR at Exhibit D7, C.R. 104-114, P.R. 116; LDC Suppl. Section D QR at Exhibit D-3, C.R. 159-177, P.R. 155-156).

More importantly, Commerce's finding regarding LDC's access to other sources of this major input is directly refuted by LDC's own statements regarding its production processes as set forth in its Suppl. Section D QR. Specifically, LDC explained that "LDC produces and purchases lemons through the [                              ]," LDC Suppl. Section DQR at Supp. D2, C.R. 159-177, P.R. 155-156; "{o}nly the [                    ] is associated with the [                    ]," LDC Suppl. Section D QR at Supp. D-1, C.R. 159-177, P.R. 155-156; "{t}he [                    ] is owned by [        ] and LDC has [                    ] . . . {and} LDC Sucos compensates [                    ]{,} which LDC then purchases . . . [                    ]," LDC Suppl. Section D QR at Supp. D-2, C.R. 159-177, P.R. 155-156; "during the POI, only the [

] produced lemons for lemon juice," LDC Suppl. Section D QR at Supp. D-1, C.R. 159-177, P.R. 155-156; and "{a}lthough some lemons were produced on the [                    ], they were not harvested or used for lemon juice." LDC Suppl. Section D QR at Supp. D-1, C.R. 159-177, P.R. 155-156.

Finally, Commerce determined that the parties were not affiliated under Section 771(33)(G) of the Act because "neither cost nor sales verifications found any evidence of affiliation or non-arm's-length transactions between those two parties." I&D Memo at 12, P.R. 294. This finding is contradicted by the record evidence. Indeed, at LDC's cost verification, Commerce analyzed LDC's purchases of lemons from [          ] to determine whether the purchases were made at arm's-length and concluded that the average transfer price of the lemons LDC purchased from [          ] were below those made to unaffiliated entities. *See* Cost Verification Report at 19, C.R. 295, P.R. 259. In fact, Commerce's calculation of the average affiliated and average unaffiliated contract prices resulted in the [                    ] "reported transfer price" and "market price" based on unaffiliated purchases, respectively, that Commerce found for in its Preliminary Determination. *Compare* Cost Verification Report at 19, C.R. 295, P.R. 259 *with* Preliminary COP & CV Memorandum at Attachment 3, C.R. 231, P.R. 222. Commerce also observed at verification that "LDC Sucos maintains separate ledgers for {} affiliated and unaffiliated lemon fruit purchases" in its books and records. Cost Verification Report at 20, C.R. 295, P.R. 259. In other words, LDC maintained completely different books and records for affiliated vs. nonaffiliated purchases, yet somehow cites this as evidence as to the non-importance of affiliated transactions. *Id*., C.R. 295, P.R. 259. Commerce's failure to address "significant arguments and evidence which seriously undermines its reasoning and conclusions," namely, the terms of the partnership agreement with [          ] that evidence LDC's control and indicate a close

supplier relationship with the potential to impact the production, pricing, or cost of subject merchandise or the foreign like product, warrants a remand in this matter.

The evidence of control that was not addressed by Commerce includes the existence of an

[

].  *See* LDC

Section D QR at Exhibit D3 (specifically, [

]), C.R. 104-

114, P.R. 116.  To be clear, Plaintiff is not arguing for a reweighing of the evidence but rather respectfully submits that it was error for Commerce to not address significant evidence which seriously undermines its reasoning and conclusions in the first place.  *Altx, Inc. v. United States*, 25 CIT 1100, 1117, 167 F. Supp. 2d 1353, 1374 (2001).

2.  <u>Commerce's Affiliation Analysis Under 771(33)(G) Was Contrary to Law
Because Commerce Failed to Consider the Temporal Aspect of the Parties'
Relationship</u>

Commerce's own regulations require that it "consider the temporal aspect of a relationship

in determining whether control exists" under Section 771(33)(G) of the Act. 19 C.F.R. §

351.102(b)(3); *see also China Steel Corp. v. United States*, 264 F. Supp. 2d 1339, 1354 (Ct. Int'l

Trade 2003).   As Commerce explained in promulgating regulations governing the agency's

temporal determination:

> {T}he Department normally will not consider firms to be affiliated
> where the evidence of "control" is limited, for example, to a two-
> month contract. On the other hand, the Department cannot rule out
> the possibility that a short-term relationship could result in control.
> Therefore, the Department will consider the temporal aspect of a
> relationship as one factor to consider in determining whether control
> exists. In this regard, we also should note that we do not intend to
> ignore a control relationship that happens to terminate at the
> beginning (or comes into existence at the end) of a period of
> investigation or review.

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,298 (Dep't

Commerce May 19, 1997) (final rule) ("Final Rule").

In *Hontex Enters., Inc. v. United States*, 248 F. Supp. 2d 1323, 1344 (Ct. Int'l Trade 2003),

the Court refused to sustain Commerce's determination where the agency failed to address the

temporal aspect of the parties' relationship or explain why that factor was not necessary to its

determination. The Court explained that "Commerce is required to weigh the nature of entities'

contacts over time, and must determine how such contacts potentially impact each entity's business

decisions.  Sporadic or isolated contacts between entities, absent significant impact, would be less

likely to lead to a finding of control." *China Steel Corp. v. United States*, 306 F. Supp. 2d 1291,

1296 (Ct. Int'l Trade 2004) (quoting *Hontex Enters., Inc. v. United States*, 248 F.Supp.2d at 1344,

n.17).  Similarly, in *China Steel Corp. v. United States*, 264 F. Supp. 2d 1339, 1354 (Ct. Int'l Trade

2003), the Court held that Commerce's affiliation determination was not in accordance with law because the agency failed to consider the temporal aspect of the parties' relationship.  Conversely, the Court has affirmed, as supported by substantial evidence, Commerce's finding that a 7-month relationship that endured through the period of investigation was sufficiently lengthy to support an inference of control.  *See China Steel Corp. v. United States*, 306 F. Supp. 2d 1291, 1297 (Ct. Int'l Trade 2004) ("The record clearly reveals that {the parties'} relationship was neither short nor temporary.").

In this case, the record indicates that LDC and [          ] entered into an [

] and a [

] on [                          ], which the parties [

].  *See* LDC Section D QR at Exhibit D3, C.R. 104-114,

P.R. 116.   Under the parties' [

].  *See* LDC Section D QR at Exhibit D3, C.R. 104-114, P.R. 116.  Moreover, "{b}ecause of the [                     ] of the [          ] purchase contract," LDC "included [          ] on the Major Inputs Purchases from Affiliated Parties Chart in Exhibit D7 and Exhibit Supp. D15 pursuant to question 7 of {} Section D {of the Initial DOC Questionnaire}."  LDC Case Brief at 4, C.R. 299-300, P.R. 271 (referencing LDC Section D QR at Exhibit D7, C.R. 104-114, P.R. 116; LDC Suppl. Section D at Exhibit Supp. D15, C.R. 159-177, P.R. 155-156).  Thus, the temporal aspect of the parties' relationship supports a finding of affiliation under Section 771(33)(G) of the Act.

However, nothing in the I&D Memo indicates that Commerce ever considered the temporal aspect of the parties' relationship, as it was required to do under 19 C.F.R. § 351.102(b)(3). Accordingly, Commerce's assessment of affiliation through a close supplier relationship under 19 U.S.C. § 1977(33)(G) was not in accordance with law.

In sum, Commerce's determination regarding affiliation under Section 771(33)(G) of the Act was both legally defective and unsupported by substantial evidence.

> a.   *Commerce's Determination that LDC and [        ] Were Not Affiliated Under Section 771(33)(C) of the Act Was Contrary to Law and Not Supported by Substantial Evidence*

Section 771(33) of the Act defines the types of relationships between "persons" which render the parties "'affiliated' or 'affiliated persons'"– in particular, Section 771(33)(C) requires that Commerce treat "Partners" as *de jure* affiliated parties.  As explained in the I&D Memo, Commerce based its determination that LDC and [        ] were not affiliated as partners within the meaning of Section 771(33)(C) of the Act on two specific findings—namely, a lack of "joint selling activities" and "joint ownership" pursuant to their contract:

> We also find that LDC and its supplier are not affiliated as partners within the meaning of section 771(33)(C) of the Act. Record evidence supports that this is a contractual relationship. LDC and its supplier do not jointly own anything pursuant to the terms of their contract and do not engage in joint selling activities.  Therefore, we conclude that LDC and its supplier are not affiliated as partners within the meaning of section 771(33)(C) of the Act.

I&D Memo at 13, P.R. 294.

Thus, notwithstanding LDC's and [        ] well-documented [            ] partnership, Commerce refused to treat the parties as affiliated under 19 U.S.C. § 1677(33)(C) because they "do not jointly own anything pursuant to the terms of their contract" or "engage in joint selling

activities." I&D Memo at 13, P.R. 294.   As detailed below, Commerce erred as a matter of law in determining that LDC and [        ] were not partners within the meaning of Section 771(33)(C) of the Act.  Additionally, Commerce's determination was not supported by substantial evidence.

The Court has held that "{t}he plain and unambiguous language of 19 U.S.C. § 1677(33) instructs that, to successfully prove affiliation under subsections (A)-(E), a party need only show the existence of one of the standards specified therein." *Ta Chen Stainless Steel Pipe Co. v. United States*, 31 Ct. Int'l Trade 794, 821 (2007).  Because "Congress has 'directly spoken' to the precise question at issue, 'that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Ta Chen Stainless Steel Pipe Co. v. United States*, 31 Ct. Int'l Trade at 823 (citations omitted).  Accordingly, subsections (A)-(D) of Section 771(33) of the Act "plainly do not premise affiliation upon 'control.'" *Ta Chen Stainless Steel Pipe Co. v. United States*, 31 Ct. Int'l Trade at 820.  Consequently, "if any one of the factors in section 771(33){(A)-(D)} is present, {Commerce} is required to find that persons are affiliated." *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,311 (Feb. 27, 1996); *see also* T*a Chen Stainless Steel Pipe Co. v. United States*, 31 Ct. Int'l Trade 794 at 820 ("{T}his court discerns no ambiguity in 19 U.S.C. § 1677(33)(A)-(E).").

The Court has repeatedly affirmed that Commerce's actions are unlawful when they go beyond the plain meaning of the relationships set forth in Section 771(33) to find no affiliation between two persons.  For example, in *Crawfish Processors Alliance v. United States*, the Court held that it was legal error for Commerce to impose requirements beyond the statute's plain language in determining whether affiliation existed within the meaning of Section 771(33)(E). *See* 477 F.3d 1375, 1380-81 (Fed. Cir. 2007). Additionally, in *Mitsubishi Heavy Indus., Ltd. v. United States*, 15 F.Supp.2d 807, 832 (Ct. Int'l Trade 1998), this Court held that Commerce's

affiliation analysis was erroneous because it imposed an evidentiary burden greater than the requirements of the statute.

Given that "Congress has 'directly spoken' to the precise question at issue," Commerce was required to "give effect to the unambiguously expressed intent of Congress." *Ta Chen Stainless Steel Pipe Co. v. United States*, 31 Ct. Int'l Trade 794 at 823. Accordingly, Commerce was required to evaluate whether LDC and [        ] were partners within the ordinary meaning of the term to determine whether they constituted affiliated parties under 19 U.S.C. 1677(33)(C). Merriam-Webster Dictionary, for example, defines "partner" as *inter alia* "one associated with another especially in action" and "a member of a partnership especially in business." *See* "partner." Merriam-Webster.com. 2023. https://www.merriam-webster.com (July 25, 2023). *See also*, Britannica Dictionary defining partner as "one of two or more people, businesses, etc., that work together or do business together." https://www.britannica.com/dictionary/partner (August 3, 2023).

Put simply and as reiterated throughout, the underlying agreement between the LDC and [        ] is literally a [                            ], *see* LDC Section D QR at D-5, Exhibit D3, C.R. 104-114, P.R. 116, and Section 771(33)(g) of the Act defines "affiliated persons" as including "Partners." 19 U.S.C. § 1677(33)(C). Therefore, based on the ordinary meaning of the word "partner," Commerce should have found that LDC and [        ] were affiliated under Section 771(33)(C) of the Act.[6] Instead, Commerce erred by imposing requirements beyond the statute's

---

[6] Indeed, LDC referred to the relationship as a partnership on numerous occasions (*e.g.*, [

                                                                                                                                    ],

Suppl. Section A QR at Supp. A-14 (emphasis added), C.R. 94, P.R. 114; [

plain language when it treated "joint ownership pursuant to a contract" and "joint selling activities" as required features of a relationship between partners for purposes of establishing affiliation under 19 U.S.C. § 1677(33)(C), in derogation of the Court's holding that the word "partner" in Section 771(33)(C) of the Act is unambiguous.

To understand why Commerce's imposition of these requirements would constitute legal error even if the Court had not already found the statute to be unambiguous, the "familiar principle of statutory construction . . . that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute" is instructive. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (S. Ct. 2006), superseded by statute on other grounds, Military Commissions Act of 2006, Pub. L. No. 109-366, § 7 (b), 120 Stat. 2600, 2636 (2006); *see also Russello v. United States*, 464 U.S. 16, 23 (S. Ct. 1983) ("{W}here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quotation omitted). Specifically, subsections (F) and (G), respectively, of 19 U.S.C. § 1677(33) define affiliated persons as: "(F) {t}wo or more persons directly or indirectly controlling, controlled by, or under common control with, any person," and "(G) Any person who controls any other person and such other person." These two subsections contemplate the type of relationships in which the joint behavior that Commerce impermissibly read into Section 771(33)(C) would most likely be exhibited. Indeed, it would be difficult to conceive of "joint ownership pursuant to a contract," for instance, that wouldn't give rise to an analysis of affiliation

_____

], LDC Suppl. Section D QR at Supp. D-2, C.R. 159-177, P.R. 155-156 (emphases added); [                                ], LDC Suppl. Section D QR at Supp. D-1 (emphasis added), C.R. 159-177, P.R. 155-156.

under subsection (F) or (G).   Thus, Commerce's additional requirements would force parties to demonstrate a control relationship in order to establish affiliation under 771(33)(C), which this Court has expressly rejected.  *See Ta Chen Stainless Steel Pipe Co.*, 31 Ct. Int'l Trade at 820.   As emphasized throughout, LDC repeatedly describes its relationship with [

              ] partnership, and this is exactly what the underlying commercial documents show. *See e.g.*, Suppl. Section A QR at Supp. A-5, C.R. 94, P.R. 114.

For the forgoing reasons, Commerce erred in imposing requirements in excess of the clear language provided in Section 771(33)(C) of the Act.  Accordingly, Commerce's determination that LDC and [        ] were not affiliated as "partners" under 19 U.S.C. § 1677(33)(C) was contrary to law and unsupported by substantial evidence.

> i.  Commerce's Use of LDC's FY2020 Financial Statements for Some Purposes But Not Others Was Arbitrary and Capricious

Commerce relied on LDC's FY2020 financial statements for purposes of calculating LDC's "Period Cost{s}" despite its established preference is to "calculate general expenses . . . based on a full year's information that most closely corresponds to the POI."  *See* I&D Memo at 14, P.R. 294.   In the present case, it is undisputed that the POI – October 1, 2020, through September 30, 2021 – overlaps to a greater extent with LDC's financial statements for FY2021 than FY2020.  However, the Court has repeatedly affirmed the appropriateness of using financial statements which do not most closely correspond to the POI, when doing so would result in the use of the most accurate and reliable information on the record.  *See e.g.*, *Union Steel v. U.S.*, 755 F. Supp. 2d 1304, 1311 (Ct. of Int'l Trade 2011).   Indeed, as the Court found in *Union Steel v. U.S.*, "{w}hat Commerce describes as its practice is at most a preference for using the financial

statement most closely corresponding to the POR, a preference that Commerce does not observe when it finds sufficient reason to use a different financial statement or statements." *Id*.

As explained in Commerce's I&D Memo, in this case, "the record facts of this case warrant{ted} a deviation from Commerce's normal practice . . . {and we} have relied on {LDC's} FY 2020 financial statement." I&D Memo at 15, P.R. 294. In particular, "the FY 2021 audited financial statement was not placed on the record of this proceeding until verification . . . Consequently, interested parties did not have sufficient time to examine the information. More importantly, the record does not contain sufficient detail to allow Commerce to identify or discern {certain} expenses . . . for Commerce to use the FY 2021 financial statement . . . we would need to examine the FY 2021 accounting details, which are not on the record . . . we find it appropriate to continue to use the 2020 financial statement because it provides the most complete set of data."[7]

---

[7] LDC's behavior throughout the proceeding raised further questions regarding the reliability of its FY2021 financial statements. As noted by Commerce, LDC did not place its FY2021 financial statement on the record until the last day of its sales verification. *See* Letter from Sec'y Commerce to White & Case LLP, re: *Certain Lemon Juice from Brazil* (Aug. 12, 2022) at 2, C.R. 245, P.R. 229; Letter from White & Case LLP, to Sec'y Commerce, re: *Certain Lemon Juice from Brazil: Sales Verification Exhibits* (Sept. 2, 2022) at Exhibit IV.B, C.R. 249-259, P.R. 237 ("LDC Sales Verification Exhibits"); LDC Case Brief at 10, C.R. 299-300, P.R. 271. LDC's belated submission is particularly troubling because: (1) the accompanying auditor's note to LDC's FY2021 financial statement was dated for [          ]; (2) LDC stated that it would "provide {its} final 2021 audited financial statements once they are available, approximately by the end of April 2022{}" in its Supp. Section A QR; (3) LDC was submitting new factual information in response to Commerce's supplemental questionnaires as late as July 18, 2022. *See* LDC Sales Verification Exhibits at Exhibit IV-B, pg. 3, C.R. 249-259, P.R. 237; Suppl. Section A QR at Supp. A-14, C.R. 94, P.R. 114; Letter from White & Case LLP, to Sec'y Commerce, re: *Certain Lemon Juice from Brazil: Response to the Third Supplemental Section D of the Antidumping Duty Questionnaire* (July 18, 2022), C.R. 205, 207-215, P.R. 214. It is not clear why LDC, who seemingly had access to its financial statements far earlier in the proceeding (*i.e.*, [          ]), waited until the last day of its sales verification to submit these documents. LDC's Case Brief claimed that its financial statements were [          ] (*i.e.*, the last day of its sales verification) and made reference to [          ] approving the financial statements, ostensibly provided at Exhibit CVE-7 of its Sales Verification Exhibits, as support for its claim. *See* LDC Case Brief at 12 (citation omitted), C.R. 299-300, P.R. 271.

*Id*. at 15, P.R. 294.  To reiterate, Commerce elected to use LDC's FY2020 financial statements rather than LDC's FY2021 financial statements for both its G&A expense rate and the financial expense rate calculations due to serious issues relating to the latter's reliability and completeness: (1) LDC's FY2021 financial statements were not put on the record until verification; (2) consequently, the interested parties did not have adequate time to comment on LDC's FY2021 financial statements; (3) LDC's FY2021 financial statements require additional accompanying accounting information, which are not on the record, to serve as a complete source of data.

Commerce thus concluded that it would rely on LDC's FY2020 financial statements for its "Period Cost Calculations."  *See* I&D Memo at 14-16, P.R. 294.  And as established by Commerce's Cost Verification Report the [                                           ] is "determined at year end after the company's auditors have confirmed the fiscal year sales revenues."  Cost Verification Report at 8, C.R. 295, P.R. 259.[8]  Yet, Commerce used the "<u>POI</u> fruit material price difference" for purposes of valuing the [                                     ].  I&D Memo at 17, P.R. 294; Final COP and CV Cost Memorandum at 2, Attachment 1 and 2, C.R. 336, P.R. 300. Consequently, Commerce stated that it would rely on LDC's FY2020 financial statements for "Period Cost Calculations," but then elected to calculate the [                                     ] based on POI data, which required the use of LDC's FY2021 financial data.

---

Petitioner was unable to identify any Board meeting notes at Exhibit CVE-7.  *See* Cost Verification Exhibits at Exhibit CVE-7, C.R. 263-276, P.R. 242.

[8] In effect, LDC's purchases of lemon are valued at the time of delivery based on projected lemon juice pricing at the time of sale.  However, if lemon juice pricing over the course of the year is higher or lower than LDC's projection at the time of delivery, the price actually paid to the supplier at the year-end settlement will differ from the cost recorded in the regular course of business.  The reconciling item used to reconcile this difference between recorded cost and actual cost is recorded in the [                                     ] account.

Commerce's Final I&D Memo thus evaluated the same facts to reach two different conclusions regarding the reasonableness of relying on LDC's FY2020 financial statements for information to calculate LDC's COP.  The issues relating to the reliability and completeness of LDC's FY2021 financial statements applied equally in both instances, as did the reasons for preferring LDC's FY2020 financial statements.  Commerce did not provide any further analysis or explanation for its divergent actions.  Commerce's selective reliance on LDC's FY2020 in one instance, but 2021 financial data to value the [                                        ] – in the absence of adequate explanation as to why such selective reliance was appropriate – was therefore arbitrary and capricious.

<ol type="i" start="2">
<li>Commerce's Exclusion of Certain Administrative Expenses from LDC's G&A Expense Rate Calculation Was Not Supported by Substantial Evidence and Is Contrary to Law</li>
</ol>

Commerce relied on factually incorrect statements and conclusions to support its exclusion of potential costs from its G&A rate calculation associated with administrative services provided to LDC by LDC-affiliated entities and/or parents of LDC-affiliated entities. Commerce's Initial DOC Questionnaire requested that LDC provide "consolidated . . . financial statements" and "financial statements or other relevant documents (*i.e.*, profit and loss reports) of all affiliates involved in the production or sale of the subject merchandise . . . and of the parent(s) of these affiliates)." Initial DOC Questionnaire at A-10, P.R. 59.   LDC failed to provide the requested financial statements for the following LDC-affiliated entities and/or parents of LDC-affiliated entities:

(1) LDC reported [                    ] among the "list of the facilities and offices involved in the development, production, sale and/or distribution of the merchandise under consideration" – LDC did not provide a financial statement for [                ];

(2) LDC reported that [              ] provided administrative services to LDC – LDC did not provide a financial statement for [              ];

(3) LDC reported that [            ] was [

                                              ] – LDC therefore did not provide its [

                    ];

(4) LDC did not provide information regarding [                ] parent company nor, by extension, the required financial statements or other relevant documents for the parents of affiliates involved in the production or sale of the subject merchandise.

*See* Section A QR at A-27, C.R. 65-69, P.R. 77; Suppl. Section D QR. at Supp. D-23-D-24, C.R. 159-177, P.R. 155-156; Cost Verification Report at 9-10, C.R. 295, P.R. 259.

Yet, Commerce's I&D Memo concluded that, "LDC has provided responses to all our requests for information . . . LDC has not failed to provide information requested by Commerce." I&D Memo at 20-21, P.R. 294.  As outlined above, this statement is demonstrably false.  A conclusion which is premised on a factually false statement cannot be said to be supported by substantial evidence – therefore, a remand for further explanation or revision is warranted.

To be clear, Plaintiff is not asking the Court to reweigh the evidence on the record.  Further, Plaintiff is not claiming that Commerce wrongly concluded that they were satisfied with the incomplete information provided, or that they found certain evidence put on the record by LDC to be of greater probative value than other available countervailing evidence.  Rather, Commerce

concluded that there was "no necessary information missing from the record" and this statement is factually incorrect – in effect, Commerce requested certain financial information about affiliated companies, including parent companies, and which was not provided.  Accordingly, Commerce's conclusion that it had all the "necessary information" to determine that LDC had no unreported expenses relating to administrative services received by LDC from LDC-affiliated entities and/or parents of LDC-affiliated entities, was unsupported by substantial evidence.

Moreover, Commerce's established "practice is to include an amount for administrative services performed by the parent company or other affiliated party . . . in the numerator of a respondent's G&A expense ratio." *See e.g.*, *Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,950 (Dep't Commerce July 29, 2019) (final affirm. deter. of sales at less than fair value, final affirm. deter. of crit. circum.), and accompanying Issues and Decision Memorandum at 51.  In addition, Commerce has previously found that respondents incur administrative expenses when a parent and/or affiliated company "does not provide services to the respondents directly, {but} exists solely for the benefit of its subsidiaries by holding shares and overseeing investments in companies it owns {*e.g.*, a holding company} . . . its administrative costs should be borne by the companies of the group." *See LDWP from Canada* I&D Memo at 28.

As noted above in Section III.C., LDC submitted a revised organization chart illustrating its corporate structure at verification.  *See* Cost Verification Exhibits at Exhibit CVE-1, C.R. 263-276, P.R. 242; *supra* at Section III.C. at 18.  This chart revealed, for the first time during the proceeding, that LDC's parent company was not [          ] – instead, [                    ] was subject to [                              ] involving at least [                    ], with ultimate ownership [                                        ].

*See* Cost Verification Exhibits at Exhibit CVE-1, C.R. 263-276, P.R. 242; *supra* at Section III.C. at 18.

Applying the logic of Commerce's prior precedent, LDC would have therefore incurred *some* administrative expenses relating to at least these [                                    ], because such costs would have been borne by all members of the LDC Group, and by extension, such expenses should have been included in LDC's G&A expense calculation.  Yet Commerce's I&D Memo concluded that "**{t}here is no record evidence** that the ultimate parent company or any other LDC holding companies provided any services to LDC."  *See* I&D Memo at 2 (emphasis added), P.R. 294.  This conclusion is factually false and therefore unreasonable based on the record – because, as explained above, there had to have been *some* administrative costs associated with these holding companies that were spread across members of the LDC Group.  Accordingly, Commerce's decision to exclude the above-described potential costs from its G&A rate calculation, associated with administrative services provided to LDC by LDC-affiliated entities and/or parents of LDC-affiliated entities, was not supported by substantial evidence.

## V.   CORRECTION OF ALL ERRORS

Should the Court decide to remand the proceeding for the reasons described above, it is respectfully requested that its Order contain clear instructions to correct for all errors in the margin calculation.  Ventura and LDC submitted ministerial error and rebuttal ministerial error comments outlining calculation errors in Commerce's margin calculation.  *See* Letter from White & Case, to Sec'y Commerce, re: *Certain Lemon Juice from Brazil: Ministerial Error Comments* (Dec. 27, 2022), C.R. 337, P.R. 302; Letter from Buchanan Ingersoll & Rooney PC, to Sec'y Commerce, re: *Certain Lemon Juice from Brazil: Rebuttal Ministerial Error Allegation as to Louis Dreyfus Company Sucos S.A.* (Jan. 17, 2023), C.R. 339, P.R. 311.  Commerce subsequently issued a

Ministerial Error Memo which corrected for certain errors in its final margin calculation. *See* Commerce Memorandum, re: *Final Determination of Antidumping Duty Investigation of Certain Lemon Juice from Brazil: Allegation of Ministerial Error* (Jan. 23, 2023), P.R. 312 ("Ministerial Error Memo").

Plaintiff notes that Commerce seemingly failed to correct for all ministerial errors. Specifically, in calculating LDC's final margin, Commerce's programming instructions [

]. *See* Final COP and CV Memorandum at 3-4, Attachment 4, C.R. 336, P.R. 300. This appears to be a ministerial error, stemming from inadvertent duplication as defined by 19 C.F.R. § 351.224(f) and results in an implied profit rate of [    ] percent for Commerce's analysis of dumping by LDC Sucos. Plaintiff is not alleging that Commerce's failure to correct this error in the first instance justifies a remand, due to issues connected with when this error was discovered. However, to the extent that the Court remands the determination to address the issues described above, Commerce should also address all known calculation errors as well.

*    *    *    *

## VI.   CONCLUSION

For the foregoing reasons, we respectfully request that the Court remand the Final Determination in the underlying investigation to Commerce consistent with the arguments made in this brief.

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached PLAINTIFF'S MEMORANDUM IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD contains 13,370 words, according to the word-count function of the word processing system used to prepare this brief.


Dated: August 3, 2023                              */s/Daniel B. Pickard*
                                                                Daniel B. Pickard