23-00009
_____

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
_____

VENTURA COASTAL, LLC,
                                    Plaintiff,


v.


UNITED STATES,
                                    Defendant


                and


LOUIS DREYFUS COMPANY SUCOS S.A,
                                    Defendant-Intervenor.
_____

Defendant's Response To Plaintiff's
Rule 56.2 Motion For Judgment On The Agency Record
_____

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

ANNE M. DELMARE
Trial Attorney
Commercial Litigation Branch,
Civil Division
P.O. Box 480, Ben Franklin Station
Washington, DC  20044
Telephone: (202) 305-0531
E-mail: Anne.M.Delmare@usdoj.gov

November 1, 2023            *Attorneys for Defendant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

STATEMENT OF THE ISSUES ......................................................................... 2

STATEMENT OF FACTS ................................................................................. 2

SUMMARY OF THE ARGUMENT ................................................................. 7

ARGUMENT ..................................................................................................... 8

    I.   Standard Of Review .......................................................................... 8

    II.   Commerce's Determination That LDC Is Not Affiliated With Its Supplier Is
Supported By Substantial Evidence And In Accordance With Law ......................... 10

        A.   Commerce's Determination Of no Affiliation Under 10 U.S.C. §
1677(33)(G) Is Supported By Substantial Evidence And In
Accordance With Law ...................................................................... 10

            1. Ventura Has Not Exhausted Its Challenge To Commerce's
Decision Based On Whether The Supplier Is Reliant Upon LDC ....... 10

            2. Commerce's Affiliation Determination Is Supported By
Substantial Evidence And Is In Accordance With Law Because
Commerce Considered The Supplier's  Relationship With LDC
When Reaching Its Conclusion ............................................................ 13

            3. Ventura Failed To Exhaust Administrative Remedies With
Respect   To Arguments Based Upon A Temporal Aspect Of
The LDC-Supplier Relationship ......................................................... 18

        B.   Commerce's Determination of No Affiliation Under 19 U.S.C.
§ 677(33)(C) Is Supported By Substantial Evidence and in Accordance
With Law ........................................................................................... 25

    III.   Commerce's Cost Of Production Calculations Are Not Arbitrary And Capricious .... 27

    IV.   Commerce's Calculation Of LDC's G&A Expense Rate Is Supported By
Substantial Evidence And In Accordance With Law ................................................. 28

    V.   Ventura Failed To Exhaust Its Administrative Remedies Regarding Its Alleged
Ministerial Error ................................................................................... 30

CONCLUSION ................................................................................................................................. 31

# TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE(S)**

*Allegheny Ludlum Corp. v. United States,*
    112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) ....................................................... 17, 18, 19, 21

*Am. Silicon Techs. v. United States,*
    261 F.3d 1371 (Fed. Cir. 2001) ...................................................................................... 9

*Boomerang Tube LLC v. United States,*
    856 F.3d 908 (Fed. Cir. 2017) .................................................................................... 11, 18

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ......................................................................................................... 9

*China Steel Corp. v. United States,*
    306 F. Supp. 2d 1291 (Ct. Int'l Trade 2004) ............................................................... 20

*Coal. of Am. Millwork Producers v. United States,*
    581 F. Supp. 3d 1295 (Ct. Int'l Trade 2022) ............................................................... 25

*Corus Staal BV v. United States,*
    502 F.3d 1370, 1379 (Fed. Cir. 2007) ..................................................................... 12, 13

*Crawfish Processors Alliance v. United States,*
    483 F.3d 1358 (Fed. Cir. 2007) ...................................................................................... 8

*Dorbest Ltd. v. United States,*
    604 F.3d 1363 (Ct. Int'l Trade 2010) ........................................................................... 30

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) ........................................................................................ 8

*Gerber Food (Yunnan) Co. v. United States,*
    601 F. Supp. 2d 1370 (Ct. Int'l Trade 1996) ............................................................... 12

*Goldlink Indus. Co. v. United States,*
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ................................................................. 9

*Hontex Enters., Inc. v. United States,*
    248 F.Supp. 2d 1323 (Ct. Int'l Trade 2003) ............................................................ 19, 20

*Hontex Enters., Inc.. v. United States,*
    387 F. Supp. 2d 1353 ..................................................................................................... 20

*Hontex Enters., Inc. v. United States,*
    425 F. Supp. 2d 1315 ..................................................................................................... 20

*INS v. Elias-Zacarias,*
    502 U.S. 478 (1992) ...................................................................................................... 8-9

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Ins. Co.*,
463 U.S. 29 (1983) ........................................................................................ 22

*Nakajima All Co., Ltd. v. United States*,
744 F. Supp. 1168 (Ct. Int'l Trade 1990)(Nakajima) ........................................... 22

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) ............................................................................ 9

*Pakfood Pub. Co. v. United States*,
724 F. Supp. 2d 1327 (Ct. Int'l Trade 2010) .................................................. 11-12

*Prime Time Commerce LLC v. United States*,
495 F. Supp. 3d 1308 (Ct. Int'l Trade 2021) ...................................................... 11

*Samsung Elecs. Co. v. United States*,
70 F. Supp. 3d 1350 (Ct. Int'l Trade 2015) ........................................................ 14

*Ta Chen Stainless Steel Pipe v. United States*,
1999 Ct. Intl. Trade LEXIS 110 (Ct. Int'l Trade 1999) ................................... 15, 16

*Ta Chen Stainless Steel Pipe, Ltd. v. United States*,
342 F. Supp. 2d 1191 (Ct. Int'l Trade 2004) ...................................................... 12

*Ta Chen Stainless Steel Pipe Co. v. United States*,
2007 WL 1573920 at *18 (Ct. Int'l Trade 2007) ................................................. 26

*Ticaret A.S. v. United States*,
931 F. Supp. 2d 1258 (Ct. Int'l Trade 2013) ...................................................... 24

*Timex V.I., Inc. v. United States*,
157 F.3d 879 (Fed. Cir. 1998) .............................................................................. 9

*Unemployment Compensation Comm'n v. Argon*,
329 U.S. 143 (1946) ........................................................................................... 11

*United States v. Chemical Foundation, Inc.*,
272 U.S. 1 (1926) .............................................................................................. 22

*United States v. Eurodif S.A.*,
555 U.S. 305 (2009) ............................................................................................. 8

*Zhongce Rubber Grp. Co. v. United States, Slip. Op. 2018-160*,
2018 Ct. Int'l Trade LEXIS 169 (Nov. 20, 2018) ................................................ 12

## STATUTES

19 U.S.C. § 1673 ................................................................................................... 2

19 U.S.C. § 1677 ............................................................................................ *passim*

iv

**REGULATIONS**

19 C.F.R. § 351 ................................................................................................ *passim*

87 Fed. Reg. 3,768 ..................................................................................................... 3

87 Fed. Reg. 47,697 ................................................................................................... 5

87 Fed. Reg. 78,939 ............................................................................................... 2, 6

87 Fed. Reg. at 78,940 ............................................................................................... 6

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | | |
|---|---|---|
| VENTURA COASTAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 23-00009 |
| | ) | PUBLIC VERSION |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LOUIS DREYFUS COMPANY SUCOS S.A., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of this Court's Rules, defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by plaintiff, Ventura Coastal, LLC (Ventura). Ventura challenges the United States Department of Commerce (Commerce) final affirmative determination issued in the less-than-fair-value investigation on certain lemon juice imported from Brazil. Because Commerce's final results are supported by substantial evidence and in accordance with law, the Court should deny Ventura's motion and enter judgment in favor of the United States.

**STATEMENT PURSUANT TO RULE 56.2**

**I.     Administrative Determination Under Review**

Ventura challenges the final affirmative determination issued in the less-than-fair-value (LTFV) investigation on certain lemon juice from Brazil. *See Certain Lemon Juice From Brazil:*

*Final Affirmative Determination of Sales at Less Than Fair Value*, 87 Fed. Reg. 78,939 (Dep't of Commerce Dec. 23, 2022) (Final Determination) (P.R. 301) and accompanying Issues and Decision Memorandum (IDM) (P.R. 294).  The period of investigation is October 1, 2020, through September 30, 2021.

## II.   <u>Issue Presented For Review</u>

1.   Whether Commerce's determination that Louis Dreyfus Company Sucos, S.A. (LDC) is not affiliated with its supplier[1] is supported by substantial evidence and in accordance with law.

2.   Whether Commerce's use of certain information in its cost of production calculations is supported by substantial evidence and in accordance with law.

3.   Whether Commerce's calculation of LDC's general and administrative (G&A) expense rate is supported by substantial evidence and in accordance with law.

4.   Whether Ventura failed to exhaust its administrative remedies regarding its alleged ministerial error, and, if not, whether the alleged error should be deemed moot.

## <u>STATEMENT OF FACTS</u>

On December 29, 2021, Ventura filed a petition with Commerce on behalf of the domestic industry, alleging that lemon juice from Brazil was being sold for LTFV within the meaning of 19 U.S.C. § 1673.  *See* Petition for the Imposition of Antidumping Duties, Lemon Juice from Brazil and South Africa (Dec. 29, 2021) (C.R. 1-23, P.R. 1-13)[2].  On January 19, 2022, Commerce published its notice of initiation of the LTFV investigation into imports of lemon juice from Brazil.  *See Lemon Juice from Brazil and South Africa:  Initiation of Less-*

---

[1] Unless indicated otherwise,                                    is referenced as LDC's supplier throughout this brief.

[2] "P.R. __ " refers to public record documents in the administrative record and "C.R. __ " refers to confidential record documents in the administrative record.

*Than-Fair-Value Investigations*, 87 Fed. Reg. 3,768 (Dep't of Commerce Jan. 19, 2022) (P.R.

56).  Pursuant to 19 CFR 351.204(b)(1), Commerce established the period of investigation (POI)

for the LTFV investigation as October 1, 2020, through September 30, 2021.  *Id.*  On February 8,

2022, Commerce selected LDC and Citrus Juice Eireli (Citrus Juice) as mandatory respondents

(parties).  *See* Respondent Selection Memorandum (Feb. 8, 2022) (C.R. 63, P.R. 58).

In a February 14, 2022 memorandum, Commerce solicited information from the parties

along with issuing a questionnaire that was divided into five sections, A through E.  *Id.*  In

Section A of the questionnaire, Commerce requested that the parties "{i}dentify all suppliers,

(sub)contractors, lenders, exporters, distributors, resellers, and other persons involved in the

development, production, sale and/or distribution of the merchandise under investigation which

Commerce may also consider affiliated with your company. . . ."  Initial Questionnaire (Feb. 14,

2022) at A-6 (P.R. 59).  Commerce also asked the parties to "provide the following financial

documents. . . (4) financial statements or other relevant documents (*i.e.*, profit and loss reports)

of all affiliates involved in the production or sale of the subject merchandise in the foreign

market and the U.S. market, of all affiliated suppliers to these affiliates, and of the parent(s) of

these affiliates. . . ."  *Id.* at A-10 (P.R. 59).  Commerce received LDC's and Citrus Juice's initial

responses to the questionnaires between March 14 and April 12, 2022.  (P.R. 76-116).

LDC farms, produces, and purchases lemons through an

in Brazil.  *See* LDC Section D Questionnaire

Response (Apr. 11, 2022) at D-4-D-5 and Ex. D03 (LDC DQR) (C.R. 104, 106-107).

*Id.*  In its Section A questionnaire response, LDC reported its

supplier of lemons as a third party, not as an affiliate, *see* LDC Supplemental Section A Questionnaire Response (Apr. 8, 2022) at Supp. A-5 (C.R. 94), and LDC did not identify in its affiliation charts and lists.  *See* LDC Section A Questionnaire Response (Mar. 14, 2022) at A-8-A-10 and Ex. A2  (LDC AQR) (C.R. 65, 66).  Along with its responses to the Questionnaires, LDC provided the contractual agreement with its supplier          .  *See* LDC Section D Questionnaire Response (Apr. 11, 2022) at D-4-D-5 and Ex. D03 (LDC DQR) (C.R. 104, 106-107).

Then, in response to its Section D questionnaire, LDC reported its purchases from as purchases from an affiliated supplier.  *See* LDC Section D Questionnaire Response (April 11, 2022) at Ex. D7 (C.R.108); *see also* LDC Supplemental Section D Questionnaire Response (June 3, 2022) at Ex. Supp-D15 (LDC Supp. DQR) (C.R. 163).  LDC later explained "{b}ecause of the                       of the          purchase contract, and out of an abundance of caution, LDC { } included          on the Major Inputs Purchases from Affiliated Parties Chart in Exhibit D7 and Exhibit Supp. D15 pursuant to question 7 of the Section D Questionnaire," but reiterated that it was not affiliated with          .  *See* Ventura Rebuttal Admin. Br. (Nov. 10, 2022) at 4 (C.R. 303).

Additionally, LDC provided the financial statements for      other affiliated entities involved in the production or sale of the subject merchandise in the foreign market and the U.S. market, including                                        .  *See* LDC Section A Questionnaire Response at A-27 (C.R. 65).  In its March 14, 2022 response, LDC reported that its 2021 annual financial statements had not been finalized or audited at the time of submission, and that it would provide the statements when available.  *Id.*

On August 4, 2022, Commerce published its preliminary determination.  *See Certain Lemon Juice From Brazil:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 47,697 (Dep't of Commerce Aug. 4, 2022) (P.R. 228) and accompanying Issues and Decision Memorandum (PDM) (P.R. 219).  In the preliminary determination, Commerce did not specifically address whether LDC is affiliated with its supplier.  *See generally* PDM.  However, it did apply the major input rule under 19 U.S.C. § 1677b(f)(3), in accordance with how LDC reported its purchases from the supplier in its Section D questionnaire responses.  *See* LDC Section D Questionnaire Response (April 11, 2022) at Ex. D7 (C.R.108); *see also* LDC Supplemental Section D Questionnaire Response (June 3, 2022) at Ex. Supp-D15 (LDC Supp. DQR) (C.R. 163).

Commerce calculated cost of production (COP) based on the sum of the costs of materials and fabrication for the foreign like product, plus amounts for G&A expenses and financial expenses, as reported by LDC, except for certain limited adjustments.  *See* PDM at 14-15.  In the preliminary margin calculations, Commerce used a constructed export price (CEP) profit rate value of          and a constructed value (CV) profit rate value of          .  *See* LDC Preliminary Margin Program (Aug. 1, 2022) at line 8689 (C.R. 224) *with* LDC Preliminary COP and CV Calculation Adjustments Memorandum (July 28, 2022) at 2 (C.R. 230).  Commerce then calculated a preliminary dumping margin of 21.49% for Citrus Juice, 4.45% for LDC, and 12.97% for all non-individually examined companies.  87 Fed. Reg. at 47,697.

Following the preliminary determination, LDC submitted its fiscal year 2021 financial statements to Commerce at verification.  *See* IDM at 15.  On November 2, 2022, Ventura and LDC submitted their administrative case briefs to Commerce.  Ventura Admin. Br. (Nov. 2,

2022) (C.R. 297); LDC Admin Br. (Nov. 2, 2022) (C.R. 299).  On November 10, 2022, both

parties subsequently submitted their rebuttal briefs.  Ventura Admin. Rebuttal Br. (Nov. 10,

2022) (C.R. 303); LDC Admin. Rebuttal Br. (Nov. 10, 2022) (C.R. 304).  Among other things,

Ventura raised in its case brief that Commerce should find that LDC's

is an affiliate and make the requisite adjustments, and Commerce should make various

adjustments to LDC's Reported Costs for Verification Findings.  *See* Ventura Admin Br. (Nov.

3, 2022) (C.R. 297) (P.R. 2070).

On December 23, 2022, Commerce published its Final Determination.  *See* Final

Determination, 87 Fed. Reg. at 78,939.  In its Final Determination, Commerce determined that

LDC is not affiliated with its supplier,          , and there is no record evidence demonstrating

services to LDC provided by certain parent companies and/or holding companies requiring an

adjustment to LDC's G&A expense rate.  IDM at 11-13; IDM at 20-21.  For purposes of

calculating the material price differences associated with lemons (KDM material price

difference), Commerce relied on the values in Exhibit 6 of the Cost Verification Report at page

17, which were reconciled with the fiscal year 2020 financial statement.  *See* Final Cost

Calculation Memorandum – LDC (Dec. 19, 2022) (C.R. 336) at 2; Cost Verification Report Ex.

6 at 17 (C.R. 267).  In the final margin calculations for LDC, Commerce used the value

for the CV profit rate and          for the CEP profit rate.  *See* Final Cost Memorandum at 3-4,

Attachment 4 (C.R. 336)) (showing CV profit rate); LDC Final Margin Program Log (Dec. 21,

2022) at line 8689 (C.R. 313) (showing the CEP profit rate).  Commerce calculated a final

antidumping margin of 22.31% for Citrus Juice, 0.00% for LDC, and 22.31% for all non-

individually examined companies.  87 Fed. Reg. at 78,940.

## SUMMARY OF THE ARGUMENT

First, Commerce's determination that LDC is not affiliated with its supplier is in accordance with law and supported by substantial evidence.  Under 19 U.S.C. § 1677(33)(G), Commerce reasonably determined that neither party was reliant on the other, therefore the parties were not affiliated by means of control.  Although Ventura argues that Commerce's determination was unlawful for not making certain findings, Commerce either did make the findings that Ventura claims are absent from Commerce's decision or Commerce was not required to explicitly address certain matters because Ventura did not raise related arguments before Commerce.  Ventura is also incorrect that the term "partners" in 19 U.S.C. § 1677(33)(C) has an unambiguous meaning, and therefore Commerce did not err as a matter of law by evaluating whether a partnership existed according to the reasonable criteria it elucidated. Further, Commerce reasonably interpreted the statute as requiring some certain indicia of a corporate or legal relationship beyond the mere contractual relationship present here between LDC and its supplier.  Although the contract was styled as an

, Commerce reasonably analyzed the substance and nature of the relationship between the parties and determined that the parties were not "partners" within the meaning of the statute.

Second, Commerce did not rely on or use LDC's fiscal year 2021 financial statements, and therefore Ventura's arguments that Commerce was arbitrary and capricious in relying on the 2021 financial statement instead of the 2020 financial statement are moot.

Third, Commerce reasonably found that LDC was not required to provide certain financial statements for certain holding companies and that there is no record evidence of any services provided by those holding companies to LDC requiring an adjustment to LDC's G&A

expense rate.  Therefore, LDC complied with Commerce's requests for information, and record evidence did not demonstrate requiring further adjustments to LDC's G&A expense rate.

Lastly, Ventura failed to raise in its case brief the alleged ministerial error in the calculation of the constructed export price (CEP) profit rate that was discoverable at the time of the preliminary determination.  Commerce therefore is not required to address the alleged ministerial error.  The alleged error is also moot because any potential adjustment would only result in an even lower calculated margin for LDC, which would have no effect here because Commerce calculated a 0.0 percent final dumping margin for LDC.

## ARGUMENT

## I.   Standard Of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'"  *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).  "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence."  *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  "'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Crawfish Processors Alliance v. United States*, 483 F.3d 1358, 1361 (Fed. Cir. 2007) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  When an issue is inherently fact-intensive, the Court will set aside Commerce's finding only if the evidence is "so compelling that no reasonable factfinder" could reach the same conclusion.  *See INS v. Elias-Zacarias*, 502 U.S.

8

478, 483-84 (1992).  Thus, the substantial evidence standard is a "high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

Moreover, "{e}ven if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) (citing *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1044 (Fed. Cir. 1996)).  And "the Court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*."  *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citations and internal quotations omitted) (second alteration in original).

The Court reviews Commerce's interpretation of a statute by applying the two-step test laid out in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) (*Chevron*).  First, the Court must ascertain whether Congress has "directly spoken to the precise question at issue." *Id.* at U.S. 842.  If Congress's intent is clear then "that is the end of the matter," as the agency and the Court must "give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43.  In determining whether this step is satisfied, the Court looks to the statute's text and employs the "traditional tools of statutory construction." *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998) (quoting *Chevron*, 467 U.S. at 843 n.9).  If the statute is "silent or ambiguous with respect to the specific issue" then the Court must determine whether the agency's interpretation is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

9

**II.     Commerce's Determination That LDC Is Not Affiliated With Its Supplier Is
         Supported By Substantial Evidence And In Accordance With Law**

In the Final Determination, Commerce reasonably determined that LDC was not

affiliated with its supplier,           , either under 19 U.S.C. § 1677(33)(C) or (G).  Commerce

properly found that LDC and its suppliers are not reliant on the other and neither exerts control

over the other and therefore are not affiliated pursuant to 19 U.S.C. § (33)(G).  *See* IDM at 12-

13.  Additionally, Commerce found that LDC and its supplier are not reliant upon each other nor

do they jointly own or jointly sell anything.  *Id.*  Therefore, LDC is also not an affiliate pursuant

to section 771(33)(C).  *Id.*

19 U.S.C. § 1677(33)(C) and (G) sets out a list of persons who will be considered

affiliated, including ". . . (C) Partners. . . .  (G) Any person who controls any other person and

such other person."  The statute further explains for paragraph (G) that "a person shall be

considered to control another person if the person is legally or operationally in a position to

exercise restraint or direction over the other person."  A "person" is defined to include "any

interested party as well as any other individual, enterprise, or entity, as appropriate."  19 C.F.R. §

351.102(b)(37).

As explained below, Commerce's determination that LDC and its supplier are not

affiliated is supported by substantial evidence and in accordance with law.

**A.  Commerce's Determination Of No Affiliation Under 19 U.S.C. § 1677(33)(G) Is
     Supported By Substantial Evidence And In Accordance With Law**

   1.   Ventura Has Not Exhausted Its Challenge To Commerce's Decision Based On
        Whether The Supplier Is Reliant Upon LDC

Ventura attempts to argue for the first time that when determining whether an affiliate

relationship exists Commerce failed to consider whether the supplier is reliant on LDC, and only

decided that LDC is not reliant on the supplier.  *Compare* Ventura Br. at 24-26 *with* Ventura

Admin. Br. at 3-5 (C.R. 297).  However, Ventura failed to raise this issue with Commerce.  This Court "where appropriate, {shall} require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  This statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."  *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)).  A reviewing court "usurps {the agency's} function when it sets aside an agency determination upon a ground not theretofore presented and deprives the {agency} of an opportunity to consider the matter, make its ruling, and state the reasons for its action."  *Unemployment Compensation Comm'n v. Argon*, 329 U.S. 143, 155 (1946).  As such, parties must exhaust administrative remedies by raising all issues in their initial case briefs before Commerce.  *See Boomerang Tube*, 856 F.3d at 910 (holding that 28 U.S.C. § 2637(d) "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies"); *see also Prime Time Commerce LLC v. United States*, 495 F. Supp. 3d 1308, 1313-14 (Ct. Int'l Trade 2021) (citing *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (internal citation omitted); *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383 (Fed. Cir. 2008); *ABB, Inc. v. United States*, 920 F.3d 811, 818 (Fed. Cir. 2019)).

Commerce's regulations also require parties to submit a case brief that contains all the arguments that the submitters view to be relevant to the final determination.  *See* 19 C.F.R. § 351.309(c)(2); *see also Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327, 1350 (Ct. Int'l Trade 2010) ("Generally the 'prescribed remedy for a party in disagreement with Commerce's Preliminary Results is to file a case brief … and that 'case brief must present *all* arguments that

11

*continue* in the submitter's view to be relevant to {Commerce}'s final determination or final results…") (internal citations omitted and emphasis in original); *see also Zhongce Rubber Grp. Co. v. United States*, Slip. Op. 2018-160, 2018 Ct. Int'l Trade LEXIS 169 (Nov. 20, 2018) (granting a motion to dismiss for failure to state a claim upon which relief can be granted because plaintiff did not file a case brief before the agency).

Moreover, exhaustion serves two basic purposes: to protect administrative agency authority and to promote judicial efficiency. "It allows the administrative agency to perform the functions within its area of special competence (to develop the factual record and to apply its expertise), and – at the same time – it promotes judicial efficiency and conserves judicial resources, by affording the agency the opportunity to rectify its own mistakes (and thus to moot controversy and obviate the need for judicial intervention)." *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 342 F. Supp. 2d 1191, 1206 (Ct. Int'l Trade 2004); *see also Corus Staal*, 502 F.3d at 1380-81.

There are limited exceptions to this requirement that are not present here. Under the first of these, a pure question of law may excuse a failure to exhaust if the party raises "a new argument that is of a purely legal nature" that does not "require further agency involvement, additional fact finding, or opening up of the record" and does not "create undue delay nor cause expenditure of scarce party time and resources." *Gerber Food (Yunnan) Co. v. United States*, 601 F. Supp. 2d 1370, 1380 (Ct. Int'l Trade 1996). Failure to exhaust may also be excused by a lack of access to the confidential record or by an intervening judicial decision "which if applied might have materially altered the result." *Id.* (internal citations omitted). Finally, parties need not exhaust their administrative remedies if doing so would have been futile, although the exception is a narrow one and "{t}he mere fact that an adverse decision may have been likely

does not excuse a party from a statutory or regulatory requirement that it exhaust its administrative remedies." *Corus Staal*, 502 F.3d at 1379 (internal citations omitted).

Here, LDC cannot avail itself of any of these exceptions. The question of whether the supplier has become reliant on LDC is a highly fact-intensive inquiry and therefore is not a purely legal question. Nor would raising this argument before Commerce have been futile, as Commerce fully addressed party arguments in its Final Determination and there is no indication it would not have likewise provided reasoned consideration of this issue. Finally, there is no intervening legal authority that would have materially altered the result, nor is there any allegation of non-access to a confidential record.

Ventura's administrative case brief before Commerce raised arguments about whether LDC is reliant on the supplier, and only now before this Court does Ventura contend that Commerce did not consider whether the supplier is reliant on LDC. Because this argument was not raised in any administrative case brief, the Court should decline to consider it.

      2.    Commerce's Affiliation Determination Is Supported By Substantial Evidence And Is In Accordance With Law Because Commerce Considered The Supplier's Relationship With LDC When Reaching Its Conclusion

Even if the Court finds that Ventura is excused from exhausting its administrative remedies and that Commerce must address Ventura's argument regarding whether the supplier was reliant on LDC, Ventura's claim fails because Commerce *did* specifically address whether the supplier was reliant on LDC. Specifically, as Ventura acknowledges, Commerce determined that, the "contractual terms between LDC and its supplier recognize the sovereignty of the parties and indicate no obligation toward *each other* beyond those spelled out by the terms of the contract." IDM at 12 (*citing* LDC DQR at Ex. D03) (emphasis added). Thus, Commerce plainly addressed whether the supplier was reliant on LDC based on record evidence.

13

When determining whether affiliation exists pursuant to 19 U.S.C. § 1677(33)(G), Commerce looks to whether there is a "close supplier relationship," which requires considering whether the relationship is significant and could not be easily replaced.  IDM at 12 (*citing* SAA at 838; *TIJID, Inc. v. United States*, 366 F. Supp. 2d 1286, 1298-99 (Ct. Int'l Trade 2005)).  Only when Commerce determines that reliance exists does Commerce then determine whether one of the parties is in a position to exercise restraint or direction over the other.  *Id.* (*citing Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362, 1373-73 (Ct. Int'l Trade 2009)); *Samsung Elecs. Co. v. United States*, 70 F. Supp. 3d 1350, 1357 (Ct. Int'l Trade 2015) (internal citations omitted) ("Not all close supplier relationships are control relationships, however"; a supplier and buyer are affiliates only when one "'becomes reliant upon the other.'").  In determining whether a party has become reliant, Commerce's analysis goes beyond a mere evaluation of the extent of the transactions between the companies, and Commerce will not find reliance solely based on the proportion of purchases or sales between the parties, even where that proportion is one hundred percent.  *Id.* (*citing Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019–2020*, 87 Fed. Reg. 20,817 (Apr. 8, 2022), and accompanying IDM at Comment 1.

Additionally, the Statement of Administrative Action accompanying the Uruguay Rounds Agreement Act (SAA) states, "a company may be in a position to exercise restraint or direction, for example, through corporate or family grouping, franchise or joint venture agreements, debt financing, or close supplier relationships in which the supplier or buyer becomes reliant upon the other."  H.R. Doc. 103-316, Vol. 1 (1994) at 838; *see also* 19 C.F.R. § 351.102(b)(3).  "Control" exists "if one person is legally or operationally in a position to exercise restraint or direction over

another person." *Id.*  The regulations further provide that Commerce "will not find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." 19 C.F.R. § 351.102(b)(3).

Ventura contends that Commerce found that neither LDC nor the supplier had the ability to control one another, but that Commerce did not analyze or address the nature and extent of the relationship.  Ventura Br. at 25.  This misapprehends the record.  In the Issues and Decision Memorandum, Commerce first properly articulated the legal standard for determining whether LDC and the supplier possess control over one another for the purposes of assessing affiliation. *See* IDM at 10-11 (P.R. 294).  Commerce then went on to state, "when a buyer has other supply options, the buyer is not reliant on its supplier." *Id.* at 13; *see also Final Affirmative Determination of Sales at Less Than Fair Value: Certain Walk-Behind Lawn Mowers and Parts Thereof from the Socialist Republic of Vietnam*, 86 FR 27383 (May 20, 2021), and accompanying IDM at Comment 7 (*Lawn Mowers from Vietnam*).  Commerce stated that the "record evidence supports finding that LDC had other sources for purchasing major input other than this particular supplier" and the "contractual terms between LDC and its supplier recognize the sovereignty of the parties and indicate no obligation toward each other beyond those spelled out by the terms of the contract." *Id.*

LDC indeed has other supply chain options and is not solely reliant on          . *See* LDC's Supplemental Section D Questionnaire Response (June 3, 2022) at Exhibit Supp. D15.  In *Ta Chen Stainless Steel Pipe v. United States*, 1999 Ct. Intl. Trade LEXIS 110, *24A (Ct. Int'l Trade 1999), the Court noted that a supplier with an exclusive sales agreement may be reliant

upon its buyer, but if an "affiliation finding hinged on this factor alone, however, {a} court would be reluctant to uphold the determination as based on substantial evidence."

Here, LDC and            are not affiliates, but rather contractual parties, because neither is reliant on the other, and neither can impact the production, price, or cost of the lemons once the lease and purchase agreement were signed.  IDM at 12; P.R. 294.  The contract terms prevent control between the parties, as


                                                  .  *See* LDC's Section D Questionnaire Response at Exhibit D3. Further, the agreements do not constitute a joint venture as            assumes            as to the            or            of lemons it receives.  *Id.*  For example,                        , LDC would still owe            the                        of lemons.  Similarly, LDC must pay            the fixed value

                  , throughout the contract duration.  *Id.*

Ultimately, Commerce considered the issue, and concluded that the "{r}ecord evidence supports finding that LDC had other sources for purchasing major input other than this particular supplier; the "contractual terms between LDC and its supplier recognize the sovereignty of the parties and indicate no obligation toward each other beyond those spelled out by the terms of the contract[3]; and "neither cost nor sales verifications found any evidence of affiliation or non-arm's-length transactions between those two parties.  IDM at 12-13.  Thus, Commerce found that LDC's and its supplier's relationship is market-based and the transactions between them are at

---

[3] Without providing support, Ventura generally contends that Commerce cannot rely on the contract between LDC and its supplier when finding that "contractual terms between LDC and its supplier . . . indicate no obligation toward each other beyond those stated in the contract." IMD at 12; P.R. 294.  The is an unreasonable stance, as the contract is certainly evidence that outlines the relationship between LDC and its supplier.

arm's length.  *Id.*  Therefore, for the final determination Commerce reasonably "found that LDC and its supplier are not affiliated pursuant to section 771(33)(G) of the Act."  *Id.*

Additionally, "there is no statutory requirement that {Commerce} explicitly discuss every piece of record evidence that is put before it in an investigation," and the fact that Commerce did not discuss certain record evidence does not establish that Commerce failed to consider that evidence.  *See Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (Ct. Int'l Trade 2000); (*Allegheny Ludlum*) (citing *Torrington Co. v. United States*, 790 F. Supp. 1161, 1167-68 (Ct. Int'l Trade 1992)) ("The fact that certain information is not discussed in an International Trade Commission determination does not establish that the Commission failed to consider that information because there is no statutory requirement that the Commission must respond to each piece of evidence presented by the parties"), *aff'd*, 991 F.2d 809 (Fed. Cir. 1993) (unpublished disposition).

Throughout its brief, Ventura generally contends that Commerce ignored evidence and arguments when reaching its conclusions.  *See e.g.*, Ventura Br. at 28.  For example, Ventura alleges Commerce does not discuss the sale and purchase agreement between LDC and          , but this assertion is belied by the IDM.  *See e.g., Id.* at 9-13 ("Record evidence supports that this is a contractual relationship { }; LDC and its supplier do not jointly own anything pursuant to the terms of their contract and do not engage in joint selling activities.)  The record demonstrates that Commerce considered the                               between LDC and its supplier and determined that they were not affiliated as partners within the meaning of 19 U.S.C. § 1677(33)(C) of the Act.

Accordingly, should the Court determine that LDC's claims meet an exception to the exhaustion doctrine or should otherwise be reviewed, Commerce has sufficiently addressed the

lack of a reliance by the supplier on LDC, and reasonably determined that no controlling

relationship was present.  Thus, Commerce's determination is supported by law and substantial

evidence.

       3.   Ventura Failed To Exhaust Administrative Remedies With Respect To
             Arguments Based Upon A Temporal Aspect Of The LDC-Supplier
             Relationship

Ventura next contends that Commerce's analysis was unlawful because Commerce failed

to consider the temporal aspect of LDC and its supplier's relationship.  Ventura Br. at 30-32.

While 19 C.F.R. § 351.102(b)(3) provides that Commerce "will consider the temporal aspect of a

relationship in determining whether control exists; normally, temporary circumstances will not

suffice as evidence of control," and as set forth above, the agency is presumed to have

considered all pertinent information that is put before it in an investigation and there is no

statutory requirement that Commerce explicitly discuss every piece of record evidence.  Thus,

the fact that Commerce did not discuss certain temporal evidence does not establish that

Commerce failed to consider that evidence.  *See Allegheny Ludlum Corp*, 112 F. Supp. 2d at

1165.

Ventura raises the argument concerning the temporal aspect of the relationship between

LDC and its supplier for the first time on appeal before this Court.  *See generally* Ventura

Admin. Br. at 2-6 (C.R. 297).  Accordingly, this Court should decline to consider Ventura's

contentions regarding the temporal aspect of the relationship between LDC and its supplier

because Ventura failed to raise this issue to Commerce and therefore did not exhaust its

administrative remedies.  *See* 28 U.S.C. § 2637(d); *Boomerang Tube LLC v. United States*, 856

F.3d 908, 912 (Fed. Cir. 2017).  Perhaps in recognition of the fact that it failed to exhaust its

administrative remedies on this issue, Ventura has presented this matter as a very narrow legal

question that Commerce, as a matter of law, must explicitly make a finding about the temporal

nature of a relationship for every affiliation finding.  Ventura Br. at 32.  Ventura's argument is

not, however, purely legal, but rather, fact-intensive, *i.e.*, whether the temporal aspect of this

relationship supports a finding of affiliation.  Moreover, because Ventura did not raise the issue

before Commerce it was reasonable for Commerce to not have explicitly addressed this in its

Final Determination.

However, even if this Court reaches the merits of Ventura's argument, its legal

interpretation is incorrect.  On its face, Ventura's argument that the issue is purely legal and that

the regulation (or the statutory and regulatory framework overall) requires an explicit finding of

a facts-based issue is problematic and would lead to absurd results.  The argument, if true, would

make all Commerce findings of affiliation or non-affiliation unlawful if Commerce does not

address this temporal aspect of a relationship even when no party raises it as an issue.  As

demonstrated by the regulation at issue, 19 C.F.R. § 351.102(b)(3), the legal framework relevant

here provides parties with guidance on the types of factual information Commerce would

consider probative of whether or not control exists between parties.  The regulation also provides

that Commerce "will consider the following factors, among others: Corporate or family

groupings; franchise or joint venture agreements; debt financing; and close supplier

relationships."  19 C.F.R. § 351.102(b)(3).  And, in any event, Ventura has yet to identify any

evidence that Commerce declined to consider information pertaining to the temporal aspect of

the relationship in contravention of the regulation.  *See generally* Ventura Br.; s*ee also Allegheny*

*Ludlum Corp*, 112 F. Supp. 2d at 1165.

Ventura cites *Hontex Enters., Inc. v. United States*, 248 F.Supp. 2d 1323 (Ct. Int'l Trade

2003), in support of its proposition that Commerce is required to weigh the nature of an entities

contacts over time to determine how its contacts impact business decisions.  However, *Hontex* is factually distinguishable.  Failure to exhaust administrative remedies was not an issue before the court in *Hontex*. The reviewing court in *Hontex* remanded, three times, Commerce's collapsing analysis for failure to support with substantial evidence its conclusions that the operations of two exporters were intertwined and there was a relationship of control.[4]  Commerce ultimately reversed its decision to collapse.  *Hontex Enters. v. United States*, 425 F. Supp. 2d 1315, 1318-19, SLIP OP. 2006-42 (2006).

Similarly, Ventura cites *China Steel Corp. v. United States*, 306 F. Supp. 2d 1291, 1297 (Ct. Int'l Trade 2004), another case where the plaintiff challenged Commerce's finding that multiple companies were affiliated with a collapsed entity.  In *China Steel Corp*, the plaintiff argued that the temporal relationship would show the companies are not affiliated, despite one company conceding affiliation, and sharing a chairman of the board.  The Court stated, "to determine whether 'control' exists, Commerce's regulations direct the agency to consider the following factors, "among others: corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships." *Id.* at 1351 citing 19 C.F.R. § 351.102(b).  The Court further stated that Commerce is "precluded from finding 'control' on the basis of those factors 'unless the relationship has the potential to impact decisions concerning the … pricing, … of the subject merchandise.'"  *Id*.  Thus, in *China Steel Corp*, despite an admission of affiliation in its section A questionnaire responses, a shared director of the board with "extensive power," and the companies each owning stock in one another, the Court still

---

[4] *Hontex*, 248 F. Supp. 2d at 1345-47; *Hontex Enters. v. United States*, 342 F. Supp. 2d 1225, 1234-38, 1246-47, SLIP OP. 2004-55 (2004); *Hontex Enters. v. United States*, 387 F. Supp. 2d 1353, SLIP OP. 2005-116 (2005).

remanded the case to determine the temporal relationship rather than sustaining Commerce's decision finding affiliation. *Id.* at 1372.

Here, instead, LDC described the supplier as a third party and not an affiliate, *see* IDM at 12, and Commerce reasonably determined that LDC and its supplier are not reliant on each other by means of a close supplier relationship and therefore not affiliated under 19 U.S.C. § 1677(33)(G). As discussed above, the record evidence supports that LDC had other sources for purchasing major input other than this particular supplier, and the contractual terms between LDC and its supplier indicated no obligation toward each other beyond those spelled out by the terms of the contract. *Id.* Neither the cost nor sales verifications found any evidence of affiliation or non-arm's-length transactions between those two parties. *Id.* at 12-13.

Ventura appears to fault Commerce for noting that the contract agreement does not indicate any obligation between the parties beyond the terms of the contract. Ventura Br. at 26 (citing IDM at 12). Indeed, Commerce identified that there was nothing in the contract, or elsewhere on the record, indicating that the relationship between the two parties went beyond that defined by the contract. This is important because it demonstrates that Commerce reasonably analyzed whether there was any evidence of affiliation beyond the mere existence of the contractual relationship, in accordance with the governing regulation 19 CFR § 351.102(b)(3). IDM at 13. Recognizing that a mere contractual relationship is insufficient to establish affiliation, Commerce emphasized that record information supports that this is a contractual relationship. *Id.* at 13.

Ventura next argues that Commerce did not support its conclusion that the contract recognizes the sovereignty of the parties. Ventura Br. at 26. Again, "there is no statutory requirement that the Department explicitly discuss every piece of record evidence that is put

before it in an investigation," *see Allegheny Ludlum*, 112 F. Supp. 2d at 1165, and Commerce is

"presumed…to have considered all pertinent information sought to be brought to its attention."

*Nakajima All Co., Ltd. v. United States*, 744 F. Supp. 1168, 1175 (Ct. Int'l Trade 1990)

(*Nakajima*).  Although certain specific contractual provisions were not explicitly discussed in the

final determination, Commerce's decisional path was reasonably discernable.  S*ee Motor Vehicle*

*Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983).

Commerce cited to the contractual agreement in support of its conclusion, and further found that

the parties do not jointly own anything pursuant to the terms of the contract and do not engage in

joint selling activities.  IDM at 12-13.  These findings support Commerce's reasonable

determination that the parties retain their sovereignty and have no obligations outside of the

contract.  Conversely, Ventura does not present any arguments or evidence that the contract

abrogates the two parties separate corporate or legal sovereignty as distinct corporate/legal

entities or that the contract creates a shared corporate or legal entity.  Therefore, Commerce

reasonably found that the contractual agreement did not establish reliance or control.

      Ventura also contends that Commerce determined that lemons do not constitute a major

input of lemon juice.  Ventura Br. at 27.  This is inaccurate and confuses the statutory and

regulatory methodology that Commerce undertakes.  One component in the calculation of

constructed value is "the cost of materials and fabrication or other processing of any kind

employed in producing the merchandise."  19 U.S.C. § 1677b(e)(1).  Such costs may include

inputs (either self-produced or purchased from third parties) that are consumed in the production

of subject merchandise.  The statute provides special rules relating to the treatment of

transactions between *affiliated* parties in the calculation of constructed value.  19 U.S.C. §

1677b(f)(2), (3).  Under 19 U.S.C. § 1677b(f)(3), commonly referred to as the "major input

rule," Commerce will determine the value of a major input purchased from an affiliated person based on the higher of three values pursuant to 19 C.F.R. § 351.401(b).  Importantly, the major input rule only applies in an instance of affiliation.  *See* SAA at 838.

Here, having found that the parties were not affiliated, Commerce lawfully did not apply the major input rule.  By stating that LDC had other suppliers of lemons, Commerce was simply noting that this was a factor in determining whether LDC was reliant on          .  IDM at 12 (". . . when a buyer has other supply options, the buyer is not reliant on its supplier.").  Commerce did not, contrary to Ventura's suggestion, make any statement about whether lemons are an important input or not in the production of lemon juice.  Ventura further contends that Commerce did not support its conclusion that LDC had other sources of purchasing lemons.  Ventura Br. at 27-28.  However, Commerce cited to LDC's Section D questionnaire response and Section D Supplemental Questionnaire response which demonstrate that it did have other sources of purchasing lemons.  IDM at 12 (citing LDC DQR at Ex. D7 (C.R.108); LDC Supplemental Section D Questionnaire Response (June 3, 2022) at Ex. Supp-D15 (LDC Supp. DQR) (C.R. 163).  Both exhibits clearly demonstrate not only that LDC could source from other suppliers but indeed did so during the period of investigation.  IDM at 12.

Finally, Ventura argues that the cost verification report demonstrates that the parties are affiliated, and that Commerce failed to address multiple aspects of the contract.  Ventura Br. at 28-29.  With respect to the cost verification report findings, in the report, Commerce stated, "it *may* be appropriate to adjust LDC { } transfer price of lemon fruit obtained from {the supplier} to reflect the average market price of lemon fruit purchased from unaffiliated suppliers."  Cost Verification Report (Oct. 21, 2022) at 19-20 (C.R. 295) (emphasis added).  Under the major-input rule described above, Commerce only adjusts reported costs *after* determining that the

parties are in fact affiliated.  19 U.S.C. § 1677b(f)(3).  The reported quantitative values in and of themselves do not demonstrate affiliation, and Commerce acknowledged as much in its verification report by stating that the values *may* need to be adjusted if the parties were found to be affiliated.  Cost Verification Report at 20 (C.R. 295); *see also Marsan Gida Sanayi ve Ticaret A.S. v. United States*, 931 F. Supp. 2d 1258, 1272 n.15 (Ct. Int'l Trade 2013) ("Moreover, under the statute, whether or not transactions are at arm's length is not a factor in determining affiliation.  In accordance with agency regulations, Commerce 'first determines whether parties are affiliated and then considers whether their transactions are arm's length.'") (internal citations omitted).

Ultimately, Ventura's argument that the report does not indicate evidence of non-arm's-length transactions between the parties is contradicted by the quantitative values and thus is not based on record evidence.  Ventura Br. at 28-29 (citing IDM at 12-13).  Commerce was expressing that verification did not provide any evidence of an element of the relationship or events surrounding the transactions that would indicate that they were not at arm's length.  IDM at 12-13.  Commerce's determination that the numerical values do not indicate non-arm's length transactions and are not sufficient to demonstrate affiliation is supported by record evidence and is in accordance with law.

Ventura next proceeds to list certain specific aspects of the contract that it argues Commerce failed to consider.  Ventura Br. at 29.  Again, Commerce is not required to explicitly discuss every piece of record evidence that is put before it in an investigation, and Commerce did explicitly consider the contractual agreement and reasonably concluded that the relationship was contractual in nature and that LDC and its supplier do not jointly own anything pursuant to the terms of their contract and do not engage in joint selling activities.  IDM at 12-13.  The general

characteristics of the contract that Ventura lists without indicating any specific provisions do not indicate that the relationship extended beyond a contractual one or that either party was reliant on the other or that either party could control the other.  This is consistent with Commerce's reasonable determination that neither of the parties were reliant on each other, nor was either under control of the other.  IDM at 12-13.  Notably, although affiliation analyses are necessarily fact-specific and intensive, this Court recently held that Commerce's determination to not find affiliation between parties based on a similar arrangement between Brazilian companies was supported by substantial evidence and in accordance with law, even despite the existence of a joint venture agreement, a fact not present here.  *See Coal. of Am. Millwork Producers v. United States*, 581 F. Supp. 3d 1295, 1311-1312 (Ct. Int'l Trade 2022).

Based upon the foregoing, Commerce reasonably determined that neither party was reliant on the other and therefore a close supplier relationship did not exist sufficient to find affiliation under 19 U.S.C. § 1677(33)(G).  Commerce's decision is in accordance with law and supported by substantial evidence.

**B.   Commerce's Determination of No Affiliation Under 19 U.S.C. § 1677(33)(C) Is Supported By Substantial Evidence and in Accordance With Law**

In its Final Determination, Commerce reasonably and lawfully determined that LDC is not affiliated with its supplier under 19 U.S.C. § 1677(33)(C) as partners within the meaning of the statute.  *See* IDM at 13.  Ventura contends that the term "partners" within the statute is unambiguous, and because LDC and its supplier signed a contract called a

, Commerce must, as a matter of law, find them affiliated under 19 U.S.C. § 1677(33)(C).  Ventura Br. at 32-36.  As an initial matter, Commerce did not find that the parties must demonstrate control beyond a finding that the two parties are partners, contrary to the allegation made by Ventura.  Ventura Br. at 33.  Commerce, however, reasonably evaluated what

25

it means to be "partners" or "part of a partnership" within the meaning of the statute, while taking into consideration again that a mere contractual relationship could not rationally be dispositive of affiliation.  IDM at 13.  Ventura claims that this Court has found the term "partners" to be unambiguous.  Ventura Br. at 35.  However, the case law cited by Ventura does not state that the term "partners" is unambiguous, only that once Commerce has determined that one of the provisions under 19 U.S.C. § 1677(33)(A)-(G) has been satisfied the parties must be considered affiliated.  *See Ta Chen*, 2007 WL 1573920 at *18 (Ct. Int'l Trade 2007).

Ventura's own arguments demonstrate that the term "partners" can be an ambiguous term.  Ventura proposes that Commerce was required to evaluate whether the parties were partners "within the ordinary meaning of the term" citing to various differing dictionary definitions.  Ventura Br. at 34.  Some of the proposed definitions are "one associated with another especially in action" and "one of two or more people, businesses, etc. that work together or do business together."  *Id.*  Thus, in its attempts to provide a definition of "partners," Ventura demonstrates that the term is ambiguous in the context of affiliated companies under the statute.

Commerce does not contest that the parties signed a contract with the translated title of
.  However, Commerce reasonably looked to the substance of the relationship between the parties, as directed by the statutory and regulatory framework regarding affiliation standards, to determine if it was a "partnership" within the meaning of the statute.  Commerce then determined that the two parties do not jointly own anything pursuant to the terms of the contract and do not engage in joint selling activities and thus are not partners.  IDM at 13; DQR at Exhibit D3.  These factors were reasonable for Commerce to consider when evaluating whether the relationship is a partnership in fact or a mere contractual relationship.

Commerce did not, as Ventura argues, require a showing of control to support its finding. Ventura Br. at 36.

Commerce reasonably and lawfully determined that LDC and its supplier were not "partners" within the meaning of 19 U.S.C. § 1677(33)(C) and therefore its determination that the parties are not affiliated should be sustained.

## III.   Commerce's Cost Of Production Calculations Are Not Arbitrary And Capricious

In the Final Determination, Commerce determined that the adjustment of the KDM material price difference for lemon fruit should be included in the cost of manufacturing (COM) rather than in G&A expenses, and likewise in the total cost of goods sold (COGS) denominator used to calculate the G&A and financial expense rates.  IDM at 17-18; *see also* Final Cost Calculation Memorandum – LDC (Dec. 19, 2022) (C.R. 336) at 2.  In the final cost calculation memorandum for LDC, Commerce demonstrated how it calculated the period of investigation KDM material price difference for lemon fruit, explaining that the figure was derived from the Cost Verification Report Exhibit 6 at page 17.  *See* Final Cost Calculation Memorandum – LDC at Attachment 1 (citing Cost Verification Report Ex. 6 at 17 (C.R. 267)).  In the Cost Verification Report, Commerce explained that it had,

> reviewed LDC{'s} reported reconciliation at {Exhibit 6 of the Report}.  The following table summarizes the reconciliation from the total costs in the *company's fiscal year 2020 (FY2020) audited income statement* to the total cost of goods sold (COGS) for finished goods from the financial accounting system.

Cost Verification Report at 8 (C.R. 295) (emphasis added).

Ventura claims that it was arbitrary and capricious for Commerce to rely on LDC's fiscal year 2021 financial statement to calculate the KDM material price difference because Commerce declined to rely on the fiscal year 2021 financial statement for other aspects of its calculations.

27

Ventura Br. at 36-39.  However, as detailed above, Ventura is mistaken that Commerce relied on the 2021 financial statement of LDC for purposes of calculating the KDM material price difference.  Commerce relied on the values in Exhibit 6 of the Cost Verification Report at page 17, which were reconciled with the fiscal year 2020 financial statement and not the fiscal year 2021 statement.  *See* Final Cost Calculation Memorandum – LDC (Dec. 19, 2022) (C.R. 336) at 2; Cost Verification Report Ex. 6 at 17 (C.R. 267).  Therefore, Commerce's cost of production calculation is not arbitrary and capricious as it did not rely on the fiscal year 2021 financial statement.

## IV.   Commerce's Calculation Of LDC's G&A Expense Rate Is Supported By Substantial Evidence And In Accordance With Law

Next, Commerce reasonably determined that no adjustments are required to LDC's G&A expenses when incorporating expenses incurred by LDC's parent or other holding companies for services provided to LDC.  IDM at 20-21.  Commerce specifically requested information regarding any affiliated services provided to LDC by its parent company, but LDC reported that another affiliated company that was not LDC's parent company provided the services in question.  *Id.* at 20 (citing LDC Supp. DQR at Supp. D-23-D-24 (C.R. 159)).  Additionally, Commerce reasonably found that affiliated companies within the LDC corporate structure charged each other where services were provided to other affiliated companies.  *Id.*  Thus, Commerce determined that LDC's reported G&A expenses included costs associated with any service provided by affiliated companies, including any parent companies.  *Id.*  There is no other evidence—and Ventura points to none—that indicates LDC's

or any other affiliated company performed administrative services on behalf of LDC that would require adjustment to the G&A expense rate.  *See* IDM at 20.

28

Ventura argues that LDC failed to provide financial statements for certain LDC affiliated entities or parents of LDC affiliated entities and therefore Commerce could not conclude that were not any services provided by these entities to LDC.  Ventura Br. at 39-42.  However, Commerce explained that LDC was not required to provide financial statements for all holding companies in its Section A questionnaire response, which requested that LDC provide financial statements or other relevant documents (*i.e.*, profit and loss reports) of all affiliates involved in the production or sale of the subject merchandise in the foreign market and the U.S. market, of all affiliated suppliers to these affiliates, and of the parent(s) of these affiliates.  IDM at 21 (citing Initial Questionnaire (Feb. 14, 2022) at A-10 (P.R. 59)).  Commerce thus determined that by the terms of its inquiry LDC was not required to submit financial statements of affiliates *not* involved in the production of subject merchandise.  *Id.*  Likewise, Commerce did not specifically request that LDC submit financial statements of any other holding companies beyond its parent. *Id.*  Further, as explained above, Commerce found that affiliated companies within the LDC corporate structure charged each other where services were provided to other affiliated companies.  *Id.* at 20.  This counters Ventura's argument that there must have been some administrative services provided by these holding companies that should be spread across the entirety of the LDC corporate structure.  Ventura Br. at 42.  Indeed, although Ventura argues that Commerce's statement that there is no record evidence that these holding companies provided services to LDC is factually false, Ventura does not point to any record information indicating that a service was provided.  *Id.* at 39-42.  Accordingly, Commerce's determination was supported by substantial evidence and in accordance with law.

**V.      Ventura Failed To Exhaust Its Administrative Remedies Regarding Its Alleged Ministerial Error**

In the final margin calculations for LDC, Commerce used the value           for the CV profit rate and           for the CEP profit rate.  *See* Final Cost Memorandum at 3-4, Attachment 4 (C.R. 336)) (showing CV profit rate); LDC Final Margin Program Log (Dec. 21, 2022) at line 8689 (C.R. 313) (showing the CEP profit rate).  Ventura now argues that in calculating LDC's final margin, Commerce's programming instructions


.  Ventura Br. at 42-43 (citing Final Cost Memorandum at 3-4, Attachment 4 (C.R. 336)); *see also* LDC Final Margin Program Log (Dec. 21, 2022) at line 8689 (C.R. 313).

First, the alleged error that Ventura identifies was discoverable at the time of the preliminary determination and, per the relevant regulation, Ventura should have raised it in its case brief, which it did not do.  *Compare*  LDC Preliminary Margin Program (Aug. 1, 2022) at line 8689 (C.R. 224) *with* LDC Preliminary COP and CV Calculation Adjustments Memorandum (July 28, 2022) at 2                                        (C.R. 230); *see also generally* Ventura Admin Br; *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1376 (Ct. Int'l Trade 2010) (explaining that Commerce is not required to consider ministerial errors that were discoverable during the original proceedings but not pointed out to Commerce during the time period specified in the regulations).  Commerce's regulations require that a case brief "must present all arguments that continue in the submitter's view to be relevant to {Commerce's} final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results."  19 C.F.R. § 351.309(c)(2).  Further, "{c}omments concerning ministerial errors made in the preliminary results of a review should be included in a party's case brief" and "must present what, in the party's view, is the appropriate

30

correction." 19 C.F.R. § 351.224(c)(1), (d). Thus, the Court should decline to consider Ventura's contention concerning the alleged ministerial error because it has failed to exhaust this argument.

However, if the Court reaches the merits of issue, Commerce appropriately did not rely on the default margin program to calculate CEP profit because there were no comparison market sales above the cost of production. *See* LDC Preliminary COP and CV Calculation Adjustments Memorandum at 1 (C.R. 230). And, even if the CEP profit rate was incorrect as Ventura alleges, any potential adjustment would only result in a higher U.S. price output, meaning that the final calculated margin for LDC would be lower. Therefore, even if this Court were to find that Ventura has not waived this issue, this issue is moot because the final calculated margin for LDC is 0.0 percent and therefore cannot go any lower. Notably, even if this Court finds error, Ventura does not identify how it proposes to correct the alleged error. Ventura Br. at 42-43.

Accordingly, this Court should deny Ventura's request because the issue has not been exhausted. If the Court considers the issue of alleged ministerial errors, Commerce's determinations are in accordance with law and supported by substantial evidence. Moreover, if the Court finds there is a ministerial error, any relief would be moot because the final calculation would not change.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court sustain Commerce's determination and deny plaintiff's motion for judgment on the agency record.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

JONZACHARY FORBES                   /s/Anne M. Delmare
U.S. Department of Commerce         Anne M. Delmare
Office of Chief Counsel for         Trial Attorney
Trade Enforcement and Compliance    Commercial Litigation Branch
1401 Constitution Avenue, NW.       Civil Division
Washington, DC 20230-0001           U.S. Department of Justice
Telephone: (240) 449-5906           P.O. Box 480
Facsimile: (202) 482-8184           Ben Franklin Station
Email: JonZachary.Forbes@trade.gov  Washington, DC 20044
                                    Telephone: (202) 305-0531
                                    Email: Anne.M.Delmare@usdoj.gov

                                    *Attorneys for Defendant*

November 1, 2023

## <u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this motion complies with the Court's type-volume limitation rules.  According to the word count calculated by the word processing system with which the brief was prepared, the brief contains a total of 9234 words.


<u>/s/ Anne M. Delmare</u>
ANNE M. DELMARE


November 1, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on this 1st day of November, 2023, a copy of the foregoing "Defendant's Response To Plaintiff's Rule 56.2 Motion For Judgment On The Agency Record" was filed electronically.

<u>X</u>  This filing was served electronically on all parties by operation of the Court's electronic filing system.

/s/ Anne M. Delmare
ANNE M. DELMARE