**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

VENTURA COASTAL, LLC,

               Plaintiff,

     v.

UNITED STATES,

               Defendant,

     and

LOUIS DREYFUS COMPANY SUCOS
S.A.,

     Defendant-Intervenor.

Court No. 23-00009

# NON-CONFIDENTIAL VERSION

**Business Proprietary Information has been deleted in the Table of Contents and on pages 1 – 12, 17, 19 – 26, and 29 – 33.**

**DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Gregory J. Spak
Jessica E. Lynd
Cristina M. Cornejo

White & Case LLP
701 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 626-3600

*Counsel for Louis Dreyfus Company Sucos S.A.*

November 1, 2023

## TABLE OF CONTENTS

Page No.

I.    Statement Pursuant to USCIT R. 56.2(C)................................................................1

      A.    Administrative Determination Sought to Be Reviewed ...........................................1

      B.    Issues Presented and Summary of the Argument.....................................................1

            1.    Was Commerce's determination that LDC Sucos was not affiliated with
                  one of its lemon suppliers, which was based on an analysis of the supply
                  contract and other factors, supported by substantial evidence and
                  otherwise in accordance with law? .............................................................. 1

            2.    Was Commerce's adjustment to LDC Sucos's cost of manufacturing for
                  end-of-year fruit costs for the period of investigation, which was based on
                  verified information from LDC Sucos's books and records, arbitrary and
                  capricious? ................................................................................................... 2

            3.    Was Commerce's calculation of LDC Sucos's general and administrative
                  expense ratio which followed established practice and included only
                  service expenses that were incurred by a related party on behalf of LDC
                  Sucos, supported by substantial evidence and otherwise in accordance
                  with law?...................................................................................................... 2

            4.    Should the Court uphold Commerce's proper rejection of Petitioner's
                  untimely request for a methodological change in Commerce's Final
                  Determination when Petitioner failed to exhaust its administrative
                  remedies and thus the issue is not properly before the Court? .................. 3

II.   STATEMENT OF FACTS ................................................................................................3

      A.    Facts Relating to Commerce's Non-Affiliation Determination Between LDC
            Sucos and [        ]...........................................................................................3

      B.    Facts Relating to Commerce's Adjustment for End-of-Year Fruit Costs. ...............7

      C.    Facts Relating to Commerce's Calculation of LDC Sucos's G&A Expense
            Ratio. ......................................................................................................................9

      D.    Facts Relating to Petitioner's Request for an Untimely Correction of Alleged
            Errors ....................................................................................................................13

III.  STANDARD OF REVIEW ..........................................................................................15

IV.   ARGUMENT.................................................................................................................17

      A.    Commerce's Determination That LDC Sucos Was Not Affiliated With [        ]

Because They Are Contractual Parties That Do Not Control or Rely on Each Other and Are Not Partners Is Supported by Substantial Evidence and Is In Accordance With Law. ............................................................................................. 17

1.   Commerce's determination that LDC Sucos and [     ] are not affiliates through a close supplier relationship pursuant to 19 U.S.C. § 1677(33)(G) is supported by substantial evidence and in accordance with the law. ..... 17

2.   Commerce's determination that LDC Sucos and [     ] are not affiliates through a partnership under 19 U.S.C § 1677(33)(C) is supported by substantial evidence and in accordance with the law. ............................... 23

B.   Commerce's Determination to Adjust LDC Sucos's COM for the POI to Account for the End-of-Year Fruit Cost Adjustments Based on Verified Information Was Not Arbitrary and Capricious. ...................................................... 26

C.   Commerce Properly Relied on LDC Sucos's Reported Costs and Followed Its Established Practice in Calculating LDC Sucos's G&A Expense Ratio By Deciding Not to Include Additional G&A Expenses From LDC Sucos's Affiliated Entities. ...................................................................................................... 28

D.   The Court Should Reject Petitioner's Untimely Request to Correct Alleged Errors. ..................................................................................................................... 33

V.    CONCLUSION ................................................................................................................ 35

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AK Steel Corp. v. United States,*
346 F.Supp.2d 1348 (Ct. Int'l Trade 2004) ...................................................................31

*Allegheny Ludlum Corp. v. United States,*
112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) ..........................................................16, 23

*Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd.,*
334 F.3d 1284 (Fed. Cir. 2003).........................................................................................34

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962)..............................................................................................................16

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837 (1984)..............................................................................................................16

*Coal. of Am. Millwork Producers v. United States,*
581 F. Supp. 3d 1295 (Ct. Int'l Trade 2022) .................................................................18

*Consol. Edison Co. of New York v. NLRB,*
305 U.S. 197, 229 (1938).....................................................................................................16

*Dorbest Ltd. v. United States,*
604 F.3d 1363 (Fed. Cir. 2010)........................................................................................34

*Downhole Pipe & Equip., L.P. v. United States,*
776 F.3d 1369, 1377 (Fed. Cir. 2015)..............................................................................22

*In re DBC,*
545 F.3d 1373, 1378 (Fed. Cir. 2008)..............................................................................21

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29, 43 (1983).........................................................................................................16

*Samsung Elecs. Co. v. United States,*
70 F. Supp. 3d 1350 (Ct. Int'l Trade 2015) ..................................................................17

*Shandong Dongfang Bayley Wood Co. v. United States,*
375 F. Supp. 3d 1339 (Ct. Int'l Trade 2019) .................................................................16

*Solarworld Americas, Inc. v. United States,*
910 F.3d 1216 (Fed. Cir. 2018)........................................................................................22

*Ta Chen Stainless Steel Pipe v. United States,*
1999 Ct. Intl. Trade LEXIS 110 (Oct. 28, 1999) ...........................................18, 22

*Ta Chen Stainless Steel Pipe Co. v. United States,*
31 C.I.T. 794, 820 (2007) ...........................................................................24

*TIJID, Inc. v. United States,*
366 F. Supp. 2d 1286 (Ct. Int'l Trade 2005) ...............................18, 19, 22

*Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States,*
426 F. Supp. 3d 1353, 1357 (Ct. Int'l Trade 2020) ...............................16

*Universal Camera Corp. v. NLRB,*
340 U.S. 474 (1951).............................................................................15

*Zhaoqing New Zhongya Aluminum Co. v. United States,*
929 F. Supp. 2d 1324 (Ct. Int'l Trade 2013) ...............................16

## STATUTES AND REGULATIONS

5 U.S.C. § 706(2)(A).............................................................................16

19 U.S.C. § 1516a(b)(1)(B)(i)...........................................................15

19 U.S.C. § 1677(33) ...........................................................17, 24

19 U.S.C. § 1677(33)(C) ........................................................... passim

19 U.S.C. § 1677(33)(G).............................................................2, 6, 17

19 C.F.R. § 351.102(b)(3)...........................................................17, 24

19 C.F.R. § 351.224(c)(2).............................................................14

19 C.F.R. § 351.224(d) ...........................................................34

## ADMINISTRATIVE DETERMINATIONS

*Certain Lemon Juice from Brazil: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,*
87 Fed. Reg. 47,697 (Dep't Commerce Aug. 4, 2022),
accompanying Issues and Decision Memorandum........................................5, 7, 26

*Certain Lemon Juice from Brazil: Final Affirmative Determination of Sales at Less Than Fair Value,*
87 Fed. Reg. 78939 (Dec. 23, 2022),
accompanying Issues and Decision Memorandum........................................ Passim

*Notice of Final Determination of Sales at Less Than Fair Value: Outboard Engines From Japan,*
70 Fed. Reg. 326 (Dep't Commerce Jan. 5, 2005),
accompanying Issues and Decision Memorandum ..................................................12, 29, 31

*Large Diameter Welded Pipe from Canada: Final Affirmative Determination of Sales at Less Than Fair Value,*
84 Fed. Reg. 6,378 (Dep't Commerce Feb. 27, 2019),
accompanying Issues and Decision Memorandum ..........................................................12, 32

*Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2017-2018,*
85 Fed. Reg. 10411 (Dep't Commerce Feb. 24, 2022).....................................................17, 18

*Notice of Final Results of Antidumping Duty Administrative Review: Solid Urea from the Russian Federation,*
75 Fed. Reg. 51440 (Dep't Commerce 2010),
accompanying Issues and Decision Memorandum ..............................................................18

*Notice of Final Determination of Sales at Less Than Fair Value: Large Residential Washers From the Republic of Korea,*
77 Fed. Reg. 75988 (Dep't Commerce Dec. 26, 2012),
accompanying Issues and Decision Memorandum ..............................................................21

*Antidumping Duties; Countervailing Duties,*
62 Fed. Reg. 27296, 27298 (Dep't Commerce May 19, 1997) .............................................23

*Notice of Final Results of Antidumping Duty Administrative Review: Certain Corrosion-Resistant Steel Products From the Republic of Korea,*
84 Fed. Reg. 10784 (Dep't Commerce Mar. 22, 2019),
accompanying Issues and Decision Memorandum ..............................................................24

*Common Alloy Aluminum Sheet From Slovenia: Final Affirmative Determination of Sales at Less Than Fair Value,*
86 Fed. Reg. 13305 (Dep't Commerce Mar. 8, 2021),
accompanying Issues and Decision Memorandum ..............................................................29

## MISCELLANEOUS

Partner, Black's Law Dictionary (11th ed. 2019).........................................................25

Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 at 838 (1994)....................17

## I.  STATEMENT PURSUANT TO USCIT R. 56.2(C)

### A.  Administrative Determination Sought to Be Reviewed

Defendant-Intervenor Louis Dreyfus Company Sucos S.A., ("LDC Sucos") responds to Plaintiff Ventura Coastal, LLC's ("Petitioner") Memorandum in Support of its Rule 56.2 Motion for Judgment Upon the Agency Record (ECF 30, 31) ("Petr.'s Br."), regarding the final determination issued by the International Trade Administration of the Department of Commerce ("Commerce") in the antidumping ("AD") investigation of certain lemon juice from Brazil (Case No. A-351-858).  The period of investigation ("POI") was October 1, 2020, through September 30, 2021.  Notice of the final determination was published in the *Federal Register* on December 23, 2022.  *Certain Lemon Juice from Brazil: Final Affirmative Determination of Sales at Less Than Fair Value*, 87 Fed. Reg. 78939 (Dec. 23, 2022) (PR 301)[1] ("*Final AD Determination*"), and accompanying Issues and Decision Memo (Dec. 19, 2022) (PR 294) ("*Final IDM*").

### B.  Issues Presented and Summary of the Argument

1.  **Was Commerce's determination that LDC Sucos was not affiliated with one of its lemon suppliers, which was based on an analysis of the supply contract and other factors, supported by substantial evidence and otherwise in accordance with law?**

Yes. Commerce's analysis of the level of control exerted between LDC Sucos and the lemon supplier in question [                                              ] demonstrated that the two parties were not affiliates, but rather contractual counterparties.  The contract terms make clear that neither party relies on the other and neither party controls the other, thus the [                ] does not constitute a "close supplier relationship" or result in affiliation

---

[1] We assign the prefix "PR" (for "public record") to public documents on the administrative record and assign the prefix "CR" (for "confidential record") to confidential documents on the administrative record, followed by the reference number for the document.

within the meaning of 19 U.S.C. § 1677(33)(G).  Moreover, Commerce properly determined that

LDC Sucos and [       ] are not partners by analyzing the contract terms when making the

determination under 19 U.S.C. § 1677(33)(C).

> **2.      Was Commerce's adjustment to LDC Sucos's cost of manufacturing for end-of-year fruit costs for the period of investigation, which was based on verified information from LDC Sucos's books and records, arbitrary and capricious?**

No. Commerce followed its standard practice for calculating the cost of manufacturing

("COM") of subject merchandise for the entire POI, and thus adjusted the COM for end-of-year

fruit cost adjustments on a POI basis.  Contrary to Petitioner's argument, when making this

adjustment, Commerce did not rely on LDC Sucos's financial statements for fiscal year 2021, and

instead relied on LDC Sucos's accounting system, which it verified during the cost verification.

Thus, Commerce's adjustment was not arbitrary and capricious.

> **3.      Was Commerce's calculation of LDC Sucos's general and administrative expense ratio which followed established practice and included only service expenses that were incurred by a related party on behalf of LDC Sucos, supported by substantial evidence and otherwise in accordance with law?**

Yes. Commerce's calculation followed its past practice with respect to the inclusion of any

parent company general and administrative ("G&A") expenses in LDC Sucos's G&A expense

ratio calculation.  The record establishes that the only services provided to LDC Sucos were

invoiced to LDC Sucos, paid by LDC Sucos, and reported in LDC Sucos's submitted costs as part

of the G&A calculation.  There is no evidence that [

] or any of the other companies identified by Petitioner performed any other

administrative services on behalf of LDC Sucos.  Therefore, consistent with Commerce's past

practice, Commerce properly determined that an adjustment was not required to include G&A

expenses from any of these [                    ].

4.    **Should the Court uphold Commerce's proper rejection of Petitioner's untimely request for a methodological change in Commerce's Final Determination when Petitioner failed to exhaust its administrative remedies and thus the issue is not properly before the Court?**

Yes.  Petitioner failed to raise their concerns about Commerce's methodological choices (i.e., not ministerial errors) that were first made in Commerce's Preliminary Determination until after Commerce published its Final Determination.  Moreover, Petitioner made its allegation in an improper manner by raising its methodological concerns in its rebuttal comments in response to LDC Sucos's ministerial error comments.  LDC's ministerial error comments did not touch on the topic raised in Petitioner's allegation, and thus Petitioner's submission was not a proper rebuttal. Because Petitioner has failed to exhaust its administrative remedies, the Court should reject Petitioner's request to address this untimely challenge.

## II.    STATEMENT OF FACTS

### A.    Facts Relating to Commerce's Non-Affiliation Determination Between LDC Sucos and [      ].

In its response to Section A of Commerce's initial questionnaire, LDC Sucos listed its affiliates.  *See* LDC Sucos's Response to Section A of the Antidumping Duty Questionnaire (Mar. 14, 2022) at A-9, Exhibit A2 ("AQR") (PR 77) (CR 65-66).  This list did not include [

].  *See* AQR at Exhibit A2.  LDC Sucos explained in its response that it had an [                              ] with another entity [

] whereby [

] *See* AQR at A-

13.  [

] *See* AQR at A-13.  LDC Sucos further clarified that [

].  *See* AQR at A-13.

3

In a supplemental response, LDC Sucos correctly identified the entity as [

] and further clarified that [

] LDC Sucos's Response to Commerce's Supplemental Section A Questionnaire (Apr. 8, 2022) at Supp. A-5 (PR 114) (CR 94).

In response to Section D of Commerce's questionnaire, LDC Sucos provided [

] between LDC Sucos and [      ]. *See* LDC Sucos's Response to Section D of the Antidumping Duty Questionnaire (Apr. 11, 2022) at D-5, Exhibit D3 ("DQR") (PR 116) (CR 104). LDC Sucos also submitted a Major Input Purchases from Affiliated Parties Chart in Exhibit D7 pursuant to question 7 of Commerce's Section D Questionnaire. *See* DQR at D-10, Exhibit D7; *see also* LDC Sucos's Response to Commerce's Supplemental Section D Questionnaire (June 3, 2022) at Exhibit Supp. D15 ("SDQR") (PR 155) (CR 159) (updating the exhibit to be in Brazilian Reals). This list demonstrated that LDC Sucos [

]. *See* DQR at Exhibit D7; SDQR at Exhibit Supp. D15. This list erroneously included [      ] as an "affiliated supplier," *see id.*, a mistake which was corrected through the supplemental questionnaire process, *see* SDQR at Supp. D-10 ([

]); *see also* AQR at Exhibit A2 (listing affiliates and not including [      ]); SAQR at Supp. A-5 (identifying [      ] as a non-affiliated party). In Commerce's preliminary determination, Commerce relied on the cost-of-production data submitted by LDC Sucos except that it "adjusted LDC's reported direct material costs for lemon

fruit obtained from an affiliated supplier to reflect an arm's-length value in accordance with section 773(f)(3) of the Act." *See Certain Lemon Juice from Brazil: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 47,697 (Dep't Commerce Aug. 4, 2022) (PR 228), and accompanying Issues and Decision Memorandum at 15 (July 28, 2022) (PR 219) ("*PDM*"); *see also* Commerce Memorandum, re: *Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – Louis Dreyfus Company Sucos S.A.* (July 28, 2022) at 2 (PR 222) (CR 231).

Commerce verified LDC Sucos's cost responses from September 12, 2022 through September 16, 2022. *See* Commerce Memorandum to File re: *Verification of the Cost Response of Louis Dreyfus Company Sucos S.A. in the Lower-Than-Fair-Value Investigation of Certain Lemon Juice from Brazil* (Oct. 21, 2022) (PR 259) (CR 295) ("Cost Verification Report"). At cost verification, and in response to Commerce's verification outline, LDC Sucos presented information related to the affiliation issue. Commerce observed in its report that "{i}n its normal books and records, LDC Sucos maintains separate ledgers for the affiliated and unaffiliated lemon fruit purchases." Cost Verification Report at 20.

On November 2, 2022, Petitioner filed its case brief. *See* Letter from Buchanan Ingersoll Rooney, to Sec'y Commerce, re: *Certain Lemon Juice from Brazil: Petitioner's Case Brief as to Louis Dreyfus Company Sucos S.A.* (November 2, 2022) ("Petitioner Case Brief"). Petitioner argued that "LDC Sucos's [                                                                              ] is an affiliated partnership" and that "Commerce should adjust all [

                                        ] to market price, not just the [                                        ]."

Petitioner Case Brief at 1. On November 10, 2022, LDC Sucos filed its rebuttal brief. *See* Letter

from White & Case LLP to Sec'y Commerce, re: *Certain Lemon Juice from Brazil: Rebuttal Brief of LDC Sucos* (Nov. 10, 2022) (PR 287) (CR 304) ("LDC Sucos Rebuttal Brief").  In it, LDC Sucos argued that the record demonstrates that "LDC Sucos and [      ] are not affiliates, but rather contractual parties, because neither is reliant on the other, and neither can impact the production, price, or cost of the lemons once the lease and purchase agreement were signed."  LDC Sucos Rebuttal Brief at 4.

In its final determination, Commerce determined that [      ] and LDC Sucos are not affiliated pursuant to 19 U.S.C. § 1677(33)(C) as partners or 19 U.S.C. § 1677(33)(G) through a close supplier relationship.  *Final IDM* at 11–13.  Commerce based this determination on several pieces of record evidence.  First, "LDC {Sucos} did not identify . . . [      ] . . . in its affiliation charts and lists" and LDC Sucos "described the supplier as a third party and not an affiliate."  *Id.* at 12.  Second, Commerce found that "{r}ecord evidence supports finding that LDC had other sources for purchasing {this} major input other than this particular supplier."  *Id.* (citing DQR at Exhibit D7; SDQR at Exhibit Supp. D15).  Third, Commerce determined that "this is a contractual relationship."  *Id.* at 13.  Commerce found that the "contractual terms between LDC and its supplier recognize the sovereignty of the parties and indicate no obligation toward each other beyond those spelled out in the terms of the contract."  *Id.* at 12 (citing DQR at Exhibit D3).  Commerce also explained what the record did not support.  Commerce did not find "any evidence of affiliation or non-arm's-length transactions" between LDC Sucos and [      ] during both verifications and thus found that "LDC's and its supplier's relationship is market-based and the transactions between them are at arm's length."  *Id.* at 13.  Moreover, "LDC and its supplier do not jointly own anything pursuant to the terms of their contract and do not engage in joint selling activities."  *Id.*

**B.      Facts Relating to Commerce's Adjustment for End-of-Year Fruit Costs.**

On August 4, 2022, Commerce published its preliminary determination. *See PDM*. Commerce relied on the cost of production ("COP") data submitted by LDC Sucos except that it "revised LDC's reported G&A expense rate to include additional G&A expenses that were excluded from the fiscal year cost of goods sold in the overall cost reconciliation" and "revised the cost of goods sold denominator to exclude the same G&A expenses along with additional financial and selling expenses that were likewise identified in the overall cost reconciliation." *Id.* at 15.

In response to Commerce's verification outline, LDC Sucos explained that "certain raw fruit purchase contracts include a variable price component that is based on the sales price of the finished juice. Because the final price for these contracts is determined at year end after the company's auditors have confirmed the fiscal year sales revenues, this settlement is not part of the inventoried cost of the finished goods, but rather recorded directly to {cost of goods sold} COGS." Cost Verification Report at 8. These annual fruit cost adjustments relating to both lemons and oranges are accumulated in account [          ] "KDM material price difference" and were initially excluded from the reported cost of manufacturing, and included in LDC Sucos's G&A. Cost Verification Report at 8, 21. Commerce later verified LDC Sucos' revised cost reconciliation, which was adjusted for this account using the values in LDC Sucos's accounting system from the fruit contract auditors. *See* Letter from White & Case LLP to Sec'y Commerce re: *Certain Lemon Juice from Brazil: Cost Verification Exhibits* (Sept. 23, 2022) at Exhibit CVE-6 (PR 242) (CR 263-76) ("Cost Verification Exhibits"). LDC Sucos also provided the POI total for the fruit cost adjustment in the cost reconciliation and provided monthly values specific to lemons for this account in the same exhibit. *See* Cost Verification Exhibits at Exhibit CVE-6. Commerce verified both exhibits and noted that its "preliminary adjustment to G&A included additional raw fruit cost"

and that "{i}t might be appropriate to include the additional raw fruit cost as cost of manufacturing, rather than G&A expenses." Cost Verification Report at 21.

On November 2, 2022, in their case briefs, LDC Sucos and Petitioner both agreed that Commerce should make adjustments to LDC Sucos's G&A and cost of manufacturing to account for the end-of-year fruit cost adjustments. *See* Letter from White & Case LLP to Sec'y Com. re: *Certain Lemon Juice from Brazil: Case Brief* (Nov. 2, 2022) at 7–10 (PR 271) (CR 299) ("LDC Sucos Case Brief"); Petitioner Case Brief at 9–10. LDC Sucos also argued that Commerce should remove the raw fruit cost adjustments captured in account [          ] – "KDM material price difference" from the G&A calculation numerator and add the value to the G&A calculation cost of goods sold denominator. LDC Sucos Case Brief at 7–10. LDC Sucos also argued that Commerce should include only the portion of this expense pertaining to lemon – not orange – fruit into the cost of manufacturing ("COM") for the POI. LDC Sucos Case Brief at 7–10. Petitioner argued that this COM adjustment should be done on a fiscal year basis because "{b}asing the COM adjustment on a value approved by the FY2021 auditors while the cost reconciliation is based on the 2020 financial statements would be inconsistent." Petitioner Case Brief at 10. In its rebuttal brief, LDC Sucos argued that Commerce should disregard this request because LDC Sucos provided support for the POI total for the appropriate COM fruit cost adjustment corresponding to lemon fruit (*i.e.*, a [                              ]). *See* LDC Sucos Rebuttal Brief at 8–9 (citing Cost Verification Exhibits, Exhibit CVE-6 at 17).

In its Final Determination, Commerce adjusted LDC Sucos's COM to account for the end-of-year fruit cost adjustments made for lemons during the POI. *Final IDM* at 17–18. Commerce "agree{d} with all interested parties that the {end-of-year fruit cost} adjustment should be included in the COM and likewise in the COGS denominator used to calculate the G&A and financial

expenses rates." *Id.* at 17.  Commerce also agreed that "the COM adjustment should only include the portion of the POI fruit material price difference pertaining to lemon fruit." *Id.*  Commerce noted that "{a}t verification, {it} examined the POI fruit material price difference for both lemons and oranges and traced the values to source documents." *Id.* (citing Cost Verification Exhibits at Exhibit CVE-6).  Commerce also explained that "{a}t verification, {it} noted that the material price differences are finalized at year-end after the final price of the fruit purchase contracts have been determined . . . ." *Id.* at 18 (citing Cost Verification Report at 8).

C. **Facts Relating to Commerce's Calculation of LDC Sucos's G&A Expense Ratio.**

LDC Sucos provided its 2020 and 2019 audited financial statements.  *See* AQR at Exhibit A13 & A14.  Commerce also requested the 2019 and 2020 financial statements for "all affiliates involved in the production or sale of the subject merchandise in the foreign market and the U.S. market, of all affiliated suppliers to these affiliates, and of the parent(s) of these affiliates." *See* AQR at A-26.  In response, LDC Sucos provided 2019 and 2020 audited financial statements for all entities that met this description: [

].  *See* AQR at Exhibits A13 – A21, and A26.  Regarding administrative services provided by other entities, LDC Sucos explained that [



] *See* AQR at A-26.

In Commerce's supplemental Section A questionnaire, Commerce requested that LDC Sucos provide "financial statements for [



]" and asked for "financial statements for the fiscal

year 2021" or if not ready then "2021 monthly or quarterly statements to cover the period of investigation for LDC and its affiliates, including [

].*" See* SAQR at A-13.  In response, LDC Sucos provided annual reports for [

] but noted that these affiliates of the LDC Group in the fruit juice line of business "are not directly related to the production, sales, or distribution of the merchandise under consideration." *See* SAQR at Supp. A-13–Supp. A-14 & Exhibits Supp. A06–A10.  LDC Sucos also explained that LDC Juices NA's financial statements [

], and [

]'s financial statements are included in [

] both of which were previously provided to Commerce.  *See* SAQR at Supp. A-13– Supp. A-14; *see also* AQR at Exhibits A13, A14, A17 & A18.  LDC Sucos also explained that it was unable to provide 2021 monthly or quarterly statements "because the company works on annual basis." *See* SAQR at Supp. A-14.

Later, when responding to Commerce's cost questionnaire, LDC Sucos explained once again that it [

] *See* DQR at D-15, D-19–D-20.  In a supplemental cost questionnaire, Commerce asked LDC Sucos to (1) provide more information regarding how it has reported the cost of these accounting services and (2) ensure that all services expenses incurred on behalf of LDC Sucos by its parent company have been included in G&A expenses. *See* SDQR at D-23–D-24.  LDC Sucos explained:

> The administrative and accounting services provided by Louis Dreyfus Company Brasil S.A. ("LDC Brasil S.A.") (an affiliate, not involved in fruit juice production)

> to LDC Sucos and LDC Juices N.A. in 2020 are subject to a Cost-Sharing Agreement between the companies . . . . ***The cost is reported in the G&A expenses***. Please see **Exhibit** D15 listing account [          ] (Intercompany Service Fee). Please also see **Exhibit Supp. D13** (pages 2-14) containing the Cost-Sharing Agreement (and related amendment) between LDC Sucos and LDC Brasil and in turn between LDC Sucos and LDC {J}uice NA.
>
> . . .
>
> ***All service expenses incurred on behalf of LDC Sucos by its parent company have been included in the G&A expenses***. Compare account number [          ] with its description ([                        ]) under the G&A accounts in **Exhibit D15** and in the Chart of Accounts in **Exhibit A12**.

SDQR at Supp. D-23–Supp. D-24, & Exhibit Supp. D13 (citing DQR at Exhibit D15; AQR at Exhibit A12) (emphasis added).

During the sales verification, Commerce "reviewed the organization charts submitted in Exhibit A-2 of the March 14, 2022, Section A questionnaire response (AQR), and discussed the companies within the LDC Group that are involved in the production and global sale of lemon juice." Commerce Memorandum to File re: *Verification of the Sales Questionnaire Response of Louis Dreyfus Company Sucos S.A. in the Antidumping Investigation of Certain Lemon Juice from Brazil* (Oct. 5, 2022) at 3 (PR 253) (CR 293) ("Sales Verification Report"). Commerce noted:

> In reviewing the aforementioned documents, we verified all short- and long-term investments and holdings by LDC and affiliated companies involved in the sale or production of lemon juice, ***and the nature of any affiliations between LDC, LDC NA, [          ], and Louis Dreyfus Company Agrícola S.A. and other companies***, including, but not limited to, all suppliers and customers as reported in LDC's submissions. ***We noted no discrepancies***.

Sales Verification Report at 3 (emphasis added). During the cost verification, LDC Sucos provided [                                              ]. *See* Cost Verification Exhibits at Exhibit CVE-1 ([

11

]).  Commerce explained that it "discussed with company officials the consolidated and non-consolidated affiliated parties that are involved in the production and sale of the merchandise under consideration."  Cost Verification Report at 3.  Commerce also verified expenses captured in [                                        ] and concluded that "{b}ased on our test work throughout verification, we found no evidence of undisclosed affiliated transactions."  Cost Verification Report at 4.

In Petitioner's case brief, Petitioner argued that Commerce should include parent company G&A expenses in LDC Sucos's G&A expense ratio.  Petitioner Case Brief at 11–14.  Petitioner argued that LDC Sucos failed to provide financial statements for [                        ] and that a portion of the [                    ] G&A expenses should be included in LDC Sucos's G&A expense ratio because a holding company "exists solely for the benefit of its subsidiaries by holding shares and overseeing investments in companies it owns."  Petitioner Case Brief at 13–14 (citing *Large Diameter Welded Pipe from Canada: Final Affirmative Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 6,378 (Dep't Commerce Feb. 27, 2019), accompanying Issues and Decision Memorandum at Comment 6) ("*LDWP from Canada*")).  In its rebuttal brief, LDC Sucos argued that "LDC Sucos reported its G&A expenses, including expenses for administrative services provided by a related party, according to Commerce's instructions and Commerce's established past practice" of only including a portion of the parent company's G&A expenses "<u>if the parent performed administrative services on behalf of the respondent.</u>"  LDC Sucos Rebuttal Brief at 10–11 (citing *Notice of Final Determination of Sales at Less Than Fair Value: Outboard Engines From Japan*, 70 Fed. Reg. 326 (Dep't Commerce Jan. 5, 2005), accompanying Issues and Decision Memorandum at 46 (Comment 20) ("*Outboard Engines From Japan*")).

In its Final Determination Commerce "agree{d} with LDC that no adjustments are required to LDC's G&A expenses to incorporate expenses incurred by its parent or other holding companies." *Final IDM* at 20.  Commerce noted that there "is no record evidence that the ultimate parent company or any other LDC holding companies provided any services to LDC." *Final IDM* at 20.  Commerce pointed to LDC Sucos's response to Commerce's supplemental questionnaire to find that "an affiliated company that was not LDC's parent nor any other LDC holding company provided the SG&A services in question" and that "the LDC companies charge each other where services are provided to other LDC companies." *Final IDM* at 20 (citing SDQR at Supp. D-23 – Supp. D-24, Exhibit Supp. D-13).  Commerce also explained that:

> LDC is not required to provide the financial statements of affiliates that are not involved in the production of subject merchandise, moreover, we did not specifically request LDC to provide the financial statement of the other holding companies. We note that LDC has responded to our questionnaires and submitted all requested financial statements on the record.

*Final IDM* at 21 (citing SAQR).  On this basis, Commerce found that "there is no necessary information missing from the record" and thus determined "based on the record evidence that there are no parent company G&A costs incurred for the benefit of LDC that were excluded from the reported costs." *Final IDM* at 21.

**D.    Facts Relating to Petitioner's Request for an Untimely Correction of Alleged Errors**

In its Preliminary Determination, Commerce applied the constructed value ("CV") Profit rate to constructed export price ("CEP") Profit.  Specifically, Commerce's Preliminary Analysis Memorandum for LDC Sucos stated:

> "Because LDC's third-country market sales failed the cost test, we are unable to calculate a CV profit ratio and CV selling expenses using the preferred method under section 773(e)(2)(A) of the Act, *i.e.*, based on the respondent's own home-market or third-country sales made in the ordinary course of trade.

> Therefore, for this preliminary determination, we determined CV profit and selling expenses in accordance with section 773(e)(2)(iii) of the Act (*i.e.*, based on "any other reasonable method"). Specifically, for the preliminary determination, we relied on Citrus Juice Eireli's (Citrus Juice)'s cost of production of lemon juice in Brazil and comparison market sales data for deriving a combined CV profit and selling expenses in LDC's margin calculation. We entered CEP profit in the PRATECV and CEP profit fields in the SAS programming, to protect the proprietary nature of the information."

Commerce Memorandum to The File, re: *Analysis Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Certain Lemon Juice from Brazil: Louis Dreyfus Company Sucos S.A.* (July 28, 2022) (PR 220) (CR 233) ("Preliminary Analysis Memo"). The corresponding preliminary margin calculation program for LDC Sucos applied this methodological choice in lines 767, 774 and 1718. *See* Preliminary Analysis Memo at Attachment IV. Petitioner, however, did not raise any argument relating to this methodological decision in its case brief.

On December 19, 2022, Commerce issued its final determination. *See Final AD Determination*, and accompanying *Final IDM*. Pursuant to Commerce's instructions in its December 21, 2022, Memorandum to the File and 19 C.F.R. § 351.224(c)(2), the deadline to submit comments regarding ministerial errors was December 27, 2022 and the deadline to submit replies to those comments was January 3, 2023. *See* Commerce Memorandum, re: *Deadline to File Comments on Significant Ministerial Errors* (Dec. 21, 2022) (PR 299). On December 27, 2022, LDC Sucos filed ministerial comments with regard to a currency and measurement conversion issue (*i.e.*, the conversion from Brazilian Reals per kilogram to US Dollars per metric ton). Letter from White & Case LLP, to Sec'y Commerce, re: *Certain Lemon Juice from Brazil: Ministerial Error Comments* (Dec. 27, 2022) (PR 302) (CR 337). Petitioner failed to submit any comments regarding ministerial errors by the December 27, 2022 deadline. On January 3, 2023, Petitioner filed a reply to LDC Sucos's Ministerial Error Comments. *See* Letter from Buchanan

Ingersoll Rooney, to Sec'y Commerce, re: *Certain Lemon Juice from Brazil: Rebuttal Ministerial Error Allegation as to Louis Dreyfus Company Sucos S.A.* (Jan. 3, 2023) (PR 303) (CR 338). Petitioner's reply included an alleged error regarding the CEP Profit rate, which was not discussed in LDC Sucos's Ministerial Error Comments. *See id.* at 2–3. On January 6, 2023, LDC Sucos filed a letter regarding Petitioner's Rebuttal Comments arguing that they raised a non-ministerial error in an untimely manner. Letter from White & Case LLP, to Sec'y Commerce, re: *Certain Lemon Juice from Brazil: Letter regarding Petitioner's Ministerial Error Rebuttal* (Jan. 6, 2023) (PR 305).

On January 13, 2023, Commerce issued a memorandum to the parties removing both Petitioner's rebuttal comments and LDC Sucos's letter to Petitioner's rebuttal comments from the official and public records of the investigation. *See* Commerce Memorandum to File, re: *Removal of Document from the Record* (Jan. 13, 2023) (PR 310). On January 17, 2023, Petitioner resubmitted its rebuttal ministerial error comments removing any mention of its arguments relating to the CEP profit rate. *See* Letter from Buchanan Ingersoll Rooney, to Sec'y Commerce, re: *Certain Lemon Juice from Brazil: Rebuttal Ministerial Error Allegation as to Louis Dreyfus Company Sucos S.A.* (Jan. 17, 2023) (PR 311) (CR 339).

## III.   STANDARD OF REVIEW

In reviewing a challenge to Commerce's determination in an antidumping duty proceeding, the Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951)

(quoting *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)). For a determination to be supported by substantial evidence, there must be a rational connection between the facts on the record and the choice made by Commerce. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). "In reviewing Commerce's factual determinations under the substantial evidence standard, the agency is 'presumed . . . to have considered all pertinent information sought to be brought to its attention'" and "there is no statutory requirement that the Department explicitly discuss every piece of record evidence that is put before it in an investigation." *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (Ct. Int'l Trade 2000) (citations omitted).

"To be in accordance with law, the agency's decision must be authorized by the statute, and consistent with the agency's regulations." *Zhaoqing New Zhongya Aluminum Co. v. United States*, 929 F. Supp. 2d 1324, 1326 (Ct. Int'l Trade 2013). The Court determines whether the agency's statutory interpretation is "in accordance with law" based on the two-prong test established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See, e.g.*, *Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 426 F. Supp. 3d 1353, 1357 (Ct. Int'l Trade 2020).

The Administrative Procedure Act prohibits an agency from acting in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The court has found an agency to act in "an arbitrary and capricious manner if it 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Shandong Dongfang Bayley Wood Co. v. United States*, 375 F. Supp. 3d 1339, 1344 (Ct. Int'l Trade 2019) (quoting *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

**IV.     ARGUMENT**

 **A.     Commerce's Determination That LDC Sucos Was Not Affiliated With [  ]
  Because They Are Contractual Parties That Do Not Control or Rely on Each
  Other and Are Not Partners Is Supported by Substantial Evidence and Is In
  Accordance With Law.**

  **1.     Commerce's determination that LDC Sucos and [  ] are not
   affiliates through a close supplier relationship pursuant to 19 U.S.C. §
   1677(33)(G) is supported by substantial evidence and in accordance
   with the law.**

Commerce's determination that LDC and its supplier [  ] are not affiliated within the meaning of section 19 U.S.C. § 1677(33) is supported by substantial evidence on the record and was made in accordance with the law.  In this case, Commerce properly determined that LDC Sucos and [  ] are not affiliates, but rather contractual parties, because neither is reliant on the other, and neither can impact the production, price, or cost of the lemons once the lease and purchase agreement were signed.  Commerce relied on verified evidence on the record to come to this conclusion and its analysis met the requirements of the statute.

Commerce's affiliation analysis was consistent with its past practice and the requirements of 19 U.S.C. § 1677(33).  Under Section 771(33) of the Tariff Act of 1930, two parties are affiliated when one party "controls" the other.  *See* 19 U.S.C. § 1677(33)(G).  Control may occur within a "close supplier relationship," as Petitioner argues existed between LDC Sucos and [  ].  19 C.F.R. § 351.102(b)(3); Petr.'s Br. at 23–29.  "Not all close supplier relationships are control relationships, however"; a supplier and buyer are affiliates only when one "'becomes *reliant* upon the other.'"  *See Samsung Elecs. Co. v. United States*, 70 F. Supp. 3d 1350, 1357 (Ct. Int'l Trade 2015) (citing Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 at 838 (1994)) (emphasis in original).  Moreover, exclusive sales contracts alone do not indicate reliance or that the parties in question have a close supplier relationship.  *See Chlorinated Isocyanurates from the*

*People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 10411 (Dep't Commerce Feb. 24, 2022) (Distinguishing between "exclusivity" and "reliance: "A party might have an exclusive relationship with a supplier, customer, or reseller, but still be perfectly capable of acting independently if the exclusive relationship is no longer in its interests."); *see TIJID, Inc. v. United States*, 366 F. Supp. 2d 1286, 1299 (Ct. Int'l Trade 2005) ("TIJID argues that there is a 'close supplier relationship' because Fay Candle sells 100 percent of its candles to TIJID. . . . This fact alone does not support a finding of a 'close supplier relationship.' Commerce found that although Fay Candle may have sold 100 percent of its exports to TIJID, there was no evidence that Fay Candle was required to do.")

A supplier with an exclusive sales agreement may be reliant upon its buyer, but if an "affiliation finding hinged on this factor alone, however, {a} court would be reluctant to uphold the determination as based on substantial evidence." *Ta Chen Stainless Steel Pipe v. United States*, 1999 Ct. Intl. Trade LEXIS 110, at *24 (Oct. 28, 1999).  Even when a supplier or buyer is reliant upon the other, Commerce will only consider the parties as affiliates if the parties are "legally or operationally in a position to exercise restraint or direction over the third party" and if "the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise." *Coal. of Am. Millwork Producers v. United States*, 581 F. Supp. 3d 1295, 1311 (Ct. Int'l Trade 2022) (citing 19 U.S.C. § 1677(33)(G); 19 C.F.R. § 351.102(b)(3)).  Finally, Commerce does not require two parties to prove the negative, namely, a lack of control. *Notice of Final Results of Antidumping Duty Administrative Review: Solid Urea from the Russian Federation*, 75 Fed. Reg. 51440 (Dep't Commerce 2010), accompanying Issues and Decision Memorandum at 8–9 (Comment 1).

There is substantial evidence on the record to support Commerce's determination that LDC Sucos's contractual relationship with [      ] does not constitute affiliation through a close supplier relationship.  First, Commerce noted that in LDC Sucos's Section A Questionnaire Response, LDC Sucos listed its affiliates, and did not include [      ].  *See* AQR at Exhibit A2.[2]  LDC Sucos's Supplemental Section A Questionnaire Response went on to explicitly identify [      ] as a non-affiliate.  *See* SAQR at Supp. A-5.  In response to Petitioner's argument that LDC Sucos was reliant on [      ] for lemons because it needed a land holder with harvest-ready lemon trees to source lemons and was required by contract to purchase a portion of its lemons from [      ] as part of its rent, Commerce pointed to record evidence demonstrating that "LDC had other sources for purchasing {this} major input other than this particular supplier." *Final IDM* at 12 (citing DQR at Exhibit D7; SDQR at Exhibit Supp. D15).  Petitioner also argues that [      ] is reliant on LDC Sucos because [

                                                          ] and CAB is prohibited from "engaging in transactions with third parties for any portion of its land or fruit." Petr.'s Br. at 29.  However, as Commerce explained in its determination, there is a difference between exclusivity and reliance. *Final IDM* at 12.  The Court has recognized, "{t}his fact alone does not support a finding of a 'close supplier relationship.'" *See TIJID, Inc.*, 366 F. Supp. 2d at 1299 (finding no close supplier relationship between seller and buyer even though seller sold 100% of if its goods to buyer).

Commerce also verified that there was no "evidence of affiliation or non-arm's-length transactions between" LDC Sucos and [      ] further supporting a finding that neither LDC Sucos

---

[2] In its initial response, LDC Sucos inadvertently identified its affiliate LDC Agricola as the [agricultural partner under the agricultural partnership agreement].  *See* AQR at A-13.  In its supplemental section A questionnaire response at page Supp. A-5, LDC Sucos corrected the error and correctly identified non-affiliate [CAB] as the other contractual partner. *Compare* AQR at A-13, *with* SAQR at Supp. A-5.

nor [        ] were reliant on one another.  *Final IDM* at 12–13 (citing Sales Verification Report;

Cost Verification Report).

 In so doing, Commerce thoroughly reviewed the contractual terms in the agreement

between LDC Sucos and [        ], looking beyond the mere title of the agreement to understand the

nature of this relationship.  *See Final IDM* at 12–13 (citing DQR at Exhibit D3).  As explained in

the record, [                        ] like the one between LDC Sucos and [        ] are a common

tool used to allow foreign companies to make supply and sale agreements relating to agricultural

goods because, in Brazil, foreign companies must seek authorization from the Ministry of

Agriculture to purchase or lease land, and in practical terms it is "impossible for any company

controlled by foreign nationals or entities, to pursue such a route . . . ."  Cost Verification Report,

Exhibit CVE-8 at 7–8.  The contract terms protect against undue control between the parties: [



                                ].  *See* DQR

at Exhibit D3.  Further, the agreements do not constitute a joint venture as [        ] assumes no risk

as to the price or quantity of lemons it receives.  *See* DQR at Exhibit D3, cl. (e) (In the Purchase

and Sale Agreement, the parties agreed that [



                        ])  [

                                ] by, for

example, [                                ].  *See* DQR at Exhibit D3, cl. 7.5

([                                ]).  Far from control,

the arrangement is one that leaves the parties autonomous from one another.  Thus, Commerce

properly found that the "contractual terms between LDC and its supplier recognize the sovereignty

of the parties and indicate no obligation toward each other beyond those spelled out by the terms of the contract." *Final IDM* at 12. Thus, the agreement itself, along with record evidence demonstrating that LDC Sucos [                                                    ], establish that Commerce's determination was supported by substantial evidence.

Contrary to Petitioner's argument, Commerce did not commit legal error by not explicitly analyzing whether [      ] was reliant on LDC Sucos. Commerce properly analyzed the nature of the relationship between [      ] and LDC Sucos, and discernably found that [      ] was not reliant on LDC Sucos.[3] Specifically, after finding that LDC Sucos was not reliant on [      ] because it had "other supply options," Commerce in the next sentence found that the "contractual terms between LDC and its supplier *recognize the sovereignty of the parties and indicate no obligation towards each other* beyond those spelled out in the contract." *Final IDM* at 12 (emphasis added). Moreover, Commerce also did not find "any evidence of affiliation or non-arm's-length transactions between those two parties," and determined that "LDC's and its supplier's relationship is market-based," which further supports Commerce's finding that neither party is reliant on the other. *Id.* at 12–13; *see also Notice of Final Determination of Sales at Less Than Fair Value: Large Residential Washers From the Republic of Korea*, 77 Fed. Reg. 75988 (Dep't Commerce Dec. 26, 2012), accompanying Issues and Decision Memorandum at Comment 8 (finding no close

---

[3] We note that Petitioner did not argue before Commerce that CAB was reliant on LDC Sucos, and thus that the parties had a close-supplier relationship. *See generally*, Petitioner Case Brief; Letter from Buchanan Ingersoll Rooney, to Sec'y Commerce, re: *Certain Lemon Juice from Brazil: Petitioner's Rebuttal Brief as to Louis Dreyfus Company Sucos S.A.* (Nov. 10, 2022) (PR 282) (CR 303). Because this argument was not raised before the agency, Petitioner has failed to exhaust its administrative remedies. *See In re DBC*, 545 F.3d 1373, 1378 (Fed. Cir. 2008) ("It is well-established that a party generally may not challenge an agency decision on a basis that was not presented to the agency."). In any event, as explained above, Commerce analyzed the relationship as a whole and found that the transactions were based on commercial considerations, which addresses the substance of Petitioner's untimely argument.

supplier relationship when the buyer "lacks the ability to influence or control the prices at which it purchases parts or assemblies for incorporation into subject merchandise.").

Petitioner points to evidence on the record to argue that [     ] is reliant on LDC Sucos, including the exclusive sales and purchase agreement and the fact that [     ]% of LDC Sucos' total lemon purchases were grown on [     ] groves. Petr.'s Br. at 24–29. These arguments ask the Court to reweigh evidence that Commerce has already considered. Specifically, Commerce noted that LDC Sucos had other supply options, and explained that exclusivity did not necessarily mean reliance before determining that the contractual agreement did not result in a close supplier relationship. *Final IDM* at 12; *see also Ta Chen Stainless Steel Pipe*, 1999 Ct. Intl. Trade LEXIS 110, at *24; *see also TIJID, Inc.*, 366 F. Supp. 2d at 1299. Thus, the Court should disregard Petitioner's efforts to cast doubt on Commerce's thorough analysis. *See Solarworld Americas, Inc. v. United States*, 910 F.3d 1216, 1225 (Fed. Cir. 2018) ("Besides its claim of legal error, SolarWorld also invites us to reweigh the evidence already considered by Commerce. . . . However, we may not reweigh the evidence in this case.") (citing *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015)). Commerce's analysis demonstrates that it determined that neither party was reliant on the other. This further shows that Commerce's determination is supported by substantial evidence and in accordance with law.

Also contrary to Petitioner's argument, *see* Petr.'s Br. at 30–32, Commerce considered the temporal nature of the agreement in its analysis, when it analyzed the terms of the contract, which includes the length. *See Final IDM* at 12–13 (citing DQR at Exhibit D3). "In reviewing Commerce's factual determinations under the substantial evidence standard, the agency is 'presumed . . . to have considered all pertinent information sought to be brought to its attention'" and "there is no statutory requirement that the Department explicitly discuss every piece of record

evidence that is put before it in an investigation." *See Allegheny Ludlum Corp.*, 112 F. Supp. 2d at 1165 (citations omitted). In addition, Petitioner misconstrues Commerce's explanation regarding its analysis of the temporal nature of a relationship for indicia of control. Petitioner argues that because Commerce has said it "cannot rule out the possibility that a *short-term* relationship *could* result in control," it follows that *all long-term* relationships result in control, because they are long-term in nature. *See* Petr.'s Br. at 30 (citing *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27298 (Dep't Commerce May 19, 1997) (final rule)) (emphasis added). This is a logical leap not supported by Commerce's final rule. Moreover, length is but one factor of a relationship between two parties, and this factor alone cannot establish whether the relationship results in control. In other words, a long-term "market-based" "contractual relationship" with arms-length transactions is still market-based, no matter how long the relationship lasts. *See Final IDM* at 13 ("We find that LDC's and its supplier's relationship is market-based and the transactions between them are at arm's length. . . . Record evidence supports that this is a contractual relationship."). Thus, Commerce's determination was made in accordance with law.

> **2. Commerce's determination that LDC Sucos and [    ] are not affiliates through a partnership under 19 U.S.C § 1677(33)(C) is supported by substantial evidence and in accordance with the law.**

Commerce properly determined that LDC Sucos and [    ] are not affiliated as partners within the meaning of 19 U.S.C. § 1677(33)(C). Petitioner focuses on the translated title of the agreement between LDC Sucos and [    ], namely an [            ], to argue that this is sufficient evidence to find that LDC Sucos and [    ] are partners. As much as Petitioner might like to leave the argument at that, such an approach is inconsistent with Commerce's normal practice and would require Commerce *not to* examine the evidence presented. Even when parties

have entered into a "partnership agreement," Commerce will not consider the parties as affiliates unless "the general terms of the agreement . . . describe the type of relationship between {the parties} which reaches the level of control envisioned in section 771(33)(G)." *See Notice of Final Results of Antidumping Duty Administrative Review: Certain Corrosion-Resistant Steel Products From the Republic of Korea*, 84 Fed. Reg. 10784 (Dep't Commerce Mar. 22, 2019), accompanying Issues and Decision Memorandum at 19 (Comment 2). This is further supported by the language in Commerce's regulation 19 C.F.R. § 351.102(b)(3) which details the indicia of control that Commerce must consider in order to find affiliation under 19 U.S.C. §1677(33).

> "In determining whether control over another person exists, **within the meaning of section 771(33) of the Act**, the Secretary will consider the following factors, among others: Corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships. The Secretary will not find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product."

19 C.F.R. § 351.102(b)(3) (emphasis added). As described above, Commerce properly determined that neither LDC Sucos nor [      ] controls each other.

Nevertheless, Petitioner argues that Commerce erred in its analysis of partnership under 19 U.S.C § 1677(33)(C) because it premised affiliation upon "control" in its analysis. Petr.'s Br. at 33 (citing *Ta Chen Stainless Steel Pipe Co. v. United States*, 31 C.I.T. 794, 820 (2007)). Commerce's determination that "LDC and its supplier are not affiliated within the meaning of section 771(33)(C)" however, was made in accordance with law because Commerce did not premise its lack of partnership finding upon whether either LDC Sucos or [      ] had control over each other. Instead, Commerce relied on record evidence demonstrating "that this is a contractual relationship" rather than a partnership. *Final IDM* at 13 (citing DQR at Exhibit D3). A partner is defined as "{s}omeone who shares or takes part with another, esp. in a venture with shared benefits

24

and shared risks." *See* Partner, Black's Law Dictionary (11th ed. 2019). Thus, to determine whether LDC Sucos and [      ] are partners within the meaning of 19 U.S.C. § 1677(33)(C), Commerce properly analyzed whether the parties shared benefits or shared risks. To do so, Commerce looked at whether they jointly owned anything pursuant to the agreement or whether they engaged in joint selling activities. *Final IDM* at 13. Commerce found that LDC Sucos and [      ] "do not jointly own anything pursuant to the terms of their contract and do not engage in joint selling activities" thus, establishing that LDC Sucos and [      ] do not share risks or benefits. Moreover, if, for example, [

                                                  ]. *See* DQR at Exhibit D3 (In the Purchase and Sale Agreement, the parties agreed that [


                                                  ]). Based on this, Commerce properly concluded "that LDC and its supplier are not affiliated as partners . . . ." *Final IDM* at 13.

     Petitioner suggests that the fact that the title of the agreement includes the word partnership means that the agreement establishes that LDC Sucos and [      ] are partners. This simplistic analysis is not what the statute requires. By this same logic, if the agreement was titled Non-Partnership Agreement, Commerce's analysis would come to a different conclusion, without examining the terms of the agreement itself. This would be an absurd outcome. Commerce was correct to look beyond the title of the agreement to the terms of the contract to determine if the parties involved were actually partners within the meaning of §1677(33)(C). In fact, the record contains [

[                         ] Cost Verification Report, Exhibit CVE-8 at 7–8.  Thus,
[                         ] like the one between LDC Sucos and [       ] are [

                    ] and Commerce's determination is supported by substantial evidence

and is in accordance with law.

B.  **Commerce's Determination to Adjust LDC Sucos's COM for the POI to Account for the End-of-Year Fruit Cost Adjustments Based on Verified Information Was Not Arbitrary and Capricious.**

Commerce's decision to rely on verified exhibits in making a POI-based adjustment to

LDC Sucos's COM was not arbitrary and capricious.  First, Commerce followed its established

practice of calculating COM on a POI basis.  Second, contrary to Petitioner's argument, there was

no inconsistency in Commerce's use of verified cost information pertaining to production costs

during the POI.  *See Final IDM* at 17–18 (citing Cost Verification Exhibits, Exhibit CVE-6).

LDC Sucos explained at the cost verification that it makes monthly accounting provisions

for its fruit purchases but does not obtain the final price until the year-end.  *See* Cost Verification

Report at 8, 21; Cost Verification Exhibits, Exhibit CVE-6.  Once the final price is known, LDC

adjusts the total for the year by either a negative or a positive value.  Cost Verification Report at

8, 21; Cost Verification Exhibits, Exhibit CVE-6.  LDC Sucos did not initially report these price

adjustments as part of COM, and Commerce added the entire amount (related to lemons and

oranges) to G&A.  *PDM* at 14.  For the Final Determination, Commerce properly assigned these

costs to COM, but only that portion of the adjustment related to lemons and only those related to

the POI, which is the basis of the COM reporting.  *Final IDM* at 17–18.

Petitioner ignores Commerce's established practice of calculating the COM of subject merchandise on a POI basis.  In its cost questionnaire, Commerce "defines COM as the cost of materials, labor, variable overhead, and fixed overhead incurred to produce the finished goods **during the POI**."  *See* DQR at D-32 (emphasis added).  In contrast, for general and administrative expenses and financial costs, Commerce instructs respondents to calculate these values on a fiscal year basis.  *See* DQR at D-37 ("In calculating your company's G&A ratio use the full-year G&A expense and COGS reported in your company's audited fiscal year financial statements for the fiscal year that most closely corresponds to the POI. . . . In calculating your company's net interest ratio, use the full-year net interest expense and COGS reported in the consolidated audited fiscal year financial statements for the period that most closely corresponds to the POI.").  In this case, as recognized by all parties and properly determined by Commerce, the end-of-year fruit cost adjustments were initially classified as G&A, and were reclassified as part of COM.  *Final IDM* at 17 ("we agree with all interested parties that the adjustment should be included in the COM…").  Because Commerce reclassified these costs from G&A to the COM, the cost is properly reported on a POI basis, and should no longer be reported on a fiscal year basis.  Commerce's determination to adjust the COM to account for the end-of-year fruit cost adjustments was completely in line with Commerce's questionnaire instructions and established practice.

Petitioner mischaracterizes the record evidence that Commerce relied on to adjust the COM to account for the end-of-year fruit cost adjustments.  Contrary to Petitioner's argument, Commerce did ***not*** rely on LDC Sucos's FY2021 financial statements when adjusting the COM for the end-of-year fruit cost adjustments.  Throughout this section of its determination, Commerce never cited to LDC Sucos's FY2021 financial statements, which were submitted as Exhibit IV.B. of the Sales Verification Exhibits.  *See Final IDM* at 17–18.  Instead, Commerce noted that at

verification it "examined the POI fruit material price difference for both lemons and oranges and traced the values to source documents." *Id.* (citing Cost Verification Exhibits at Exhibit CVE-6). Those source documents included LDC Sucos's accounting records demonstrating the composition of the underlying account where the end-of-year adjustments are accumulated, identifying the relevant monthly purchases, and separating the adjustment by fruit type. *See* Cost Verification Exhibits, Exhibit CVE-6 at 18. Exhibit CVE-6 also included the POI total for the fruit cost adjustment in the cost reconciliation and provided monthly values specific to lemons for the relevant account. *See* Cost Verification Exhibits, Exhibit CVE-6 at 17–18. Based on only this record evidence, Commerce determined that "the material price difference related to oranges should not be included in the reported costs as it is associated with the COM of non-subject merchandise" and "adjusted reported COM only to include the lemon fruit portion of the fruit material price difference." *Final IDM* at 18. Thus, Commerce's decision to account for the end-of-year fruit cost adjustments on a POI basis was supported by substantial evidence, in accordance with law, and was not arbitrary and capricious.[4]

**C.    Commerce Properly Relied on LDC Sucos's Reported Costs and Followed Its Established Practice in Calculating LDC Sucos's G&A Expense Ratio By Deciding Not to Include Additional G&A Expenses From LDC Sucos's Affiliated Entities.**

Commerce properly relied on LDC Sucos's reported costs to calculate LDC Sucos's G&A expense ratio, and followed its established practice when deciding not to include a portion of LDC

---

[4] Petitioner's effort to cast doubt on LDC Sucos's FY2021 financial statements rely in part on a typo in LDC Sucos's case brief to the agency. Petr.'s Br. at 37–38 n.7. Rather than cite Exhibit CVE-6 for the Board Minutes approving and finalizing LDC Sucos's financial statements, LDC Sucos's inadvertently cited Exhibit CVE-7. *See* LDC Sucos's Case Brief at 12 n.29 (citing Cost Verification Exhibits at Exhibit CVE-7). However, the record clearly includes these board minutes, which were reviewed and verified by Commerce at the cost verification. *See* Cost Verification Report at Exhibit CVE-6.

Sucos's [                    ] G&A expenses in LDC Sucos's G&A.  Petitioner misconstrues the record and Commerce's past practice, which only requires the inclusion of parent company G&A expenses if the parent entity performed administrative services on behalf of the respondent company and those costs were not already included in the respondent company's reported costs.

It is Commerce's "practice to calculate the G&A expense ratio based on a respondent company's (*i.e.*, the producer of subject merchandise) unconsolidated financial statements plus a portion of the parent company's G&A expenses *if the parent performed administrative services on behalf of the respondent*." *Outboard Engines From Japan*, 70 Fed. Reg. 326, accompanying Issues and Decision Memorandum at 46 (Comment 20) (emphasis added).  As long as the respondent company demonstrates that: (1) "{the parent company} charged its subsidiaries for the services provided{,}" (2) the respondent "included the service fees paid to {the parent company} in its reported costs{,}" and (3) "the service fees charged by {the parent company} reasonably account for the costs of the services provided by the parent company to its subsidiaries{,} . . . no adjustment to {respondent's} reported G&A expenses is warranted." *Common Alloy Aluminum Sheet From Slovenia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 13305 (Dep't Commerce Mar. 8, 2021), accompanying Issues and Decision Memorandum at 31 (Comment 6).

The record supports Commerce's determination that no parent or holding company provided SG&A services to LDC Sucos.  *See Final IDM* at 20.  LDC Sucos reported its G&A expenses, including expenses for administrative services provided by a related party, according to Commerce's instructions and Commerce's established past practice.   In its response to Commerce's Section A Questionnaire, LDC Sucos explained that [        ] of LDC Sucos [

] and provided [                                    ] financial statement. *See* AQR at A-9, and Exhibits A2, A13.  There is no evidence on the record that this [

] or any other [                    ] performed any administrative services on behalf of LDC Sucos.

In its Section D questionnaire response and supplemental Section D questionnaire response, LDC Sucos also explained that an affiliate, Louis Dreyfus Company Brasil S.A. ("LDC Brasil"), provides LDC Sucos [

]. *See* AQR at A-26; SDQR at Supp. D-23–Supp. D-24.  LDC Sucos submitted the [                        ], *see* SDQR at Exhibit Supp. D13, the relevant account for intercompany service fees, *see* SDQR at Exhibit D15 (listing account [          ] for Intercompany Service fee), and supporting worksheets demonstrating the expenses incurred from the [

] LDC Sucos, *see* SDQR at Exhibit Supp. D13.

In response to Commerce's Verification Outline, LDC Sucos presented materials to show that "[

]." Cost Verification Report at 4. Commerce "examined the total shared service expenses that LDC Brasil allocated to juice for 2021 ([              ] BRL) and compared the amount to the total fees recognized by LDC Sucos [          ] BRL in account [          ] for service fees (LDC Sucos pays LDC Brasil periodically but overestimated the accrual at year end)."  Cost Verification Report at 4.  Therefore, the record establishes that the only services provided to LDC Sucos were invoiced to LDC Sucos, paid by LDC Sucos, and reported in LDC Sucos's submitted cost as part of the G&A calculation.

There is no evidence that LDC Sucos's [                                        ] or any of the other companies identified by Petitioner performed any administrative services on behalf of LDC Sucos.  Therefore, no adjustment is required to include G&A expenses from any of these [                    ].  *Outboard Engines From Japan*, 70 Fed. Reg. 326, accompanying Issues and Decision Memorandum at 46 (Comment 20).

To be clear, Commerce properly determined that LDC Sucos cooperated fully in the investigation and provided all the information that Commerce requested.  *Final IDM* at 21.  LDC Sucos provided timely responses to all of Commerce's questionnaires and supplemental questionnaires.  *See generally,* AQR; DQR; SDQR; *Final IDM* at 21.  Moreover, during the sales verification, Commerce verified "the nature of any affiliations between LDC, LDC NA, [          ], and Louis Dreyfus Company Agrícola S.A. and other companies, including, but not limited to, all suppliers and customers as reported in LDC's submissions" and "***noted no discrepancies***."  Sales Verification Report at 3 (emphasis added).  There is simply no evidence on the record that LDC Sucos hid any cost information from Commerce.  *Final IDM* at 21.  This court has recognized that it "runs counter to the discretion afforded to Commerce" to require Commerce to "prove that an importer cooperated to the best of its ability every time that the agency decides not to apply adverse facts available."  *AK Steel Corp. v. United States*, 346 F.Supp.2d 1348, 1355 (Ct. Int'l Trade 2004).  Thus, Commerce's determination that "there is no necessary information missing from the record" was supported by substantial evidence.

Petitioner cites to two cases in its brief that Commerce distinguished from LDC Sucos's situation, in its Final Determination.  *See* Petr.'s Br. at 41; *Final IDM* at 20.  First, unlike the respondent in *Cold Rolled Steel from Russia,* here Commerce found that LDC Sucos "has provided {it} with the details of all service expenses incurred on its behalf."  *Final IDM* at 20; *c.f. Certain*

*Cold-Rolled Steel Flat Products from the Russian Federation: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 81 Fed. Reg. 49,950 (Dep't Commerce July 29, 2016), accompanying Issues and Decision Memorandum at 51–52 (Comment 15) (allocating parent G&A to the respondent's G&A using partial adverse facts available because respondent failed to respond to Commerce's request for a breakdown of the parent company's investment portfolio to determine which expenses should be allocated to the respondent's G&A).   Second, in deciding whether to allocate parent G&A expenses to the respondent in *LDWP from Canada,* while Commerce did state that "the company exists solely for the benefit of its subsidiaries by holding shares and overseeing investments in companies it own{s} . . . ." Commerce also noted that the parent company's financial statements "clearly show expenses incurred by the company for the benefit of its subsidiaries." *LDWP from Canada*, 84 Fed. Reg. 6,378, accompanying Issues and Decision Memorandum at 28 (Comment 6).   That is not the case here. As previously mentioned, the financial statements for [

                              ] which are on the record, do not provide any evidence that

[                              ] performed, or had unrecovered costs for, services to its subsidiaries or incurred expenses for the benefit of its subsidiaries.   *See* AQR at Exhibits A15 & A16.   Thus, Commerce properly determined that in "the instant case, there is no evidence that the ultimate parent company . . . provided administrative expenses to its Brazilian subsidiary." *Final IDM* at 20.

As properly determined by Commerce, there is no evidence that LDC Sucos's [

                              ] or any of the other companies identified by Petitioner performed any administrative services on behalf of LDC Sucos.   Therefore, Commerce's determination to use LDC Sucos's costs as reported to calculate LDC Sucos's G&A expense ratio

without including G&A expenses from any of these [                    ] is supported by substantial evidence and is in accordance with law.

> **D.**     **The Court Should Reject Petitioner's Untimely Request to Correct Alleged Errors.**

In its brief, Petitioner asks the Court to include instructions to correct "all errors in the margin calculation" should the Court remand the proceeding back to Commerce for another reason.  Petr.'s Br. at 42–43.  The Court should reject Petitioner's untimely request to address alleged errors in Commerce's Final Determination because: a) Petitioner failed to exhaust its administrative remedies and raise these arguments before the agency in a timely manner (*i.e.,* prior to Commerce's Final Determination); and b) Commerce properly rejected Petitioner's attempt to present a substantive, methodological argument as "rebuttal" to unrelated ministerial error claims made by LDC Sucos.

First, Petitioner's claims are clearly untimely, as evidenced by the fact that Petitioner does not appeal Commerce's ruling on this issue, but rather asks the court to require Commerce to change its methodological approach if the Court remands the proceeding on other issues.  While the alleged programming error was in Commerce's Preliminary Determination, Petitioner did not raise this argument in its case brief.  Had Petitioner done so, LDC Sucos and Commerce could have addressed the argument before Commerce issued its final determination.  Instead, Petitioner raised its argument after Commerce issued its Final Determination and in reply to LDC Sucos's ministerial error comments.  *See* Letter from Buchanan Ingersoll Rooney, to Sec'y Commerce, re: *Certain Lemon Juice from Brazil: Rebuttal Ministerial Error Allegation as to Louis Dreyfus Company Sucos S.A.* (Jan. 3, 2023).  Now, Petitioner asks the Court to order Commerce to reverse its methodological decision based on an argument that it was unable to consider during its proceedings.  That is not the way judicial review works.  The fact that Petitioner did not raise its

33

arguments during briefing is fatal to its claim.  *See Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd.*, 334 F.3d 1284, 1292-93 (Fed. Cir. 2003) (holding that Commerce is not required to correct an alleged error in its final determination unless the party has exhausted its administrative remedies); *see also Dorbest Ltd. v. United States*, 604 F.3d 1363, 1377 (Fed. Cir. 2010) (explaining that the Federal Circuit has "found no such case" that "holds that Commerce's refusal to fix a clerical error in the calculation of an antidumping duty margin is an abuse of discretion when the clerical error was discoverable during the original proceedings but was not pointed out to Commerce during the time period specified in the regulations").  This Court should not reach arguments that were not presented to Commerce.

Second, Commerce properly rejected Petitioner's argument as a "rebuttal" to LDC Sucos's ministerial error claim because it was neither a rebuttal nor ministerial in nature.  Petitioner first raised its error allegation regarding Commerce's programming instructions in its *rebuttal* comments to LDC Sucos's ministerial error comments.  Pursuant to 19 C.F.R. § 351.224(d), replies to ministerial error comments are limited to the specific issues raised by other parties filed under the initial comment deadline.  19 C.F.R. § 351.224(d) ("Replies to any comments must be limited to issues raised in such comments.").  Petitioner's reply included in their so-called rebuttal certain allegations unrelated to LDC Sucos's ministerial error comments.  While LDC Sucos filed comments only with regard to a currency and measurement conversion issue (*i.e.*, the conversion from Brazilian Reals per kilogram to US Dollars per metric ton), Petitioner's reply included an alleged error regarding the CEP Profit rate.  Thus, Commerce rejected Petitioner's rebuttal comments, removing them from the official administrative record.  *See* Commerce Memorandum to File, re: *Removal of Document from the Record* (Jan. 13, 2023).  The agency was correct in doing so and Petitioner does not argue otherwise in its brief.  Thus, the Court should reject

Petitioner's blatant attempt to circumvent the administrative process and decline to address error allegations that the agency was not able to consider.  For this reason, Petitioner's request should therefore be rejected in its entirety.

## V.      CONCLUSION

For the foregoing reasons, Defendant-Intervenor respectfully requests that the Court enter judgment in favor of Defendant and affirm Commerce's *Final AD Determination* as it is supported by substantial evidence and is otherwise in accordance with law.

Respectfully submitted,

/s/ Gregory J. Spak
Gregory J. Spak
Jessica E. Lynd
Cristina M. Cornejo

White & Case LLP
701 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 626-3600
gspak@whitecase.com

*Counsel to Louis Dreyfus Company Sucos S.A.*

November 1, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for LDC Sucos's Response Brief, as computed by White & Case LLP's word processing system (Microsoft Word 2016), is 12,559 words.


/s/ Gregory J. Spak
Gregory J. Spak