**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

<table>
<tr><td>

VENTURA COASTAL, LLC,

              Plaintiff,

    v.

UNITED STATES,

              Defendant,

    and,

LOUIS DREYFUS COMPANY SUCOS S.A.,

              Defendant-Intervenor.

</td><td>

Before:   Hon. Claire R. Kelly, Judge

Court No. 23-00009

NON-CONFIDENTIAL VERSION

Confidential Information Removed From Brackets on Pages 1, 3-8, 11-19, and 21

</td></tr>
</table>

**REPLY BRIEF IN SUPPORT OF**
**PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Daniel B. Pickard, Esq.
Mert E. Arkan, Esq.
David B. Sessions, Esq.

**BUCHANAN INGERSOLL & ROONEY PC**
1700 K Street, NW
Washington, D.C. 20006
(202) 438-0070

*Counsel to Ventura Coastal, LLC*

Dated: December 29, 2023

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION AND SUMMARY OF ARGUMENT……………………………...…………1

II.   ARGUMENT .................................................................................................................. 2

    A.    Defendants' Arguments Regarding Failure to Exhaust Administrative Remedies Are Meritless................................................................................................................... 2

    B.    Commerce Fails to Excuse its Legally Defective and Analytically Inadequate Affiliation Determination............................................................................................ 5

    C.    Commerce Failed to Refute that its Partnership Analysis was Contrary to Law ....... 8

    D.    Defendants Fail to Refute the Reliance Evidenced in Brazilian Law's Prohibition on LDC from Owning or Leasing Land........................................................................... 12

    E.    Commerce has Failed to Refute that the Selective Use of LDC's 2021 Financial Data was Arbitrary and Capricious ................................................................................... 13

    F.    Commerce's Failure to Adjust LDC's G&A Expense Ratio to Include Expenses Associated with Certain LDC-affiliated Entities was Arbitrary and Capricious.............. 16

III.  CONCLUSION................................................................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agro Dutch Indus. Ltd. v. United States*,
    508 F.3d 1024 (Fed. Cir. 2007)..................................................................9

*Allegheny Ludlum Corp. v. United States*,
    112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) .........................................12

*Am. Mfrs. of Multilayered Wood Flooring v. United States*,
    639 F. Supp. 3d 1216 (Ct. Int'l Trade 2023) .........................................6

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)...................8, 9, 10

*China Steel Corp. v. United States*,
    264 F. Supp. 2d 1339 (Ct. Int'l Trade 2003) .......................................7, 8

*DuPont Teijin Films China Ltd. v. United States*,
    7 F. Supp. 3d 1338 (Ct. Int'l Trade 2014) ...........................................22

*GGB Bearing Tech. (Suzhou) Co. v. United States*,
    279 F. Supp. 3d 1233 ...........................................................................5

*Hontex Enters., Inc. v. United States*,
    248 F. Supp. 2d 1323 (Ct. Int'l Trade 2003) .........................................7

*Jacobi Carbons AB v. United States*,
    222 F. Supp. 3d 1159 (Ct. Int'l Trade 2017) .......................................3, 11

*Koyo Seiko Co. v. United States*,
    36 F.3d 1565 (Fed. Cir. 1994)..............................................................10

*Nagase & Co. v. United States*,
    628 F. Supp. 3d 1326 (Ct. Int'l Trade 2023) .........................................12

*Suprema Inc. v. Int'l Trade Comm'n*,
    796 F.3d 1338 (Fed. Cir. 2015)..............................................................9

*Suzano S.A. v. United States*,
    589 F. Supp. 3d 1225 (Ct. Int'l Trade 2022) .........................................12

*Thai Pineapple Pub. Co. v. United States*,
    21 Ct. Int'l Trade 283 (1997) ...............................................................22

*Union Steel v. United States*,
   755 F. Supp. 2d 1304 (Ct. of Int'l Trade 2011) ....................................................13

*Zhaoqing Tifo New Fibre Co. v. United States*,
   60 F. Supp. 3d 1328 (Ct. Int'l Trade 2015) ...........................................................4

**Statutes**

19 U.S.C. § 1677.............................................................................................1, 2, 4, 5, 8, 9

19 U.S.C. § 1677b....................................................................................................17

**Regulations**

19 C.F.R. § 351.102 .............................................................................................1, 4, 5

**Other Authorities**

Black's Law Dictionary, 2nd Ed., https://thelawdictionary.org ....................................9

*Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed.
   Reg. 49,950 (Dep't Commerce July 29, 2019) ......................................................20

*Certain Preserved Mushrooms From Poland*, 88 Fed. Reg. 18,118 (Dep't
   Commerce March 27, 2023) ...................................................................................19

*Ferrosilicon from Venezuela*, 58 Fed. Reg. 27,524, 27,528 (Dep't Commerce May
   10, 1993) ...............................................................................................................19

*Large Diameter Welded Pipe from Canada*, 84 Fed. Reg. 6,378 (Dep't Commerce
   Feb. 27, 2019) .......................................................................................................21

*Large Diameter Welded Pipe From the Republic of Korea*, 86 Fed. Reg. 18,508
   (Dep't Commerce February 27, 2019).....................................................................17

Merriam-Webster Dictionary, https://www.merriam-webster.com.................................9

*Welded Stainless Steel Pipe from Malaysia*, 59 Fed. Reg. 4,023, 4,027 (Dep't
   Commerce January 28, 1994) .................................................................................19

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Ventura Coastal LLC ("Ventura" or "Plaintiff") respectfully submits this reply to the Response Briefs filed by the United States ("Commerce" or "Defendant") ("Commerce's Brief") and Louis Dreyfus Company Sucos S.A. ("LDC" or "Defendant-Intervenor") ("LDC's Brief") (collectively, "Defendants' Response Briefs").

First, despite Defendants' argument that Plaintiff did not exhaust its administrative remedies with respect to Commerce's affiliation analysis, the parties' Case and Rebuttal Briefs raised the relevant issues which are elaborated below.  Further, Commerce's failure to consider the temporal aspect of LDC and [          ] relationship concerns a purely legal issue and any related exhaustion argument is therefore meritless.

Second, Defendant's argument in regard to (1) Commerce's failure to analyze [          ] reliance on LDC and, thus, fully consider LDC's legal or operational ability to exercise restraint or direction over [          ]), and (2) Commerce's failure to consider the temporal aspect of the parties' relationship, as it was required to do pursuant to 19 C.F.R. § 351.102(b)(3), are unavailing.

Third, Plaintiff has argued that Commerce's affiliation determination pursuant to 19 U.S.C. § 1677(33)(C) applied an impermissibly narrow construction of the term "Partners."  Defendant's argument that the statutory term "partners" is ambiguous and that Commerce properly required evidence of joint ownership or joint selling activities to demonstrate affiliation within the meaning of the (33)(C), is contrary to law.  Moreover, one of the most significant flaws in Commerce's determination is that it fails to address the reliance of the parties as a function of law.  Specifically, while Commerce argued that a close supplier relationship requires "reliance" beyond exclusivity, Commerce inexplicably failed to address the fact LDC could not and cannot, as a legal matter, purchase or enter into a long-term leasehold for agricultural property in Brazil.

Fourth, Defendant and Defendant-Intervenor argue that Commerce did not act arbitrarily in rejecting certain FY 2021 financial data while accepting other FY 2021 data. As demonstrated below, Commerce's use of end of year LDC's FY 2021 financial data to calculate the fruit cost adjustment, despite affirmatively declining to use financial data from LDC's FY 2021 financial statements for its "Period Cost Calculations" due to completeness and reliability issues, in the absence of reasoned discussion, was arbitrary and capricious.

Finally, Defendant and Defendant-Intervenor argue that Commerce did not err in failing to adjust LDC's G&A ratio to include administrative service expenses incurred by certain LDC-affiliated entities, because LDC's own internal records were deemed sufficient evidence of all expenses incurred on its behalf by its affiliates. This argument ignores Commerce's failure to collect and review financial statements of the relevant LDC-affiliated entities to identify any unrecovered expenses. Commerce cannot be excused for failing to follow its established practice, because it also failed to collect the information necessary to do so.

## II.  ARGUMENT

### A. Defendants' Arguments Regarding Failure to Exhaust Administrative Remedies Are Meritless

Defendants' Response Briefs argued that Ventura failed to exhaust its administrative remedies with respect to its challenge to Commerce's affiliation through control analysis under 19 U.S.C. § 1677(33)(G).[1]  Specifically, Commerce's Brief claimed the following:

> Ventura attempt{ed} to argue for the first time that when determining whether an affiliate relationship exists Commerce

---

[1] Commerce acknowledges in its I&D Memo that "{t}he petitioner and LDC also discuss{ed} whether LDC is reliant on its supplier, thus invoking section 771(33)(G) of the Act {codified at 19 U.S.C. § 1677(33)(G)} which states that affiliated parties include '{a}ny person who controls any other person and such other person.'" I&D Memo at 11, P.R. 294.

> failed to consider whether the supplier is reliant on LDC, and only decided that LDC is not reliant on the supplier . . .

> Ventura rais{ed} the argument concerning the temporal aspect of the relationship between LDC and its supplier for the first time on appeal before this Court . . . [2]

LDC's Brief joined the Government with respect to the former (*i.e.*, [          ] reliance on LDC) but not the latter (*i.e.*, the temporal aspect of LDC and [          ] relationship) of its two exhaustion claims.

Both the Government and LDC misconstrue the relevant legal standard on this issue. The Court's exhaustion requirement does not look at "whether Plaintiff's exact wording {was} used" in its case and/or rebuttal briefs, but rather, "{t}he determinative question is whether Commerce was put on notice of the issue."[3] The Defendants' arguments are unavailing because Plaintiff expressly raised both of these arguments in the underlying proceeding in the context of discussing Commerce's affiliation through control analysis – Commerce was therefore undeniably put on notice of the issues.

Specifically, on pages 3 and 5 of its Case Brief, Ventura plainly discussed the issue of reliance of both the supplier on the buyer ("Commerce shall evaluate such a relationship and consider if the supplier has become reliant upon the buyer . . .") and also reliance of the buyer on the supplier (". . . LDC {} is reliant on [          ] to produce lemons . . .").[4] Indeed, Commerce acknowledged that it was on notice regarding this issue – its I&D Memo described the "threshold issue" with respect to its "close supplier relationship{}" analysis as "whether either the

---

[2] Commerce's Brief at 10, 18.
[3] *See Jacobi Carbons AB v. United States*, 222 F. Supp. 3d 1159, 1190 (Ct. Int'l Trade 2017).
[4] *See Letter from Buchanan, Ingersoll & Rooney PC, to Sec'y of Commerce re: Certain Lemon Juice from Brazil: Petitioner's Case Brief as to Louis Dreyfus Company Sucos S.A.* (Nov. 2, 2022), C.R. 297-298, P.R. 270 ("Ventura Case Brief").

buyer or seller has, in fact, become reliant on the other."[5]

In addition, Ventura used the word "control" multiple times in its Case Brief to describe aspects of the relationship between LDC and [        ] to support its affiliation through control arguments, while citing to various legal authorities and the factual record throughout.[6]  These references include a citation to 19 C.F.R. § 351.102(b)(3) – the Commerce regulation which establishes that "{t}he Secretary will consider the temporal aspect of a relationship in determining whether control exists."[7]   Accordingly, the "temporal aspect of {LDC and [          ]} relationship" in the context of evaluating a control relationship under 19 U.S.C. § 1677(33)(G) was raised directly before the agency.

As Ventura expressly raised both of these issues in the underlying proceeding, *i.e.*, 1) [        ]'s reliance on LDC; 2) the temporal aspect of LDC and [        ] relationship, Plaintiff properly exhausted its administrative remedies.  Regardless, Commerce's exhaustion arguments in regard to the temporal aspect of LDC and [        ] relationship, are further rendered meritless under two additional and independent exceptions to the exhaustion requirement.

First, the temporal aspect of LDC and [        ] relationship was also raised by LDC itself.[8]  Indeed, LDC's Rebuttal Brief argued that Commerce should find in favor of non-affiliation in spite of the "[            ] of the [        ] purchase contract."[9]

Second, Commerce's failure to address the temporal aspect of LDC and [        ]

---

[5] I&D Memo at 12, P.R. 294.
[6] *See* Ventura Case Brief at 3, fn. 5-6, C.R. 297-298, P.R. 270.
[7] *Id.* at 3, fn. 5, C.R. 297-298, P.R. 270.
[8] *See generally Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328, 1351 (Ct. Int'l Trade 2015) ("a party {may} litigate an issue that the party did not exhaust at the administrative level where that issue was raised before the agency by a different party").
[9] *See* Letter from White & Case LLP to Sec'y of Commerce, *re: Certain Lemon Juice from Brazil: Rebuttal Brief of LDC Sucos* (Nov. 10, 2022) at 4, C.R. 304, P.R. 287.

relationship involved a "pure legal question . . . {because it did not involve} a question of substantial evidence that depends upon the particular data involved" – and accordingly, it was excepted from the exhaustion requirement.[10]  Defendant attempted to preempt this argument in its Brief by claiming that while "Ventura has presented this matter as a very narrow legal question . . . {Commerce's analysis is} fact-intensive, *i.e.*, whether the temporal aspect of this relationship supports a finding of affiliation."[11] This framing of Plaintiff's argument is plainly incorrect. Simply, there is no further finding of fact required.  The issue on appeal does not involve a factual dispute but rather a purely legal issue – in effect, that Commerce failed to conduct an analysis specifically required by its regulations.  Accordingly, even if Ventura had failed to exhaust its administrative remedies with respect to this issue (which it did not), the failure to conduct an analysis is a pure legal issue, and for this reason too the Defendant's exhaustion arguments are meritless.

### B.  Commerce Fails to Excuse its Legally Defective and Analytically Inadequate Affiliation Determination

Plaintiff argued that Commerce's affiliation determination pursuant to 19 U.S.C. § 1677(33)(G) was legally defective because (1) Commerce failed to analyze [        ] reliance on LDC and, thus, fully consider LDC's legal or operational ability to exercise restraint or direction over [        ]), and (2) Commerce did not consider the temporal aspect of the parties' relationship, as it was required to do pursuant to 19 C.F.R. § 351.102(b)(3).

As to the first error, Commerce's Brief doesn't dispute that it needed to have "specifically address{ed} whether the supplier was reliant on LDC" but, instead, argues that "Commerce plainly addressed whether the supplier was reliant on LDC" because "Commerce determined that the

---

[10] *See GGB Bearing Tech. (Suzhou) Co. v. United States*, 279 F. Supp. 3d 1233, 1250.
[11] Commerce's Brief at 18-19.

'contractual terms between LDC and its supplier recognize the sovereignty of the parties and indicate no obligation toward *each other* beyond those spelled out by the terms of the contract.'[12]

As to the second error, Defendant argues that its failure to discuss the temporal aspect of the parties' relationship does not mean that it did not consider this factor.[13] Defendant goes on to argue that the Court should adopt the presumption that Commerce considered this factor.

Both of these defenses are unavailing as discussed in turn below.

As to Commerce's failure to address one-half of the relevant issue (*i.e.*, whether [      ] was reliant on LDC and, thus, subject to LDC's ability to exercise restraint or direction over it), there does not appear to be a disagreement between the parties that Commerce was required to consider this dimension of control.[14] The question before the Court, however, is whether Defendant's explanation reasonably demonstrates that Commerce performed the legally required analysis of [        ] reliance on LDC.

Commerce's Brief argues that its conclusory statement that "contractual terms between LDC and its supplier. . . indicate no obligation toward each other beyond those spelled out by the terms of the contract" adequately demonstrates that it conducted a legally sufficient analysis of affiliation pursuant to section 771(33)(G) of the Act.  As an initial mater, Commerce's claim that the contractual terms do not indicate obligations beyond those spelled out by the terms of the contract is conclusory (and circular) and further is not supported by the record.[15]  *See Am. Mfrs. of*

---

[12] I&D Memo at 12, P.R. 294.
[13] Commerce's Brief at 18 ("{T}he fact that Commerce did not discuss certain temporal evidence does not establish that Commerce failed to consider that evidence.").
[14] *See* I&D Memo at 12, P.R. 294 (noting that "the threshold question is whether the **buyer or seller** has, in fact become reliant on the **other**") (emphasis added).
[15] This statement is contradicted by the specific terms of the parties' agreements, which Commerce failed to address let alone reconcile with its decision.  *See e.g.*, Letter from White & Case LLP, to Sec'y Commerce, re: *Certain Lemon Juice from Brazil: Response to Section D of the Antidumping Duty Questionnaire* (Apr. 11, 2022) at Exhibit D03, [                                                    ], 11.2 ([

*Multilayered Wood Flooring v. United States*, 639 F. Supp. 3d 1216, 1232 (Ct. Int'l Trade 2023) ("{C}onclusory statements are not sufficient to support, with substantial evidence, Commerce's decision."). Defendant concedes that "specific contractual provisions were not explicitly discussed in the final determination."[16] However, Commerce contends that its "decisional path was reasonably discernable" because it cited to LDC's DQR Exhibit D3.[17] This argument is unavailing because Commerce did not explain what particular information in that [                    ] document it considered or relied upon, how that record evidence supported its decision, or why its conclusion was reasonable in light of the contractual terms that contradict its decision. Thus, Commerce failed to provide a discernable path between specific facts of record and its decision.

With respect to Commerce's failure to discuss the temporal aspect of the parties' relationship, two items are abundantly clear. First, Commerce was legally required to consider this factor in analyzing affiliation under (33)(G). As the Court has explained:

> Commerce is required to examine the "temporal" nature of entities' relationships prior to finding control exists. However, since Commerce has not addressed the "temporal" aspect of the Companies' relationship, the court is unable to determine whether the Companies' contacts . . . were substantial enough to warrant a finding of control. Alternatively, if it is Commerce's position that the "temporal" nature of the Companies' relationship is irrelevant. . . , it has not fully explained its reasons why that aspect need not be considered.[18]

---

]) ("LDC's DQR"), C.R. 107, P.R. 116.

[16] *See* Commerce's Brief at 22.

[17] *See* I&D Memo at 12, fn. 80, P.R. 294.

[18] *Hontex Enters., Inc. v. United States*, 248 F. Supp. 2d 1323 at 1354, fn. 20 (Ct. Int'l Trade 2003) (citations omitted); *see also China Steel Corp. v. United States*, 264 F. Supp. 2d 1339, 1355 (Ct. Int'l Trade 2003) ("Commerce's own regulation requires that it consider the temporal aspect of a relationship in determining whether control exists. . . {Because} Commerce {} failed to address the temporal aspect of the relevant parties' relationships, or {} explain why that factor is not necessary to its determination{,}. . . the Court cannot sustain Commerce's determination.").

Second, Commerce's determination does not address the temporal aspect of the parties' relationship, despite an abundance of relevant information on the record.[19]  Indeed, the relationship is intended to last more than [

].[20]  However, Commerce's I&D Memo does not address this important aspect of the parties' relationship or explain why this factor is not necessary to Commerce's determination.[21] Consequently, Commerce's affiliation determination was legally defective.

### C. Commerce Failed to Refute that its Partnership Analysis was Contrary to Law

Plaintiff argued that Commerce's affiliation determination pursuant 19 U.S.C. § 1677(33)(C) ("Partners") applied an impermissibly narrow construction of the term "Partners." Defendant countered by claiming that the statutory term "partners" is ambiguous, Commerce's interpretation was based on a permissible construction of the statute, and Commerce reasonably required record evidence of joint ownership and joint selling activities to demonstrate affiliation within the meaning of (33)(C).[22]

As an initial matter, Commerce should not be afforded deference in interpreting the meaning of the statutory term "partners."  As established by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Court applies a two-step analysis: first, it asks "whether Congress has directly spoken to the precise question at issue."[23] If yes, "that is the end of the matter," and the Court "must give effect to the unambiguously expressed intent of Congress."[24] However, "if the statute

---

[19] *See* Commerce's Brief at 4 (LDC reported its purchases from [     ] as purchases from an affiliated supplier due to "the [     ] nature of the [     ] purchase contract" and therefore "included [     ] on the Major Inputs Purchased from Affiliated Parties Chart in Exhibit D7 and Exhibit Supp. D15.").
[20] LDC's DQR at Exhibit D3, [                              ], C.R. 107, P.R. 116.
[21] *See China Steel Corp. v. United States*, 264 F. Supp. 2d 1339, 1354 (Ct. Int'l Trade 2003).
[22] Commerce's Brief at 26.
[23] *Chevron*, 467 U.S. at 842.
[24] *Id.* at 842-43.

is silent or ambiguous with respect to the specific issue, the question for the Court is whether the agency's answer is based on a permissible construction of the statute."[25]  The Supreme Court stated in *Chevron* that a court should conduct the step one analysis by employing traditional tools of statutory construction, beginning with an examination of the relevant statutory provision.[26]

The relevant statutory provision is 19 U.S.C. § 1677(33)(C), which defines "Partners" as "affiliates" or "affiliated persons."  To give meaning to this text, courts typically seek to determine the statute's "natural reading" or "ordinary meaning."  To do so, "it is appropriate to consult dictionaries."[27]  Black's Law Dictionary defines a "partner" as "{a} member of a copartnership or firm; one who has united with others to form a partnership in business."[28]  The Merriam-Webster Dictionary defines "partner" as "one associated with another especially in action" and "a member of a partnership especially in business."[29]

Thus, a plain reading of the statute indicates that the defining feature of the relevant relationship (*i.e.*, partners) is their common relation to a partnership.  Furthermore, nothing in the statute suggests that Congress did not intend for Commerce to apply the ordinary meaning of the term "partners."  Consequently, there is no ambiguity as to the meaning of "partners" in 19 U.S.C. § 1677(33)(C).  Therefore, Commerce committed legal error by failing to give effect to the unambiguously expressed intent of Congress and instead creating a new test that requires that the parties either exercise joint ownership of an item or engage in joint selling activities in order for members of a partnership to qualify as "partners" under 19 U.S.C. § 1677(33)(C).

---

[25] *Id*. at 843.
[26] *See Suprema Inc. v. Int'l Trade Comm'n*, 796 F.3d 1338, 1346 (Fed. Cir. 2015).
[27] *Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024, 1031 (Fed. Cir. 2007).
[28] Black's Law Dictionary, 2nd Ed., Thelawdictionary.com, https://thelawdictionary.org/partner.
[29] Merriam-Webster.com. 2023. https://www merriam-webster.com (July 25, 2023).

Even if the Court proceeds to the second prong of the *Chevron* analysis, deference to Commerce's interpretation of a statute is only required when that interpretation is reasonable.[30]  In this case, Commerce's interpretation of the term "partners" was unreasonable because it applied an overly narrow reading of the term, without any legal support, and beyond the plain language of the statute.  Indeed, Commerce provides no explanation for why evidence of joint ownership and/or joint selling activities was necessary for "partners" to be affiliated under (33)(C), or whether its decision was based on an absence of joint ownership, joint selling activities, or both.  Put simply, Congress has spoken clearly that "partnership" is sufficient for affiliation between partners.  In the present case, Commerce has narrowed the term to mean only those who own something in common or engage in a joint selling activity – without reference to any legal authority.  In the absence of adequate explanation, such a determination rises to the level of arbitrary and capricious decision making.

In any event, the record indicates that the parties were engaged in a partnership and did have joint property interests and/or joint selling activities and accordingly Commerce's failure to address these facts requires remand.  In defense, Defendant claimed that "Commerce is not required to explicitly discuss every piece of record evidence that is put before it in an investigation."[31] In fact, Commerce limited its analysis under (33)(C) to two sentences: "Record evidence supports that this is a contractual relationship. LDC and its supplier do not jointly own anything pursuant to the terms of their contract and do not engage in joint selling activities."[32] This explanation does not create a reasonably discernible path between the specific facts found and decision made, nor does it enable a court to adjudge the reasonableness of the standard articulated

---

[30] *See Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1573 (Fed. Cir. 1994).
[31] Commerce Brief at 24.
[32] I&D Memo at 13, P.R. 294.

by Commerce in this case.  Conclusory statements supported by a single citation to an exhibit with no other analysis, such as those here, are not sufficient to withstand judicial review.[33]  Moreover, the barebones assertion that it is a "contractual relationship" fails to address the very fact that a partnership agreement is a type of a contractual relationship.

Additionally, Commerce's failure to address evidence that detracted from its decision renders its determination unsupported by substantial evidence.  In fact, Defendant's assertion that Commerce "cited { } the contractual agreement {for} support" and "found that the parties do not jointly own anything pursuant to the terms of the contract and do not engage in joint selling activities," is directly contradicted by the record.[34]  For example, [

] and describes how [                                              ]; [

] states that [


]; and [                ] of the [

] between LDC and [        ] states that [


].   In other words, while Commerce stated that the parties do "not jointly own anything," the actual agreement demonstrates [

].  Commerce's failure to address this and other material evidence that cut against its decision renders its determination unsupported by substantial evidence.

---

[33] *See Jacobi Carbons AB*, 222 F. Supp. 3d at 1177-79.
[34] Commerce's Brief at 22.

### D. Defendants Fail to Refute the Reliance Evidenced in Brazilian Law's Prohibition on LDC from Owning or Leasing Land

One of the most significant flaws in Commerce's determination is that it fails to address the reliance of the parties as a function of law.  Specifically, while Commerce has argued that a close supplier relationship requires "reliance" beyond exclusivity, Commerce inexplicably failed to address the fact LDC and related entities within the LDC Group cannot, as a legal matter, purchase or enter into a long-term leasehold for agricultural property in Brazil.

Indeed, it is undisputed among the parties that LDC was legally prohibited from owning or leasing land to grow lemons and could only do so through its partnership with [         ].[35]

The Court has held that "Commerce is obligated to consider anything in the record that reasonably detracts from the substantiality of the evidence supporting its determination."[36]

In this case, Commerce repeatedly "stated its legal conclusion, declared that the {evidence} supported it, and moved on."[37] However, in doing so, Commerce failed "to address significant evidence that 'fairly detract{ed}' from its conclusion{s} and fail{ed} to articulate{} {a} rational connection between" facts found and {} decision{s} made."[38] Commerce's insufficient analysis of important record evidence is exemplified by its failure to address the fact that Brazilian law prohibits foreign-controlled entities from owning or entering into a long-term leasehold for agricultural property.  In essence, the record demonstrated that LDC is unable to obtain a real

---

[35] *See* LDC's Brief at 20 ("[                              ] like the one between LDC {} and [         ] are a common tool used to allow foreign companies to make supply and sale agreements relating to agricultural goods because, in Brazil, foreign companies must seek authorization from the Ministry of Agriculture to purchase or lease land, and in practical terms it is 'impossible for any company controlled by foreign nationals or entities, to pursue such a route . . . .'") (citing Commerce Memorandum, re: *Verification of the Cost Response of Louis Dreyfus Company Sucos S.A. in the Lower-Than-Fair-Value Investigation of Certain Lemon Juice from Brazil* at Exhibit CVE-8, pg. 7-8) ("LDC's Cost Verification Report"), C.R. 295, P.R. 259.

[36] *Suzano S.A. v. United States*, 589 F. Supp. 3d 1225, 1234 (Ct. Int'l Trade 2022); *see also Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (Ct. Int'l Trade 2000) ("Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders {its} determination unsupported by substantial evidence.").

[37] *See Nagase & Co. v. United States*, 628 F. Supp. 3d 1326, 1343 (Ct. Int'l Trade 2023).

[38] *Id.* at 1342-43 (quotations and citations omitted).

interest in property in Brazil and is therefore reliant on [         ] for access to the farmland it uses to produce fruit juice.  However, Commerce did not mention this fact or discuss its implications for its analysis of affiliation attributable to one party's reliance on another.

For the reasons set forth in Plaintiff's Rule 56.2 Brief and elaborated upon above, the Court should remand Commerce's affiliation determination.

### E.  Commerce has Failed to Refute that the Selective Use of LDC's 2021 Financial Data was Arbitrary and Capricious

Plaintiff asserted in its Rule 56.2 Brief that Commerce's selective use of LDC's FY 2021 financial data to value LDC's annual material fruit cost adjustment ("fruit cost adjustment"), despite explicitly rejecting similar data for its "Period Cost Calculations," in the absence of further reasoned discussion, amounted to arbitrary and capricious decision-making.

Defendants' Response Briefs asserted that Commerce's actions were in accordance with law because "Ventura is mistaken that Commerce relied on {LDC's} 2021 financial statement . . . Commerce relied on the values in Exhibit 6 of the Cost Verification Report at 17."[39]  Defendants appear to misunderstand that Page 17 of Exhibit CVE-6 includes the same type of data derived from LDC's FY 2021 financial statements which was previously rejected by Commerce.

The parties do not contest that Commerce properly determined that "the record facts . . . warrant{ed} a deviation from Commerce's normal practice of . . . calculating general expenses . . . {based on} information that most closely corresponds to the POI."[40]  *See generally Union Steel v. United States*, 755 F. Supp. 2d 1304, 1311 (Ct. of Int'l Trade 2011) (affirming the use of data that does not most closely correspond to POI when it reflects the most accurate and reliable information on the record).  Specifically, Commerce used data from LDC's FY 2020 financial

---

[39] Commerce's Brief at 28; *see also* LDC's Brief at 27-28.
[40] I&D Memo at 15, P.R. 294.

statements, rather than its FY 2021 financial statements, for purposes of its "Period Cost Calculations" due to reliability and completeness concerns with the latter data source.[41]  Yet Commerce proceeded to calculate the "annual fruit cost adjustment" by using rejected year end LDC FY 2021 financial data as created by the same auditors.

The fruit cost adjustment reflects the difference between LDC's projected fruit acquisition costs for the calendar year, and the actual "final price" of its "raw fruit purchase contracts . . . based on the sales price of the finished juice."[42]  Commerce valued this adjustment based on the figures included on page 17 of Exhibit CVE-6 of LDC's Cost Verification Report.[43]  As illustrated below, Exhibit CVE-6 includes [

]<sup>44</sup>

---

41 I&D Memo at 15-16, P.R. 294.
42 LDC's Cost Verification Report at 8, C.R. 295, P.R. 259.
43 *See* Commerce's Brief at 27-28.
44 LDC's Cost Verification Report at Exhibit CVE-6, C.R. 295, P.R. 259.

Importantly, these figures are "determined at year end after the company's auditors have confirmed the fiscal year sales revenues."[45]  The fruit cost adjustment thus incorporated LDC's fiscal year sales revenue data for the year end of <u>FY 2021</u> after the auditors confirmed this data for the financial statement.  Therefore, Commerce's COP calculation impermissibly included the fruit cost adjustment for the months of the POI overlapping with <u>FY 2021 – which were determined at year end for LDC's FY 2021 financial statement</u>.[46]  Put simply, the values corresponding to [

] on page 17 of Exhibit CVE-6 were populated using data determined at year end after LDC's FY 2021 financial data had been confirmed.

Consequently, the same issues which Commerce identified with respect to using data from LDC's FY 2021 financial statements apply equally in the case of calculating LDC's fruit cost adjustment.  Because LDC's FY 2021 financial statements were not put on the record until LDC's Cost Verification, the parties "did not have sufficient time to examine the information," and further, the financial statements alone "d{id} not contain sufficient detail to allow Commerce to identify or discern the prior expenses that should be included in {LDC's COP}."[47]  Indeed, the only way that Commerce could value the fruit cost adjustment was by "examin{ing LDC's} FY 2021 accounting details" to identify "operating expenses that are not easily discernable from a simple review of the financial statements alone" – Commerce explicitly rejected taking this action for its "Period Cost Calculations," yet arbitrarily elected to do so during its Cost Verification to calculate the fruit cost adjustment.[48]

---

[45] *Id*., C.R. 295, P.R. 259.
[46] *Id*. at 8.
[47] *See* I&D Memo at 15, P.R. 294.
[48] *Id.*

Accordingly, Commerce's use of data from LDC's FY 2021 financial statements to calculate the fruit cost adjustment, despite affirmatively declining to use financial data from LDC's FY 2021 financial statements for its "Period Cost Calculations" due to completeness and reliability issues, in the absence of further reasoned discussion, was arbitrary and capricious.

### F. Commerce's Failure to Adjust LDC's G&A Expense Ratio to Include Expenses Associated with Certain LDC-affiliated Entities was Arbitrary and Capricious

Commerce failed to adjust LDC's G&A expense ratio to include unrecovered expenses incurred by [              ] and certain LDC group holding companies, [

              ].  This error stemmed from Commerce's failure to follow its established practice of collecting and reviewing financial statements for affiliated entities which provided LDC with administrative services to determine if any further adjustments were appropriate.

In defense of its actions, Defendant argued that "affiliated companies within the LDC corporate structure charged each other where services were provided to other affiliated companies . . . LDC's reported G&A expenses included costs associated with any service provided by affiliated companies, including any parent companies."[49]  Defendant-Intervenor further justified Commerce's "reli{ance} on LDC{}'s reported costs" by citing to the Cost-Sharing Agreement between LDC and [              ] as evidence that the transactions were at arms-length.[50]  As explained in further detail below, Defendants' analysis fails on both the facts and the law.

Commerce's Section A Questionnaire requests that respondents provide "financial statements . . . of all affiliates involved in the production or sale of the subject merchandise."[51]

---

[49] Commerce's Brief at 28.
[50] LDC's Brief at 10-11.
[51] *See e.g.*, Letter from Sec'y of Commerce to LDC, re: *Less-Than-Fair-Value Investigation of Certain Lemon Juice from Brazil: Request for Information* (Feb. 14, 2022) at A-10, P.R. 59.

Commerce collects and reviews these financial statements to, in part, identify if "the affiliate had fully recovered its costs," *i.e.*, whether it operated at a "net profit or loss."[52]  Where the affiliate operated at a net loss, Commerce increases respondents "reported G&A expenses to include its proportionate share of {the affiliates} unrecovered costs."[53]  These adjustments are informed by Commerce's broader statutory obligation under 19 U.S.C. § 1677b(f)(2) to ensure that "transaction{s} directly or indirectly between affiliated persons . . . fairly reflect the amount usually reflected in sales of merchandise under consideration."  Here, Commerce did not collect and review financial statements for certain LDC-affiliated entities which provided LDC with administrative services.

[                    ] was affiliated with LDC and provided it with certain administrative services.[54]  Commerce did not make any additional adjustment to LDC's G&A expense ratio for services provided by [                    ] because LDC "provided {Commerce} with the details of all service expenses incurred on its behalf," and there was "no evidence that LDC's reported G&A expenses fail{ed} to include the cost of services provided by {[                    ]."[55]  Commerce supported its determination by referencing LDC's Suppl. Section D Questionnaire Response at Supp. D-23 to Supp. D-24, and Exhibit Supp. D-13, *i.e.*, the Cost-Sharing Agreement between LDC and [                    ].[56]  In addition, Commerce cited to its Cost Verification Report at pages 3 to 4 to support its determination that "LDC's affiliated service provider charged for its services

---

[52] *See e.g.*, *Large Diameter Welded Pipe From the Republic of Korea*, 86 Fed. Reg. 18,508 (Dep't Commerce February 27, 2019) (final affirm. deter. of sales at less than fair value), and accompanying Issues and Decision Memorandum ("*LDWP from Korea*") at Cmt. 16.
[53] *Id.*
[54] *See* I&D Memo at 20, P.R. 294.
[55] *Id.*
[56] *See id.*, P.R. 294 (citing to Letter from White & Case LLP, to Sec'y Commerce, re: *Certain lemon Juice from Brazil: Response to the Supplemental Section D of the Antidumping Duty Questionnaire* (June 3, 2022) at, C.R. 159-177, P.R. 155-156 ("LDC Suppl. Section D QR")).

and operated at a profit."[57]

However, the word profit does not appear on pages 3 or 4 of LDC's Cost Verification Report.[58]  The only citation included in the relevant section of the Cost Verification Report is again to LDC Suppl. Section D QR at Exhibit Supp. D-13, *i.e.*, the Cost-Sharing Agreement between LDC and [               ].[59]  As explained above, Commerce's established practice is to review the financial statements of affiliated company(s) which provided administrative services to a respondent to determine if it operated at a profit or loss, and by extension, if any additional adjustment is required to the respondent's G&A expense ratio for the affiliate's unrecovered expenses.[60]  In this case, [          ] financial statements are not on record of the proceeding – and Commerce's I&D Memo makes no further reference to the matter.

Neither Commerce nor LDC provide a reasoned explanation justifying Commerce's deviation from established practice with respect to its responsibility to collect and review affiliated party financial statements to determine that the provided services were at arms-length; and adjusting the respondent's G&A expenses to include unrecovered expenses if the affiliate operated at a net loss.[61]  While LDC cites to the Cost-Sharing Agreement between LDC and [

] as establishing that the transactions between the parties were at arms-length, LDC does not provide any discussion regarding Commerce's deviation from its practice of reviewing the relevant financial statement and instead relying on a Cost-Sharing Agreement.  Commerce's failure to request and review [               ] financial statements therefore represented an unexplained deviation from Commerce's established practice, and, in the absence of further

---

[57] *See id.*, P.R. 294.
[58] *See* LDC's Cost Verification Report at 3-4, C.R. 295, P.R. 259.
[59] *See id.*, C.R. 295, P.R. 259.
[60] *See e.g.*, *LDWP from Korea* at Cmt. 16.
[61] *See generally*, Commerce's Brief at 28-29; LDC's Brief at 28-33.

reasoned discussion, was arbitrary and capricious.

Second, and again contrary to established practice, Commerce failed to request financial statements for, and subsequently allocate expenses incurred by, LDC-affiliated investment holding companies included in the LDC group – [                                                  ]. Commerce's practice "{i}n cases where a parent company {or affiliate} is an investment holding company, is to allocate a portion of G&A expenses incurred by the parent company to the respondent, under the theory that the parent's G&A expenses are incurred on behalf of, and as a result of, the parent's investment holdings."[62]

In the present case, instead of allocating the expenses incurred by the investment holding companies included in the LDC group, Commerce concluded that these entities did not incur any administrative expenses on behalf of LDC.[63]  Commerce reasoned that because "LDC companies charge each other where services are provided to other LDC companies . . . we have no evidence that LDC's reported G&A expenses fail to include the cost of services provided by any affiliated companies."[64]  Commerce did not obtain the financial statements of the investment holding companies.

Commerce's Brief defended its actions by arguing it did not require the holding companies to submit financial statements because they were not involved in the production of subject merchandise.[65]  Commerce reiterated that its I&D Memo had reasonably determined that affiliated

---

[62] *See Certain Preserved Mushrooms From Poland*, 88 Fed. Reg. 18,118 (Dep't Commerce March 27, 2023) (final affirm. deter. of sales at less than fair value), and accompanying Issues and Decision Memorandum at Cmt. 7 (citing *Welded Stainless Steel Pipe from Malaysia*, 59 Fed. Reg. 4,023, 4,027 (Dep't Commerce January 28, 1994) (final affirm. deter. of sales at less than fair value); *Ferrosilicon from Venezuela*, 58 Fed. Reg. 27,524, 27,528 (Dep't Commerce May 10, 1993) (final affirm. deter. of sales at less than fair value).

[63] I&D Memo at 20, P.R. 294.

[64] *Id.*, P.R. 294.

[65] Commerce's Brief at 29.

19

companies within the LDC group charged each other for administrative services, and LDC's G&A expense ratio already incorporated all expenses incurred on its behalf by affiliates.[66] This explanation must fail for several reasons.

As an initial matter, by definition a holding company (that has no operations) cannot be involved in the production of any merchandise.  It is exactly because of these facts that Commerce has an established practice of allocating expenses incurred by investment holding companies to all members of a larger corporate group.  It is Commerce's responsibility – and indeed its established practice – to collect the necessary information associated with the investment holding companies in order to quantify and allocate all unrecovered operational expenses.  Commerce appears to argue that it should be excused for failing to follow its practice (allocating expenses incurred by investment holding companies to the members of a larger corporate group) because it failed to collect the information necessary to do so (in effect, require the submission of the investment holding companies' financial statements).  Needless to say, this justification should not stand.

LDC's Brief is telling in this respect.  LDC attempts to distinguish itself from *Cold Rolled Steel from Russia* by stating that "unlike the respondent {in that case} here Commerce found that LDC {} 'has provided it with the details of all service expenses incurred on its behalf.'"[67]  But the records of the two proceedings are different in a crucial respect.  Commerce followed its established practice in *Cold Rolled Steel from Russia* and requested further information regarding the operations and expenses incurred by respondent's affiliated holding company parent – whereas Commerce did not obtain the relevant financial statements in the present case.

---

[66] Commerce's Brief at 29.
[67] LDC's Brief at 31-32 (citing *Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,950 (Dep't Commerce July 29, 2019) (final affirm. deter. of sales at less than fair value, affirm. deter. of critical circ.) and accompanying Issues and Decision Memorandum at Cmt. 15.

Similarly revealing is LDC's attempt to distinguish the present record from *LDWP from Canada* – as LDC correctly explained, "in deciding whether to allocate parent G&A expenses to the respondent . . . Commerce also noted that the parent company's **financial statements** 'clearly show expenses incurred by the company for the benefit of its subsidiaries.'"[68]  In comparison, Commerce rejected allocating the expenses incurred by the LDC group holding companies to LDC without reviewing any of their financial statements (with the sole exception of Louis Dreyfus Company Juices Holding B.V.).  Thus, LDC joins the Government in arguing that Commerce should be excused for failing to follow its practice (allocating expenses incurred by investment holding companies to the members of a larger corporate group) because it failed to collect the information necessary to do so (in effect, require the submission of the investment holding companies' financial statements).

Commerce's failure to adjust LDC's G&A expense ratio to include allocated expenses incurred by the LDC group holding companies, [                                                                    ], by requesting and reviewing the financial statements of those entities, was an unexplained deviation from Commerce's established practice, and therefore arbitrary and capricious.

---

[68] LDC Brief at 32 (emphasis added) (citing *Large Diameter Welded Pipe from Canada*, 84 Fed. Reg. 6,378, (Dep't Commerce Feb. 27, 2019) (final affirm. deter. of sales at less than fair value), and accompanying Issues and Decision Memorandum at Cmt. 6 ("*LDWP from Canada*").

## III.   CONCLUSION

For the foregoing reasons, we respectfully request that the Court remand the Final Determination in the underlying investigation to Commerce consistent with the arguments made in this Reply Brief. [69]

Respectfully submitted,

/s/ Daniel B. Pickard, Esq.
Daniel B. Pickard, Esq.
Mert E. Arkan, Esq.
David B. Sessions, Esq.

**BUCHANAN INGERSOLL & ROONEY PC**
1700 K Street, NW
Washington, D.C. 20006
Telephone: 202.452.7936
Email: daniel.pickard@bipc.com

*Counsel for Ventura Coastal, LLC*

---

[69] Plaintiff indicated in its Rule 56.2 Brief that it would be appropriate for any remand order to include language requesting that Commerce correct for all known errors in its calculation of the dumping margin. Defendants' Response Briefs mischaracterized this request as an attempt to make untimely arguments regarding "an alleged ministerial error." *See* Commerce's Brief at 30; LDC's Brief at 33-35. The Department is required by statute to calculate the most accurate dumping margin possible. *See e.g.*, *DuPont Teijin Films China Ltd. v. United States*, 7 F. Supp. 3d 1338, 1359 (Ct. Int'l Trade 2014). The Court has upheld the appropriateness of Commerce correcting for errors which are not directly at issue but independently "uncovered during a remand proceeding . . . {and which} result{ } in proper error correction." *See Thai Pineapple Pub. Co. v. United States*, 21 Ct. Int'l Trade 283, 284 (1997). Additionally, the Court has found that "programming errors are particularly susceptible to correction" because they do not cause "administrative disruption" which would otherwise "have a ripple effect leading to further administrative proceedings or fact finding." *See id.* (citations omitted). Accordingly, Plaintiff requests that in the event that the Final Determination is remanded by the Court, that Commerce should correct for the programming errors in its margin calculation (identified by Ventura on pages 42 to 43 of its Rule 56.2 Brief) and of which the Department is now aware. Indeed, Commerce appears to acknowledge that there are such errors in the calculation but disputes the effect that they would have on the margin.