Slip Op. 24-125

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| VENTURA COASTAL, LLC, | |
| **Plaintiff,** | |
| v. | |
| UNITED STATES, | Before: Claire R. Kelly, Judge |
| **Defendant,** | Court No. 23-00009 |
| and | **PUBLIC VERSION** |
| LOUIS DREYFUS COMPANY SUCOS S.A., | |
| **Defendant-Intervenor.** | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the Department of Commerce's final determination.]

Dated:  November 7, 2024

Daniel B. Pickard, Mert E. Arkan, David B. Sessions, and Claire M. Webster, Buchanan Ingersoll & Rooney PC, of Washington, D.C., for plaintiff Ventura Coastal, LLC.

Anne M. Delmare, Trial Attorney, Commercial Litigation Branch, Civil Division, of Washington, D.C., for defendant United States.  On the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and L. Misha Preheim, Assistant Director.  Of Counsel was JonZachary Forbes, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Gregory J. Spak, Jessica E. Lynd, and Cristina M. Cornejo, White & Case LLP, of Washington, D.C., for defendant-intervenor Louis Dreyfus Company Sucos S.A.

**PUBLIC VERSION**

Kelly, Judge:  Before the Court is Plaintiff Ventura Coastal, LLC's ("Ventura")

motion for judgment on the agency record, Aug. 3, 2023, ECF No. 30 ("Pl. Mot."),

challenging the U.S. Department of Commerce's ("Commerce") final determination in

its antidumping duty ("AD") investigation on certain lemon juice from Brazil.  See

Certain Lemon Juice From Brazil, 87 Fed. Reg. 78,939 (Dep't Commerce Dec. 23,

2022) (final determination) ("Final Results") and accompanying issues and decision

memo. ("Final Decision Memo.").  Ventura alleges that Commerce's (i) determination

finding no affiliation between Louis Dreyfus Company Sucos S.A.'s ("LDC") and its

supplier ("Supplier A"),[1] is contrary to law and unsupported by substantial evidence;

(ii) use of information from the fiscal year ("FY") 2020 financial statements was

arbitrary and capricious; and, (iii) Commerce's exclusion of certain administrative

expenses from LDC's general and administrative ("G&A") rate calculation was not

supported by substantial evidence.  Finally, Ventura seeks correction of certain

ministerial errors.  For the following reasons, the Court sustains in part and remands

in part Commerce's Final Results.

---

[1] LDC's supplier is [[                                                    ]].

## BACKGROUND

On December 29, 2021, Ventura petitioned Commerce and the International Trade Commission to investigate whether the United States lemon juice industry was materially injured or threatened with material injury by dumped lemon juice imports from Brazil and South Africa. <u>See</u> Petition for Imposition of [AD]: Lemon Juice From Brazil and South Africa at 1–4, PDs 1–13, CDs 1–23, bar codes 4195689-01–23 (Dec. 29, 2021).[2] Commerce published its notice of initiation for an antidumping duty investigation into imported lemon juice from Brazil on January 19, 2022, covering a period of investigation ("POI") of October 1, 2020 to September 30, 2021. <u>Lemon Juice From Brazil and South Africa</u>, 87 Fed. Reg. 3,768 (Dep't Commerce Jan. 25, 2022) (initiation of less-than-fair-value investigations); Final Decision Memo. at 1. Mandatory respondents consisted of Citrus Juice Eireli ("Citrus Juice") and LDC. Commerce Memo. re [AD] Invest. Certain Lemon Juice From Brazil: Resp't Select. Memo. at 4–5, PD 58, CD 63, bar code 4210197-01 (Feb. 8, 2022).

Commerce requested information from the respondents by issuing a questionnaire. <u>See generally</u> [Commerce] Request for Information, PD 59, bar code 4211690-01 (Feb. 14, 2022) ("Initial Questionnaire"). Section A of the Initial Questionnaire requires the respondent to disclose all "suppliers, (sub)contractors,

---

[2] On March 28, 2023, Defendant filed indices to the public and confidential administrative records underlying Commerce's final determination. <u>See</u> ECF No. 25-1–2. Citations to administrative record documents in this opinion are to the numbers Commerce assigned to such documents in the indices, and all references to such documents are preceded by "PD" or "CD" to denote public or confidential documents.

lenders, exporters, distributors, resellers, and other persons involved in the development, production, sale and/or distribution" of the investigated merchandise which "Commerce may also consider affiliated with [respondent]." Initial Questionnaire at A-6. That same section also requests a respondent to provide "financial statements or other relevant documents (i.e., profit and loss reports) of all affiliates involved in the production or sale of the subject merchandise in the foreign market and the U.S. market, of all affiliated suppliers to these affiliates, and of the parent(s) of these affiliates[.]" Id. at A-10.

LDC answered Commerce's Initial Questionnaire in multiple submissions. In its response to Section A, LDC disclosed its lemon supplier, Supplier A, which was not identified as an affiliate in its affiliation charts and lists, and provided its contractual agreement with Supplier A. See [LDC] Resp. Suppl. Sect. A Questionnaire at Supp. A-5, A-27–A-32, PD 114, CD 94, bar code 4230977-01 (Apr. 8, 2022) ("LDC Suppl. AQR"); [LDC] Resp. Sect. A Questionnaire at A-8–A-10, Exh. A2, PD 77, CD 65–66 bar code 4222047-01 (Mar. 14, 2022) ("LDC AQR"); [LDC] Resp. Sect. D Questionnaire at D-4–D-5, Exh. D03, PD 116, CDs 104, 106–107, bar codes 4231456-01, 03–04 (Apr. 11, 2022) ("LDC DQR").

LDC reported purchases from Supplier A as purchases from an affiliated supplier in its Section D response to Commerce's questionnaire despite also emphasizing that Supplier A was not affiliated with LDC. LDC DQR at D-6–D-7, Exh. D7; see also [LDC] Resp. Suppl. D Questionnaire at Exh. Supp.D-1–D-5, D-8–

D15, D-17–D18, PD, CD 163, bar code 4248998-05 (June 3, 2022) ("LDC Suppl. DQR").[3]  LDC also disclosed financial statements of other affiliated entities involved in the production or sale of the subject merchandise in both the foreign and U.S. market; however, LDC indicated that its own 2021 annual financial statements were neither finalized nor audited at the time of submission of the questionnaire responses, and that it would supplement the responses when the statements became available.  LDC AQR at A-27.

Commerce posted the preliminary determination on August 4, 2022.  See Certain Lemon Juice From Brazil, 87 Fed. Reg. 47,697 (Dep't Commerce Aug. 4, 2022) (preliminary determination) ("Preliminary Results") and accompanying prelim. decision memo.  ("Prelim. Decision Memo.").  Commerce calculated LDC's cost of production ("COP") "based on the sum of the costs of materials and fabrication for the foreign like product, plus amounts for [G&A] expenses and financial expenses." Prelim. Decision Memo. at 14.  Commerce used data submitted by LDC, except for adjustments to LDC's net realizable value cost allocations for lemon co-products "to reflect sales values from a period prior to the [AD] allegation" and certain G&A expenses and rates.  Prelim. Decision Memo. at 15.

---

[3]  In a later submission to Commerce, LDC explained that considering the contract with Supplier A and "out of an abundance of caution," LDC "included [Supplier A] on the Major Inputs Purchases from Affiliated Parties Chart in Exhibit D7 and Exhibit Supp. D15 pursuant to question 7 of the Section D Questionnaire," but that LDC was not affiliated with Supplier A.  Rebuttal Br. [LDC] at 4, PD 304, CD 287, bar code 4310013-01 (Nov. 10, 2022) ("LDC Rebuttal Br.").

Although Commerce did not specifically address whether LDC is affiliated with Supplier A, see generally Prelim. Decision Memo., it applied Section 773(f)(3) of the Tariff Act of 1930,[4] as amended 19 U.S.C. § 1677b(f)(3), to adjust LDC's "reported direct material costs" for the subject merchandise "obtained from an affiliated supplier to reflect an arm's-length value." Prelim. Decision Memo. at 15. Commerce calculated a preliminary dumping margin of 4.45 percent for LDC, 21.49 percent for Citrus Juice, and 12.97 percent for all non-individually examined companies.[5] Preliminary Results, 87 Fed. Reg. at 47,697.

LDC placed its 2021 financial statements on the record at verification, after Commerce issued the Preliminary Results. See Final Decision Memo. at 15; Commerce Memo. re Verif. Cost Resp. [LDC] at 1–25, PD 259, CD 295, bar code 4303216-01 (Oct. 21, 2022) ("Cost Verif. Rep."). Both LDC and Ventura submitted their administrative case briefs to Commerce on November 2, 2022, with rebuttal briefs filed on November 10, 2022. See generally [LDC] Case Br., PD 271, CDs 299–300, bar codes 4307868-01–02 (Nov. 2, 2022) ("LDC Admin. Br."); [Ventura's] Case Br. [re LDC], PD 270, CDs 297–98, bar codes 4307862-01–02 (Nov. 2, 2022) ("Ventura Admin. Br."); LDC Rebuttal Br.; [Ventura] Rebuttal Br. [re LDC], PD 282, CD 303,

---

[4] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

[5] Commerce used a constructed export price ("CEP") profit rate value of [[      ]] and a constructed value ("CV") profit rate value of [[      ]] in its preliminary margin calculation. See [COP] and [CV] Calc. Adj. For Prelim. Determ. at 2, PD 222, CD 231, bar code 4269754-01 (July 28, 2022) ("Prelim. Cost Memo."); Prelim. Margin Progr. & Prelim. Margin Log at line 8689, CDs 219, 224, bar code 4269727-08 (July 28, 2022).

bar code 4309935-01 (Nov. 10, 2022) ("Ventura Rebuttal Br."). In its brief, Ventura

alleged that LDC and Supplier A were affiliates requiring additional cost

adjustments,[6] and further that adjustments to LDC's reported costs for verification

findings were necessary. Ventura Admin. Br. at 2–6.

On December 23, 2022, Commerce published the <u>Final Results</u>. <u>See</u> 87 Fed.

Reg. at 78,939. Commerce determined that LDC is not affiliated with Supplier A

under 19 U.S.C. § 1677(33)(G), but rather that LDC and Supplier A's relationship "is

market-based and the transactions between them are at arm's length." Final

Decision Memo. at 13. Commerce found record evidence indicating that: LDC is not

reliant on Supplier A given LDC's alternative sources for purchasing major inputs;

the contractual terms between the two showed no obligations towards each other

beyond those contained in the terms; and "neither cost nor sales verifications found

any evidence of affiliation or non-arm's length transactions between those two

parties." <u>Id.</u> at 12–13. Commerce also found that LDC and Supplier A are not

affiliated as partners under 19 U.S.C. § 1677(33)(C), as their relationship is

contractual, and they do not "jointly own anything pursuant to the terms of their

contract and do not engage in joint selling activities." <u>Id.</u> at 13.

---

[6] Specifically, Ventura alleged that LDC's [[                              ]] with
[[         ]] "rendered the two entities affiliated parties" under 19 U.S.C. § 1677(33). Pl.
Mot. at 8–9 (citing Ventura Admin. Br. at 2–6). Thus, Ventura requested Commerce
to adjust "all lemons obtained during the POI from [[            ]] to market price,
not just the [[                                        ]]." Ventura Admin. Br. at 1.

Commerce further concluded that the record did not support a finding that certain parent or holding companies rendered services to LDC requiring adjustment to its G&A expense rate.  Id. at 20–21.  Commerce continued to use LDC's 2020 financial statements as a basis for calculating both the G&A expense rate calculation and material price difference adjustments associated with lemons.  Id. at 15–18. Commerce assessed a final dumping margin of 0.00 percent for LDC, and 22.31 percent for Citrus Juice and all non-individually examined companies.[7]  Final Results, 87 Fed. Reg. at 78,940.

Ventura filed this action contesting the Final Results.  See generally Summs., Jan. 18, 2023, ECF No. 1; Compl., Feb. 16, 2023, ECF No. 14.  On August 3, 2023, Ventura filed the instant motion.  See generally Pl. Mot.  Defendant and LDC filed their responses in opposition to Ventura's motion on November 1, 2023, to which Ventura replied on December 29, 2023.  See generally Def. Resp.; LDC Resp; Pl.'s Reply Supp'n [Pl. Mot.], Dec. 29, 2023, ECF No. 37.  On May 17, 2024, the Court heard oral argument on the issues presented in Ventura's motion.  See generally Oral Arg., May 17, 2024, ECF No. 65.  On July 8, 2024, the Court instructed the parties to submit supplemental briefs addressing the Supreme Court's decision in Loper Bright Enterprises v. Raimondo, 144 S.Ct. 2244 (2024) as well as the Court of Appeals for

---

[7] To calculate the final margins, Commerce used the value [[        ]] for the CV profit rate and [[        ]] for the CEP profit rate.  See [COP] and [CV] Calc. Adj. For Final Determ. at 3–4, Attach. 4, PD 300, CD 336, bar code 4323023-01 (Dec. 19, 2022) ("Final Cost Memo."); Final Determ. Analysis Memo. [LCD] at Attach. 4:8689, PD, 297 CD 313, bar code 4322790-05 (Dec. 21, 2022).

the Federal Circuit's opinion in <u>Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States</u>, 66 F.4th 968 (Fed. Cir. 2023) ("COALITION").  <u>See generally</u> Supp. Authority Order, July 8, 2024, ECF No. 70.  On August 13, 2024, Ventura, Defendant, and LDC submitted their supplemental briefs regarding subsequent authority.  <u>See generally</u> [Ventura's] Supp. Br. On Subsequent Auth., Aug. 13, 2024, ECF No. 73; Def.'s Resp. [Supp. Auth. Order], Aug. 13, 2024, ECF No. 75 ("Def Supp. Br."); [LDC's] Supp. Br. Re. Not. Supp. Auth., Aug. 13, 2024, ECF No. 76 ("LDC Supp. Br.").  The parties submitted their responses to the supplemental briefs on August 30, 2024.  [Ventura's] Supp. Resp, Aug. 30, 2024, ECF No. 80 ("Ventura Supp. Resp."); Def.'s Supp. Reply [Supp. Auth. Order], Aug. 30, 2024, ECF No. 81 ("Def. Supp. Resp."); [LDC's] Supp. Resp. Re Not. Supp. Auth., Aug. 30, 2024, ECF No. 82 ("LDC Supp. Resp.").

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting the final determination in an administrative review of an AD order.  The Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  The Court reviews the record made before the agency as a whole and may not supply a reasoned basis for the agency's action that the agency itself has not given.  <u>See</u> 19 U.S.C. § 1516a(b)(1)–(2); <u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 196 (1947).  The Court

will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,</u> 419 U.S. 281, 286 (1974).

## DISCUSSION

Ventura challenges Commerce's final determination, arguing that: (1) Commerce's affiliation analysis and determination under 19 U.S.C. § 1677(33)(C) and (G) is unsupported by substantial evidence and otherwise not in accordance with law; (2) Commerce's reliance on LDC's FY 2020 financial statements for only certain portions of LDC's COP calculations was arbitrary and capricious; and (3) Commerce's calculation of LDC's G&A expense rate is unsupported by substantial evidence and otherwise not in accordance with law.  Pl. Mot. at 23–39.  Additionally, Ventura requests that should the Court remand the <u>Final Results</u>, Commerce should be instructed to correct "all ministerial errors" in the margin calculation.  <u>Id.</u> at 42–43. Defendant and LDC counter that Commerce's determination was supported by substantial evidence and in accordance with law.  Def. Resp. at 10–30; LDC Resp. at 17–33.  Defendant and LDC further argue that Ventura failed to exhaust its administrative remedies with respect to its challenges to the reliance and temporal aspects of the affiliation analysis, as well as its allegations of ministerial errors.  Def. Resp. at 10–13, 18–19, 30–31; LDC Resp. at 3, 21 n.3, 33–34.  For the reasons that follow, the Court sustains in part and remands in part Commerce's <u>Final Results</u>.

## I.    Commerce's Affiliation Determination

Ventura challenges Commerce's affiliation analysis under both 19 U.S.C. § 1677(33)(G) and (C).  Pl. Mot. at 23–42.  Defendant responds that Ventura's arguments under Section 1677(33)(G) were not raised before Commerce and therefore cannot be raised in this Court.  Def. Resp. at 10–13.  Defendant also contends that Ventura's arguments under both Sections 1677(33)(G) and (C) are without merit.  Id. at 13–27.

### A.    Affiliation Under 19 U.S.C. § 1677(33)(G)

Ventura argues that Commerce's determination that LDC and Supplier A are not affiliated under 19 U.S.C. § 1677(33)(G) is contrary to law and unsupported by substantial evidence, because Commerce: (a) failed to consider whether Supplier A was reliant on LDC and whether LDC had the ability to control Supplier A; and (b) failed to consider "the temporal aspect of the parties' relationship, in contravention of 19 C.F.R. § 351.102(b)(3)."  Pl. Mot. at 23–42.  Defendant argues that Ventura has failed to exhaust both these arguments.  Def. Resp. 10–13.  Further, Defendant argues that in any event, Ventura's claim fails because Commerce specifically addressed whether Supplier A was reliant on LDC, and Ventura fails to identify any information regarding the temporal nature of the relationship that Commerce declined to consider.  Id. at 16–17, 19.

**PUBLIC VERSION**

### 1.    Exhaustion of Administrative Remedies

Defendant claims that Ventura failed to exhaust its administrative remedies for its challenge to Commerce's affiliation analysis under 19 U.S.C. § 1677(33)(G), which examines reliance as an indicator of control and thus party affiliation.  See Def. Resp. at 10–13, 18–24; see also LDC Resp. at 21 n.3.  Ventura responds that it expressly raised the argument that Commerce must consider whether Supplier A was reliant upon LDC in addition to whether LDC was reliant on Supplier A in its administrative case brief.  Pl. Reply at 2–3 (citing Ventura Admin. Br. at 3, 5).  Further, Ventura argues that its administrative case brief discussed affiliation through control numerous times, and that its citation to 19 C.F.R. § 351.102(b)(3)—requiring Commerce to consider the temporal aspect of a relationship in determining whether there is control between the parties—raised the temporal aspect of control in the affiliation analysis.[8]  Pl. Reply at 4.  Ventura has sufficiently raised the argument of reliance before Commerce; however, it did not raise the issue of whether temporal nature of the relationship affected the control analysis.

---

[8] The temporal aspect of control requires the Court to examine "the nature of entities' contacts over time, and must determine how such contacts potentially impact each entity's business decisions. Sporadic or isolated contacts between entities, absent significant impact, would be less likely to lead to a finding of control." Hontex Enterprises, Inc. v. United States, 287 CIT 272, 296, 248 F.Supp.2d 1323, 1344 n.17 (2004) discussing Antidumping Duties; Countervailing Duties, 62 Fed. Reg. at 27,296, 27,298 (ITA May 19, 1997) ("The Department normally will not consider firms to be affiliated where the evidence of 'control' is limited [however], the Department cannot rule out the possibility that a short-term relationship could result in control.")

Before an action may be heard by the Court, parties must exhaust their administrative remedies.  28 U.S.C. § 2637; see Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007).  The Supreme Court has explained "[a] reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action." Unemployment Comp. Cmm'n of Alaska v. Aragon, 329 U.S. 143, 155 (1946); see also Gerber Food (Yunnan) Co. Ltd. v. United States, 33 CIT 186, 195, 601 F. Supp. 2d 1370, 1379 (2009) (citing Aragon, 329 U.S. at 155).  Parties must raise not only issues for agency consideration but the specific arguments they wish the agency to consider.  See 19 C.F.R. § 351.309(c)(2) ("The case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination.").  "[S]imple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."  Dorbest Ltd. v. United States, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (quoting United States v. L.A. Tucker Truck Lines, 344 U.S. 33, 37 (1952)).

Here, Ventura raised the issue of whether Supplier A was reliant on LDC in

its administrative case brief.[9]  Specifically, Ventura explained that "Commerce shall

evaluate [a close supplier] relationship and consider if the supplier has become reliant

upon the buyer" before explicitly raising LDC's reliance on Supplier A.  Ventura

Admin. Br. at 3; id. at 5 ("[LDC] is reliant on [Supplier A's land] to produce

lemons . . .").  Indeed, Commerce acknowledged as a threshold issue, "whether either

the buyer or seller has . . . become reliant on the other." Final Decision Memo. at 12.

Thus, the issue of reliance as an indicator of control under 19 U.S.C. § 1677(33)(G)

was raised before Commerce and is appropriate for the Court to review on the merits.

However, Ventura failed to exhaust administrative remedies with respect to

Commerce's failure to assess the temporal aspect of the parties' relationship in its

affiliation analysis under 19 U.S.C. § 1677(33)(G).  First, Ventura's claim that it

raised the temporal nature of the relationship by referencing various authorities fails

to persuade.  Pl. Reply at 3–4 (citing Ventura Admin. Br. at 3 n.5).  Ventura's

administrative case brief cited U.S. Steel Corp. v. United States, 179 F.Supp.3d 1114,

1132 (Ct. Int'l Tr. 2016) (citing 19 C.F.R. § 351.102 (b)).  That Ventura's case brief

cited a case, that itself cites a regulation discussing the temporal nature of parties'

---

[9] In its administrative case brief, Ventura argued "Per the terms of the [[
            ]] LDC has a [[                                            ]] because LDC is
[[                                                                            ]].
According to LDC, it is not unusual for one concern to have [[
                                                                            ]]."
Ventura Admin. Br. at 3.

relationship, is insufficient to exhaust the argument that here, the temporal nature of the parties' relationship supports a determination that one of the parties controlled the other.  See Ventura Admin. Br. at 3 n.5.

Ventura's argument that Commerce's regulations require it to consider the temporal nature of the relationship also fails.  Pl. Mot. at 30–32.  Ventura claims that Commerce's failure to consider the temporal nature of the relationship raises a question of law which Ventura may raise before the Court.  Pl. Mot. at 30–32; see 19 U.S.C. § 1516a(a)(B) (listing reviewable determinations by Commerce in relation to an AD investigation).  Commerce's regulations provide that it "will consider the temporal aspect of a relationship in determining whether control exists," but that generally, "temporary circumstances will not suffice as evidence of control." 19 C.F.R. § 351.102(b)(3).  However, Commerce need not explicitly acknowledge or discuss every piece of evidence in the record of an investigation before making its determination.  See, e.g., Am. Honey Producers Ass'n v. United States, 653 F.Supp.3d 1329, 1340 (Ct. Int'l Trade 2023) (ruling that Commerce did not need to explicitly address or rely on unused data submitted by the plaintiff when it adopted a reasonable methodology to test the respondent's COP); Torrington Co. v. United States, 16 CIT 220, 224, 790 F. Supp. 1161, 1167 (Ct. Int'l Trade 1992) (finding that Commerce did not need to explicitly address apparent conflicts between data on the record when it chose to rely on one set of data over the other in its determination), aff'd 991 F.2d 809 (Fed. Cir. 1993); Granges Metallverken AB v. United States, 13

CIT 471, 478–79, 716 F. Supp. 17, 24 (Ct. Int'l Trade 1989) (stating that Commerce

did not need to separately address an implicit element of its fungibility analysis in

its determination). Ventura cannot now complain that Commerce failed to explicitly

discuss an argument it failed to raise before the agency. See 19 C.F.R. § 351.309(c)(2)

(requiring that an interested party's case brief before Commerce must include "all

arguments that continue in the submitter's view to be relevant" to the final

determination). Thus, the Court will only consider the reliance component of

Commerce's affiliation analysis under Subsection (G) in the instant matter.

## 2.    The Merits of Affiliation Under 19 U.S.C. § 1677(33)(G)

Ventura argues Commerce's affiliation analysis is contrary to law and

unsupported by substantial evidence because it failed to address whether an

affiliation exists through a close supplier relationship, where Supplier A is reliant on

LDC.[10]   Pl. Mot. at 23–30.   Defendant and LDC argue Commerce's affiliation

determination is supported by substantial evidence because Commerce considered

the close supplier relationship between Supplier A and LDC when reaching its

conclusion. Def. Resp. at 13–18; LDC Resp. at 17–23.

In an antidumping determination, Commerce compares the normal value of

each entry of the subject merchandise to the U.S. Price (export price). 19 U.S.C.

§ 1675(a)(2)(A). Normal value is "the price at which the foreign like product is first

---

[10]   Specifically, Ventura cites the terms of the  [[                                              ]]
agreements as evidence of LDC's control over [[      ]]. Pl. Mot. at 25.

**PUBLIC VERSION**

sold (or, in the absence of a sale, offered for sale) for consumption in the exporting

country, in the usual commercial quantities and in the ordinary course of trade and,

to the extent practicable, at the same level of trade as the export price." 19 U.S.C.

§ 1677b.  In making this comparison for purposes of normal value, Commerce may

only consider a company's sales to affiliates if Commerce is "satisfied that the price

is comparable to the price at which the exporter or producer sold the foreign like

product to a person who is not affiliated with the seller." 19 C.F.R. § 351.403(c).

Commerce excludes non arms-length sales from the calculation of normal value.  19

U.S.C. § 1677b(f)(2).  Likewise, where there is a transaction between affiliated

persons, Commerce applies the major input rule, found in 19 U.S.C. § 1677b(f)(3),

providing that:

> If, in the case of a transaction between affiliated persons involving
> the production by one of such persons of a major input to the
> merchandise, the administering authority has reasonable grounds to
> believe or suspect that an amount represented as the value of such
> input is less than the cost of production of such input, then the
> administering authority may determine the value of the major input
> on the basis of the information available regarding such cost of
> production, if such cost is greater than the amount that would be
> determined for such input under [19 U.S.C. § 1677b(f)(2)].

An "affiliated person," defined by Section 1677(33)(G), is "[a]ny person who

controls any other person and such other person." 19 U.S.C. § 1677(33)(G).  Moreover,

a person is considered to control another if the controlling person "is legally or

operationally in a position to exercise restraint or direction over the other person." 19

U.S.C. § 1677(33).  When analyzing affiliation under Section 1677(33)(G), Commerce

will consider, among other factors, the presence of "close supplier relationships." 19

C.F.R. § 351.102(b)(3).  The legislative history to the statute explains that a "close

supplier relationship" is one where "the supplier or buyer becomes reliant upon the

other."  Statement of Administration Action for the Uruguay Round Agreements Act,

H.R. Rep. No. 103-316 (1994), <u>as reprinted</u> in 1994 U.S.C.C.A.N. 4040, 4174–75

("SAA").  In evaluating a close supplier relationship, Commerce may find control

sufficient to establish affiliation under Section 1677(33) if the record indicates that

"the relationship has the potential to impact decisions concerning the product, pricing

or costs" of such merchandise.  19 C.F.R. § 351.102(b)(3).

Moreover, Section 351.102(b)(3) indicates that Commerce shall evaluate such

a relationship and consider if the supplier has become reliant upon the buyer.  19

C.F.R. § 351.102(b)(3);[11] <u>see also</u> <u>U.S. Steel Corp. v. United States</u>, 179 F.Supp.3d

---

[11] Commerce's regulations shed further light on the meaning of "reliant" in the context of the statute:

> "Affiliated persons" and "affiliated parties" have the same meaning as in section [19 U.S.C. § 1677(33)].  In determining whether control over another person exists, within the meaning of [19 U.S.C. § 1677(33)], the Secretary will consider the following factors, among others: Corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships.  The Secretary will not find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product.  The Secretary will consider the temporal aspect of a relationship in determining whether control exists; normally, temporary circumstances will not suffice as evidence of control.

19 C.F.R. § 351.102(b)(3).

1114, 1132 (Ct. Int'l Trade 2016) (remanding for further consideration and explanation after Commerce failed to analyze whether close supplier relationships made one party reliant on the other through one party's control over the other).

Here, Commerce identified the correct legal standard in explaining that "the threshold issue" with respect to close supplier relationships "is whether either the buyer or seller has . . . become reliant on the other." Final Decision Memo. at 12. However, Commerce failed to consider whether LDC has the ability to control Supplier A, and, consequently, whether Supplier A is reliant upon LDC. Although Commerce's reliance analysis in the final determination discusses the potential reliance of LDC on Supplier A, it fails to consider or acknowledge the supplier's reliance on LDC. See Final Decision Memo. at 12 ("we agree with LDC that when a buyer has other supply options, the buyer is not reliant on its supplier. Record evidence supports finding that LDC had other sources for purchasing major input other than this particular supplier"). Ventura points to record evidence suggesting mutual reliance among the parties, in that certain percentages of LDC's total purchases of lemons during the POI were procured or otherwise grown by Supplier A.[12] See Pl. Mot. at 9 (citing Ventura Admin. Br. at Exh. 1). Commerce fails to address the evidence demonstrating Supplier A's reliance on LDC, rendering

---

[12] Specifically, Ventura cites record evidence indicating that, of the lemons making up [[                                                                        ]], approximately [[      ]] percent of LDC's total purchases of lemon during the POI were attributable to [[      ]]. Pl. Mot. at 9 (citing Ventura Admin. Br. at Exh. 1).

**PUBLIC VERSION**

Commerce's analysis and determination unsupported by the record.  <u>See</u> Final

Decision Memo. at 11–13.

In support of its determination that the parties were not affiliated under

Section 1677(33)(G), Commerce notes that the contractual terms between LDC and

its supplier "indicate no obligation toward each other beyond those spelled out by the

terms of the contract," and that the parties recognize each other's sovereignty.  Final

Decision Memo. at 12.  Commerce's statement that the parties have no obligation to

each other beyond the contract is conclusory.  Commerce offers no explanation for

how the terms of the contract demonstrate a lack of Supplier A's reliance on LDC.

<u>See generally</u> Final Decision Memo.; Def. Resp.  Indeed, the agreements between LDC

and Supplier A suggest the relationship has the potential to impact production,

pricing, or cost decisions through LDC's control over its supplier.[13]  <u>See</u> LDC DQR at

Exh. D3.

---

[13] Ventura contends Commerce failed to address the following:

The existence of an [[

(footnote continued)

     Although Commerce determined that LDC had other supplier options, Final

Decision Memo at 12 n.79 (first citing LDC DQR at Exh. D7; and then citing [LDC's]

Supp. [DQR] at Exh. Supp. D15, PDs 155–56, CDs 159–77, bar code 4248998-01 (June

3, 2022) ("LDC SDQR")), it ignored evidence that would suggest that, even with the

availability of other suppliers, Supplier A may have been reliant upon the LDC.

Commerce must provide a reasonable explanation based on the evidence that

supports its determination, see CS Wind Vietnam v. United States, 832 F.3d 1367,

1376 (Fed. Cir. 2016), as well as the evidence that detracts from its determination.

Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951).  Commerce's failure

to do so here warrants remand.  On remand, Commerce must consider whether LDC

controlled its supplier through Supplier A's reliance on LDC.[14]

<div style="margin-top:3em;border-top:1px solid #000;width:40%"></div>

                  ]].

Pl. Mot. at 29 (citing LDC DQR at Exh. D3).

[14] Because the Court remands Commerce's determination under Section 1677(33)(G), the parties are free to raise any specific arguments regarding that section of the statute on remand, including the temporal nature of the relationship.  See 19 C.F.R. § 351.102(b)(3) ("The Secretary will consider the temporal aspect of a relationship in determining whether control exists; normally, temporary circumstances will not suffice as evidence of control"); see also Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,298 (Dept' Commerce May 19, 1997) (explaining that Commerce will consider "the temporal aspect of control" when evaluating whether an affiliate controls another).

### B.    Affiliation under 19 U.S.C. § 1677(33)(C)

Ventura argues that Commerce's determination that LDC and Supplier A were not partners is contrary to law and unsupported by substantial evidence.  Pl. Mot. at 32–42.  Specifically, Ventura contends that Commerce ignored the plain language of 19 U.S.C. § 1677(33)(C), which identifies "partners" as affiliates, when it determined that partners must engage in joint ownership or jointly sales.  Pl. Mot. at 33–34; Ventura. Supp. Br. at 5–6. Ventura argues the word partners refers to "one associated with another, especially in action" and "one, or two or more people . . . that do business together." Id. (citing Merriam Webster.com and Britannica.com).  Further, Ventura argues the Court should not defer to Commerce's interpretation of the term "partners" because Congress did not delegate to Commerce the authority to give meaning to the word "partners." Ventura. Supp. Br. at 1–6 (discussing Loper Bright, 144 S.Ct. at 2263).   Finally, Ventura argues that in articulating a standard for "partners," Commerce failed to engage in reasoned decision making.  Id. at 7. Defendant and LDC respond that Congress delegated to Commerce the authority to give meaning to the term "partners." Def. Supp. Br. at 4-8; LDC Supp. Br. at 6-8 (citing Loper Bright, 144 S.Ct. at 2263); Def. Supp. Reply Br. at 3-4. LDC argues that even if the Court did not defer to Commerce's interpretation of the word "partners", that interpretation is especially useful to the Court in its analysis.  LDC Supp. Br. at 8-10 (citing Loper Bright, 144 S.Ct. at 2251, 2262–63, 2267).

Courts exercise their independent judgment in deciding statutory meaning. Loper Bright, 144 S.Ct. at 2262.[15]  In doing so, courts use traditional tools of statutory interpretation, id. at 2266, specifically courts examine the "statute's text, structure, and legislative history, and apply the relevant canons of interpretation." Delverde, SrL v. United States, 202 F.3d 1360, 1363 (Fed. Cir. 2000).  Starting with the text, the plain meaning of the word is ascertained in context.  Yates v. United States, 574 U.S. 528, 537 (2015).  Dictionary definitions, although helpful, are not solely dispositive, and must be assessed considering the statute as a whole.  Id.  In exercising their judgment, courts may determine that Congress explicitly delegated authority to an agency to give meaning to a particular statutory term.  Loper Bright, 144 S.Ct. at 2263 (citing Batterton v. Francis, 432 U.S. 416, 425 (1977)). Additionally, Congress may supply an open-ended term or phrase such as "reasonable" or "appropriate" that "leaves agencies with flexibility." Id. (citing Michigan v. EPA, 576 U.S. 743, 752, (2015)).  However, for a court to conclude that an agency has the power to give meaning to the words of the statute, the source of the agency's authority must be found in the words of the statute; it cannot be presumed by virtue of silence or ambiguity.  Id. (overruling Chevron, U.S.A., Inc. v. Natural Resources Defense

---

[15] Although Loper Bright involved review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., while this Court reviews this determination under 28 U.S.C. § 2640, the logic of Loper Bright applies here because, similar to the APA, 28 U.S.C. § 2640 directs review to 19 U.S.C. § 1516a(a)(2)(B)(iii) providing that the court will set aside a determination found to be "contrary to law." See 28 U.S.C. § 2640 and 19 U.S.C. § 1516a(a)(2)(B)(iii).

Council, Inc., 467 U.S. 837 (1984)).[16]  Even where a statute implicates technical expertise "it does not follow that Congress has taken the power to authoritatively interpret the statute from the courts and given it to the agency, Congress expects courts to handle technical statutory questions."[17] Id. at 2267.  Nonetheless, the Court may be guided by the agency's "body of experience and informed judgment" in making its independent determination,[18] Id. at 2267 (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).  Although Loper Bright acknowledges that agencies may be empowered to make "fact bound determinations," an agency's power to apply the law to particular facts does not undermine the Court's duty to address questions of statutory meaning.  Id. at 2259 (discussing Gray v. Powell, 314 U.S. 402, 411–14 (1941) and NLRB V. Hearst Publications, Inc., 322 U.S. 111, 131–32 (1944)).

---

[16] Under Chevron a reviewing court would
   first assess "whether Congress has directly spoken to the precise question at issue." If, and only if, congressional intent [was] "clear," that [was] the end of the inquiry. But if the court determine[d] that "the statute [was] silent or ambiguous with respect to the specific issue" at hand, the court [would], at Chevron's second step, defer to the agency's interpretation if it "[was] based on a permissible construction of the statute."
Loper Bright, 144 S. Ct. at 2254 (citations omitted).
[17] Although Defendant correctly notes that precedent that predates Chevron have given great weight to Commerce's determinations of a technical nature, Def. Supp. Resp. at 4–5, Loper Bright explains that courts will give weight to those determinations only to the extent that the reasoning underlying them has the power to persuade.  Loper Bright, 144 S.Ct. at 2267 (citing Skidmore, 323 U.S. at 140 (1944)).
[18] Such consideration of the agency's views rests not on deference but on persuasion.

Here, Congress identified "partners" as affiliated parties under Section 1677(33)(C), but it did not define the term "partners." 19 U.S.C. § 1677(33)(C).  The statute contains no indication that Congress expressly delegated to Commerce the authority to give meaning to the word "partners." See Loper Bright, 144 S.Ct. at 2263. The statute contains no open-ended terms that would give flexibility to the agency. See Loper Bright, 144 S.Ct. at 2263 (citing Michigan v. EPA, 576 U.S. at 752) (identifying words "appropriate" or "reasonable" as terms that would give flexibility to the agency); see also e.g., Garg Tube and Export v. United States, No. 21-169 (Ct. Int'l Trade Nov. 7, 2024) (identifying the words "differ significantly" as open-ended terms).

Additionally, despite Defendant and LDC's arguments, Loper Bright does not suggest that Commerce's authority to issue regulations to implement the statute under 19 U.S.C. § 3513(a)(2), is a delegation of authority to give meaning to statutory terms.  Indeed, Defendant and LDC's argument that 19 U.S.C. § 3513(a)(2) empowers Commerce to give meaning to the statute proves too much.  See Def. Supp. Br. at 4-8; LDC Supp. Br. at 6-7.  General rulemaking authority does not empower an agency to give meaning to the law.  Under this theory Commerce would have the power to give meaning to every statutory term rendering Loper Bright meaningless.  Even under Chevron, an agency's notice and comment rulemaking went to whether the agency's interpretation was made with the force of law, not whether the agency was empowered with authority to make that interpretation.  See United States v. Mead

<u>Corp.</u>, 533 U.S. 218, 229 (2001).[19]  Thus, the Court must give meaning to the word "partners" in 19 U.S.C. § 1677(33)(C).

The word partners in the context of 19 U.S.C. § 1677(33)(C) means a for profit cooperative endeavor in which parties share in risk and reward.  Dictionary definitions suggest a broad view of "partners." For example, Black's law dictionary defines "partner" as "[s]omeone who shares or takes part with another, esp[ecially] in a venture with shared benefits and shared risks; an associate or colleague," and as "[o]ne of two or more persons who jointly own and carry on a business for profit." <u>Partner</u>, Black Law's Dictionary (11th ed. 2019).  Merriam-Webster provides multiple definitions, including "one associated with another especially in an action," and "a

---

[19] For similar reasons, Defendant's argument that the special fast track procedures of the Uruguay Round Agreements Act ("URAA") weigh in favor of finding a delegation also fail.  Def. Supp. Br. 5-6. Defendant states that as part of the fast track process "Congress expressly approved the Statement of Administrative Action" ("SAA") providing "[i]n practice, the Administration will endeavor to amend or issue the regulations . . . [19 U.S.C. § 3513(a)(2)] provides the authority for such new or amended regulations to be issued, . . . ." Def. Supp. Br. at 6.  Defendant argues that the Court of Appeals applying this statutory framework in <u>COALITION</u> the Court "concluded that 19 U.S.C. § 3513(a)(2) granted Commerce 'regulatory-implementation power' to carry out the URAA." Def. Supp. Br at 6. (citing <u>COALITION</u>, 66 F.4th at 977.  Defendant's citation to <u>COALITION</u> is inapposite as in that case the Court of Appeals relied on both § 3513(a) and 19 U.S.C. 1677f-1(e). <u>COALITION</u>, 66 F.4th at 977-78 ("It is also evident as a logical matter why an expedited-review process 'may be necessary to ensure that' the individualized-determination preference of § 1677f-1(e) is 'appropriately implemented.'") (quoting 19 U.S.C. § 3513(a)(2)).  To the extent <u>COALITION</u> stood for a broader proposition that Commerce could give meaning to the words of a statute absent an express delegation or words bestowing flexibility by virtue of its rulemaking authority alone, that proposition would now seem to be precluded by <u>Loper Bright</u>.  <u>Loper Bright</u>, 144 S.Ct. at 2263.

member of a partnership especially in a business." <u>Partner</u>, Merriam-Webster's

Dictionary, https://www.merriam-webster.com/dictionary/partner (last visited Nov.

4, 2024).

The definitions also suggest that the cooperative endeavor is itself an entity or

association.  For example, Barron's Dictionary of Business and Economics Terms

provides that a partner, is "a member of a partnership, which may be a syndicate,

association, pool, joint venture, or other unincorporated organization." Barron's

Dictionary of Business and Economics Terms (5th ed. 2012).  Likewise, the Uniform

Partnership Act ("UPA") defines a partnership as "an association of two or more

persons to carry on as co-owners a business for profit."  Unif. Partnership Act § 6(1)

(1914).  Thus, a partnership requires not only the sharing of risk and reward but also

a cooperative endeavor, e.g., an association, joint venture, or unincorporated

organization.

The view of partners, as members of a cooperative endeavor sharing in risk

and reward, makes sense in the context of the statute.  Congress defined affiliates in

19 U.S.C. § 1677(33) to include partners, amongst a list of other relationships:

> (33) Affiliated persons
>
> The following persons shall be considered to be "affiliated" or
> "affiliated persons":
> (A) Members of a family, including brothers and sisters (whether
> by the whole or half blood), spouse, ancestors, and lineal descendants.
> (B) Any officer or director of an organization and such
> organization.
> (C) Partners.

      (D) Employer and employee.
      (E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.
      (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.
      (G) Any person who controls any other person and such other person.
      For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

19 U.S.C. § 1677. The use of the word affiliates in Title 19 suggests that Congress sought to identify affiliates in cases where a party relationship might have an impact on price. See e.g. 19 U.S.C. § 1677b(f)(3) (the major input rule providing for transactions between affiliated persons involving the production of a major input to Commerce may under certain circumstances adjust the cost of that input). Further, the SAA explains that in broadening the definition of affiliates in the URAA, Congress sought to better conform the statute to market realities and the myriad of ways in which parties' relationships might affect pricing.   SAA at 4174–75.

      Commerce's view of the word "partners" as those who "jointly own anything" or "engage in joint selling activities," Final Decision Memo. at 13, is helpful but inadequate. As discussed above the 19 U.S.C. § 1677(33) targets relationships which might affect price. Joint selling and joint ownership are indeed two relationships that may affect price because they involve entities cooperating for profit by sharing risk and reward, but they are not the only arrangements that do so. Parties may form a cooperative business endeavor to engage in joint ownership and joint selling.  But

parties might also form a cooperative business endeavor to engage in other activities that involve the sharing of risk and reward.

The plain meaning of the word partners requires Commerce to analyze not only whether entities are involved in joint selling or joint ownership but also whether they more generally form a cooperative endeavor in which they share risk and reward. Here, Commerce determines that LDC and Supplier A are not partners because they did not "jointly own" or engage in "joint selling activities" beyond those provided for in a contractual relationship.[20]  <u>See</u> Final Decision Memo. at 13.  Therefore, the Court must remand to Commerce to apply the definition articulated by the Court, namely whether LDC and Supplier A formed a cooperative business endeavor in which they shared risk and reward.

## II.    **Cost of Production Calculations**

Ventura challenges Commerce's use of data from the FY 2021 audited financial statements to calculate LDC's COM expenses, arguing that Commerce arbitrarily and capriciously relied on data that it had determined was unreliable for other purposes.  Pl. Mot. at 36–39.  Defendant responds that Commerce did not rely on FY

---

[20] Commerce states:

> We also find that LDC and its supplier are not affiliated as partners within the meaning of section 771(33)(C) of the Act. Record evidence supports that this is a contractual relationship. LDC and its supplier do not jointly own anything pursuant to the terms of their contract and do not engage in joint selling activities. Therefore, we conclude that LDC and its supplier are not affiliated as partners within the meaning of section 771(33)(C) of the Act.

Final Decision Memo. at 13 (footnotes omitted).

2021 statements in its COM calculations, but rather Commerce used the cost of fruit

for the POI, which was on the record, to calculate and make necessary adjustment to

COM. Def. Resp. at 27–28 (first citing Final Cost Memo. at 2; and then citing [LDC's]

Cost Verif. Exhs. at CVE-6, PD 242, CD 267, bar code 4287519-04 (Sept. 23, 2022)

("Cost Verif. Exhs.")).   For the reasons that follow, Commerce's determination is

supported by substantial evidence and sustained.

Agency action is arbitrary and capricious where the agency fails to consider an

important aspect of the issue presented, fails to explain its reasoning in light of the

record, or reaches a result that is so implausible "that it could not be ascribed to a

difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v.

State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Agency action is also arbitrary

where it treats similar situations differently without explanation.  See Solarworld

Americas, Inc. v. United States, 182 F.Supp.3d 1372, 1379 (Ct. Int'l Trade 2016)

(citing SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001)); see also

West Deptford Energy, LLC v. FERC, 766 F.3d 10, 21 (Fed. Cir. 2014).

Here, Commerce, provided with both LDC's FY 2021 and FY 2020 financial

statements, used the FY 2020 financial statement to calculate the period cost

calculations, which includes the G&A expense rate.[21]  See Final Decision Memo. at

---

[21]  LDC explains that it "makes monthly accounting provisions for its fruit purchases

(footnote continued)

15. Commerce explained that the FY 2021 put on the record at the time of verification financial statements that did not give interested parties sufficient time to review the information, and that "the record does not contain sufficient detail to allow Commerce to identify or discern the proper expenses that should be included in the G&A expense rate for this proceeding if [it] use[d] the 2021 financial statements." Id.

For the COM expenses, Commerce used POI costs that it derived from "source documents." See Final Decision Memo. at 17 (citing Cost Verif. Exhs. at CVE-6). Although Commerce's explanation could be clearer, it is reasonably discernible that Commerce refers to source documents to mean those reflecting monthly purchases occurring in the POI, which includes the year 2021. See id. (citing Cost Verif. Exhs. at CVE-6). In other words, these source documents include documents other than the audited financial statements compiled at the end of a fiscal year. Specifically, Commerce relied on the values contained on page 17 of Exhibit 6 in the Cost Verification Exhibits. See Final Decision Memo. at 17; Cost Verif. Exhs. at CVE-6:17. That the source documents from which these numbers were derived would also be source documents for the FY 2021 audited financial statements does not mean that Commerce used the 2021 financial statements to obtain the prices of lemons from

---

but does not obtain the final price until the year-end." LDC Resp. at 26 (first citing Cost Verif. Rep. at 8, 21; and then citing Cost Verif. Exhs. at CVE-6). LDC then "adjusts the total for the year by either a negative or a positive value." Id. (citing first citing Cost Verif. Rep. at 8, 21; and then citing Cost Verif. Exhs. at CVE-6). Because LDC did not initially report these price adjustments as part of the COM, "Commerce added the entire amount (related to lemons and oranges) to G&A." Id. (citing Prelim. Decision Memo. at 14).

**PUBLIC VERSION**

2021.  Indeed, Commerce defines COM as the "cost of materials, labor, variable overhead, and fixed overhead incurred to produce the finished goods during the POI." LDC DQR at D-32.  The POI at issue here spans from October 1, 2020, through September 30, 2021.  Final Decision Memo. at 1.  Necessarily, the COM will include some costs from 2021 and, not surprisingly, those costs will also be reflected in the FY 2021 financial statements.  Accordingly, the COM calculation is reasonable and thus sustained.

## III.    G&A Expense Rate

Ventura claims that Commerce's exclusion of costs of certain LDC affiliates when calculating LDC's G&A expense rate is not supported by substantial evidence. Pl. Mot. at 39–42. Ventura argues Commerce relied on deficient and incorrect submissions by LDC concerning its affiliates and parents, and that its failure to adhere to established agency practice is arbitrary and capricious.  Pl. Reply at 16–21. Defendant and LDC counter that Commerce's determination followed established practice and is supported by substantial evidence because no adjustments to LDC's G&A expenses were required, as all expenses associated with any affiliates were already included in LDC's G&A expense calculation.  Def. Resp. at 28–29; LDC Resp. at 28–33.  For the following reasons Commerce's determination is sustained.

Commerce calculates the normal value of subject merchandise by making a comparison between the export price or CEP and normal value.  See 19 U.S.C. § 1677b(a).  Commerce calculates CEP by determining the sum of (1) the cost of

materials and fabrication for producing the subject merchandise, or (2) the costs incurred by the exporter for selling, profits, and G&A expenses.   19 U.S.C. § 1677b(e)(1)–(2).  Finally, Commerce's regulations instruct it not to "double-count adjustments" when determining adjustments for the merchandise's normal value, export price, or CEP.  See 19 C.F.R. § 351.401(b)(2).

When calculating CEP by way of selling, profits, and G&A expenses, Commerce's practice is to calculate G&A expense ratios "based on a respondent company's unconsolidated financial statements plus a portion of the parent company's G&A expenses if the parent performed administrative services on behalf of the respondent."  Outboard Engines from Japan, 70 Fed. Reg. 326 (Dep't Commerce January 4, 2005) (notice of final determination of sales at less than fair value) and accompanying issues and decision memo. at Comment 20; see also Certain Cold-Rolled Steel Flat Products from the Russian Federation, 81 Fed. Reg. 49,950 (Dep't Commerce July 29, 2016) (final determination of sales at less than fair value) and accompanying issues and decision memo. at Comment 15 ("Cold-Rolled Steel Final Decision Memo.").  However, Commerce will not include a parent company's expenses in a respondent's G&A expense ratio if the parent company charged the respondent for services provided, and the respondent included those charges in its reported costs. Common Alloy Aluminum Sheet from Slovenia, 86 Fed. Reg. 13,305 (Dep't Commerce March 8, 2021) (final determination of sales at less than fair value) and accompanying issues and decision memo. at Comment 6.

As a matter of practice, Commerce solicits financial documents of affiliates involved in the production of merchandise from respondents and seeks additional documentation where it has reason to believe that an affiliate is providing services to the respondent company. See Cold-Rolled Steel Final Decision Memo. at Comment 15 (concluding from review of documentation that further financial records were needed); Large Diameter Welded Pipe From Canada, 84 Fed. Reg. 6,378 (Dep't Commerce Feb. 27, 2019) (final determination of sales at less than fair value) and accompanying issues and decision memo. at Comment 6 (concluding the purpose of the holding company was relevant because the parent company's financial statements showed "expenses incurred by the company for the benefit of its subsidiaries").

Here, Commerce's decision not to adjust LDC's G&A expenses for purposes calculating CEP is reasonable and consistent with past practice. In the initial questionnaire, Commerce requested information relevant to the POI, including the financial documents of "all affiliates involved in the production or sale of the subject merchandise in the foreign market and the U.S. market, of all affiliated suppliers to these affiliated, and of the parent(s) of these affiliates." Initial Questionnaire at A-6. Commerce reviewed the companies involved in the production and sale of the subject merchandise at issue. See Cost Verif. Rep. at 3–4.1[22] Commerce subsequently sought

_____

[22] Commerce established that LDC is "wholly owned by Louis Dreyfus Company

(footnote continued)

additional information in a supplemental questionnaire. Final Decision Memo. at 20;

LDC's SDQR at Supp. D-23 to Supp. D-24; see also LDC's SDQR at Exhibit Supp. D-

13.  Based on the information submitted, Commerce concluded that companies within

LDC's corporate structure "charge[d] each other where services are provided to other

LDC companies."  See Final Decision Memo. at 20; see also LDC SDQR at Supp. D-

23–D-24 (stating that "administrative and accounting services" provided by LDC

Brasil are "subject to a Cost-Sharing Agreement" which are reported in the G&A

expenses); id. at Exh. Supp. D-13 (referencing the Cost-Sharing Agreement between

LDC and LDC Brasil).  Thus, Commerce concluded that LDC's reported G&A costs

included "the costs of services provided by any affiliated companies, including their

parent company."  Final Decision Memo. at 20.

Ventura's challenge, that Commerce failed to request necessary financial

documents, fails to persuade.  Ventura contends that Commerce departed from

established practice by failing to request LDC's affiliates financial statements.  Pl.

Mot. at 41–42; Pl. Reply at 18.  Commerce's actions are arbitrary and capricious when

---

Juices Holding B.V., which is a subsidiary of the Louis Dreyfus Company Group."
Cost Verif. Rep. at 3.  LDC identified [[      ]] as an "affiliated supplier."  Cost Verif.
Rep. at 4.  LDC also identified LDC Brasil [[
                                    ]]."  Id.  LDC reported that "[[


                                                                      ]]."  Id.
Commerce examined LDC Brasil's total shared service expenses that it "allocated to
juice for ([[            ]] BRL) and compared the amount to the total fees recognized
by LDC Sucos [[            ]] BRL . . . for service fees (LDC Sucos pays LDC Brasil
periodically but overestimated the accrual at year end)."  Id.

it treats similar situations differently without explanation.  Consol. Bearings Co. v.

United States, 348 F.3d 997, 1007 (Fed. Cir. 2003).  Commerce requested financial

statements from LDC, its parent and other affiliates involved in the production of

merchandise. Initial Questionnaire at A-6.  Commerce received the requested

documents, and after issuing a supplemental questionnaire received statements from

an affiliate, that was not LDC's parent but had provided administrative services and

charged for those services.  See LDC SDQR at Supp D-23–D-24; Final Decision Memo.

at 20.  Commerce, upon reviewing the financial submissions, found there is "no record

evidence that the ultimate parent company or any other LDC holding companies

provided any services to LDC." Final Decision Memo. at 20.  Thus, it is discernible

that Commerce's review of the financials it requested, and the corporate structure led

it to believe that it did not need to review further financial documents from the

ultimate parent company or holding companies. See Final Decision Memo. at 21

(citing Initial Questionnaire at A-10) (explaining that LDC was not required to

submit financial statements of affiliates that were not involved in production of the

subject merchandise); see also id. (explaining that Commerce saw no evidence that

administrative services were provided by LDC's parent company); Bowman Transp.,

Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285–86 (1974) (upholding a

decision of "less than ideal clarity" when the agency's analytical pathway to its

conclusion is reasonably discernible). Commerce's measured approach is reasonable

and consistent with past practice.  Accordingly, Commerce's determination on the

issue is sustained.

## IV.    Ministerial Errors

Finally, Ventura requests that any remand order "contain clear instructions to

correct for all errors in the margin calculation." Pl. Mot. at 42.  Specifically, Ventura

claims that Commerce, in response to Ventura's and LDC's submissions and rebuttal

comments concerning ministerial errors in the margin calculations, failed to remedy

an error in its programming instructions.[23] Id. at 43.  Defendant and LDC argue that

Ventura failed to exhaust its administrative remedies concerning its request.  Def.

Resp. at 30–31; LDC Resp. at 33–35.

Here, Ventura failed to raise its claims of ministerial errors before Commerce

and thus has not exhausted its administrative remedies.  After issuing the Final

Results and Final Decision Memorandum on December 19, 2022, Commerce notified

the parties of the deadlines to submit comments and rebuttals for any significant

ministerial errors in the determination, which were December 27, 2022, and January

3, 2023, respectively.  See Commerce Memo. re: Deadline to File Cmts. On Significant

Ministerial Errors, PD 299, bar code 4322995-01 (Dec. 21, 2022).  LDC timely

submitted its ministerial error comments concerning a currency and measurement

---

[23]  Ventura contends that Commerce "[[


]]," which it speculates stems from "inadvertent duplication"
under 19 C.F.R. § 351.224(f) that "results in an implied profit rate of [[     ]] percent
for Commerce's analysis of dumping" by LDC.  Pl. Mot. at 43.

conversion issue.  See Letter White & Case LLP, to Sec'y Commerce re: Pet.'s

Ministerial Error Cmts. at 1–5, PD 302, CD 337, bar code 4325020-01 (Dec. 27, 2022)

("LDC Error Cmts.").  On January 3, 2023, the deadline for rebuttal comments,

Ventura filed its response to LDC's alleged errors and, for the first time, raised the

errors alleged in its motion.  See Letter Buchanan Ingersoll Rooney, to Sec'y

Commerce re: [LDC Error Cmts.] at 1–3, PD 303, CD 338, bar code 4326924-01 (Jan.

3, 2023) ("Ventura Error Resp.").  After LDC contested the timeliness of Ventura's

alleged errors in a letter, Commerce removed both Ventura's rebuttal comments and

LDC's letter from the official and public records of the investigation.  See Letter White

& Case LLP, to Secy' Commerce, re: [Ventura Error Resp.], PD 305, bar code 4327896-

01 (Jan. 6, 2023); Commerce Memo. re: Removal of Document from the Record at 1–

2, PD 305, bar code 4331391-01 (January 13, 2023).

The record reflects that Ventura failed to timely raise its allegations of

ministerial error within the timeframe allotted by Commerce.  See 19 C.F.R.

§ 351.224(c)(2) (providing time limits for submitting comments regarding ministerial

errors).  Moreover, Ventura failed to request an extension of time to submit its

comments as permitted by Commerce's regulations.  See generally Pl. Mot.; Pl. Reply;

see also 19 C.F.R. § 351.224(c)(4); 19 C.F.R. § 351.302(c).  Accordingly, Ventura's

failure to raise its alleged errors in accordance with Commerce's deadlines precludes

the Court's ability to reach the merits of Ventura's claim.  However, if Commerce

reconsiders its affiliation determination pursuant to the Court's remand instructions

and finds that LDC and Supplier A are affiliated, and consequently revises its calculations that implicate the present ministerial errors raised by Ventura, then the parties can raise those issues before Commerce at the appropriate time of the proceeding.

## CONCLUSION

For the foregoing reasons, the Court sustains Commerce's determination concerning cost of production calculations, and G&A expense ratios for the <u>Final Results</u>. Commerce's affiliation determination under 19 U.S.C. § 1677(33)(G) and 19 U.S.C. § 1677(33)(C) are remanded for further explanation or reconsideration. Therefore, it is

**ORDERED** that Commerce's <u>Final Results</u>, <u>see</u> ECF No. 25-3, is remanded for further explanation or reconsideration consistent with this opinion, and it is further

**ORDERED** that Commerce shall file its remand redetermination with the Court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to the comments on the remand redetermination; and it is further

**ORDERED** that the parties shall file the joint appendix within 14 days after the filing of replies to the comments on the remand redetermination; and it is further

Court No. 23-00009                                                                     Page 40
**PUBLIC VERSION**

     **ORDERED** that Commerce shall file the administrative record within 14 days

of the date of filing its remand redetermination.


                                                 /s/ Claire R. Kelly
                                                 Claire R. Kelly, Judge

Dated:       November 7, 2024
               New York, New York