A-351-858
Remand
Slip Op. 24-125
POR: 10/01/2020–09/30/2021
**Public Version**
E&C/OIV:  DP

***Ventura Coastal, LLC v. United States et al.*,**
**Court No. 23-00009, Slip Op. 24-125 (CIT November 7, 2024)**
**Lemon Juice from Brazil**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT or the Court) in *Ventura Coastal, LLC v. United States*.[1]  The CIT's *Remand Order* concerns the final determination in the less-than-fair-value (LTFV) investigation of lemon juice from Brazil.[2]

In its ruling, the CIT remanded, in part, the *Final Determination* to Commerce to:  (1) further explain or reconsider whether the mandatory respondent, Louis Dreyfus Company Sucos S.A. (LDC), controlled its supplier[3] (Supplier A) through Supplier A's reliance on LDC, and (2) apply the CIT's definition of "partners" to LDC's relationship with Supplier A, namely whether LDC and Supplier A formed a cooperative business endeavor in which they shared risk and reward beyond Commerce's analysis employed in the *Final Determination*.[4]  Consistent with the CIT's opinion, on remand, Commerce is providing further explanation regarding Supplier A's

---

[1] *See Ventura Coastal, LLC v. United States et al.*, Court No. 23-00009, Slip Op. 24-125 (CIT November 7, 2024) (*Remand Order*).
[2] *See Certain Lemon Juice from Brazil:  Final Affirmative Determination of Sales at Less Than Fair Value*, 87 FR 78939 (December 23, 2022) (*Final Determination*), and accompanying Issues and Decisions Memorandum (IDM).
[3] LDC's supplier is [                              ] (Supplier A).
[4] *See Remand Order* at 21 and 29.

reliance on LDC and applying the statutory definition of "partners" as articulated by the CIT in the *Remand Order* to continue to find that LDC and Supplier A are not affiliated.

## II.    BACKGROUND

On December 23, 2022, Commerce published the *Final Determination* of the underlying LTFV investigation of lemon juice from Brazil.[5]  Commerce assigned an estimated weighted-average dumping margin of 0.00 percent to LDC, a mandatory respondent in the investigation.[6]  Commerce also assigned an estimated weighted-average dumping margin of 22.31 percent to Citrus Juice Eireli, another mandatory respondent in the investigation.[7]  As a result, on February 16, 2023, Commerce published the *Order* on lemon juice from Brazil, excluding merchandise produced and exported by LDC.[8]  As part of our determination, we found that LDC was not affiliated with Supplier A within the meaning of section 771(33) of the Tariff Act of 1930, as amended (the Act).[9]  Part of our analysis relied on the distinction between "exclusivity" and "reliance," wherein parties may have an exclusive relationship but still be capable of acting independently if the exclusive relationship is no longer in an individual's interests and not remain in the exclusive relationship by necessity.  Further, we concluded that the relationship between the parties was merely contractual.[10]  On February 16, 2023, Ventura Coastal LLC (the petitioner) challenged Commerce's *Final Determination* at the CIT.  On November 7, 2024, the CIT remanded for Commerce to (1) further explain or reconsider whether LDC controlled its supplier (Supplier A) through Supplier A's reliance on LDC, and (2) apply the CIT's definition of "partners" to LDC's relationship with Supplier A, namely whether LDC and Supplier A

---

[5] *See Final Determination*.
[6] *Id.*
[7] *Id.*
[8] *See Certain Lemon Juice from Brazil and the Republic of South Africa:  Antidumping Duty Orders*, 88 FR 10088 (February 16, 2023) (*Order*).
[9] *See Final Determination* IDM at Comment 3.
[10] *Id.*

formed a cooperative business endeavor in which they shared risk and reward beyond Commerce's analysis employed in the *Final Determination*.[11]  The CIT sustained (1) Commerce's use of LDC's fiscal year 2021 financial statements in its cost of manufacturing calculations, and (2) Commerce's calculation of LDC's general and administrative expense rate.[12]

On January 15, 2025, Commerce released the Draft Remand to interested parties for comment.[13] On January 22, 2025, Commerce received comments on the Draft Remand from the petitioner.[14] We received no other comments from interested parties.

## III.    REMANDED ISSUES

### 1.    Supplier A's Potential Reliance on LDC

**Background**

In the underlying investigation, Commerce found that LDC and supplier A are not affiliated under any provision of the Act.[15]  Commerce made this decision based, in part, on the nature of LDC's relationship with Supplier A vis-à-vis either party's ability to exert control over the other pursuant to section 771(33)(G) of the Act.  In the *Final Determination*, we noted that we would not find that control exists unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product.[16] Record evidence showed that LDC had sources for purchasing the major input other than Supplier A, and the contractual terms between LDC and Supplier A recognize the sovereignty of

---

[11] *See Remand Order* at 21 and 29.
[12] *Id.* at 30 and 32.
[13] *See* Draft Results of Remand Redetermination Pursuant to Court Remand, *Ventura Coastal, LLC v. United States et al.*, Court No. 23-00009, Slip Op. 24-125 (CIT November 7, 2024), dated January 15, 2025 (Draft Remand).
[14] *See* The Petitioner's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated January 22, 2025 (Petitioner's Comments).
[15] *See Final Determination* IDM at Comment 3.
[16] *Id.* (citing 19 CFR 351.102(b)(3)).

the parties without indicating any obligation toward each other beyond those spelled out by the terms of the contract.[17]  Further, the verification of LDC's record information found no evidence of affiliation or non-arm's-length transactions between LDC and Supplier A.[18]  The CIT determined that, in analyzing LDC's relationship with Supplier A, Commerce failed to adequately analyze the potential for reliance between the two parties by only evaluating record evidence for LDC's potential reliance on Supplier A and not Supplier A's potential reliance on LDC.[19]

**Analysis**

Upon further consideration of the record information and points raised by the CIT, we find that LDC and Supplier A are not affiliated within the meaning of section 771(33)(G) of the Act, because Suppler A is not reliant on LDC.  Consistent with the Act, Commerce's regulations, and SAA,[20] below we have examined whether control exists through the Agricultural Partnership Agreement (the Agreement) between the two parties or by virtue of a close supplier relationship.

Section 771(33) of the Act provides that the following persons shall be considered to be "affiliated" or "affiliated persons":

(A)   Members of a family, including brothers and sisters (whether by the whole or half-blood), spouse, ancestors, and lineal descendants.
(B)   Any officer or director of an organization and such organization.
(C)   Partners.
(D)   Employer and employee.
(E)   Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.
(F)   Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.
(G)   Any person who controls any other person and such other person.

---

[17] *Id.*
[18] *Id.*
[19] *See Remand Order* at 19.
[20] *See* Statement of Administrative Action Accompanying the Uruguay Rounds Agreement Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA).

The Act states that "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."[21]  "Person" is defined to include "any interested party as well as any other individual, enterprise, or entity, as appropriate."[22]  Under 19 CFR 351.102(b)(3), the regulations define affiliated persons and affiliated parties as having the same meaning as in section 771(33) of the Act.  Based on the SAA, "a company may be in a position to exercise restraint or direction, for example, through corporate or family groupings, franchise or joint venture agreements, debt financing, or close supplier relationships in which the supplier or buyer becomes reliant upon the other."[23]

Further, to establish that LDC and Supplier A have a "close supplier relationship," the threshold issue is whether either party has, in fact, become reliant on the other.[24]  A "close supplier relationship" is established when a party demonstrates that the relationship is significant and could not be easily replaced.[25]  Only if Commerce determines that there is reliance does it evaluate whether one of the parties is in a position to exercise restraint or direction over the other.  Commerce will not, however, find affiliation based on a close supplier relationship unless the relationship has the potential to affect decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product.[26]

As articulated in the *Final Determination*, LDC and Supplier A share no common ownership or any ownership over one another, nor is there any record evidence indicating the parties share management or staff.[27]  Rather, the only demonstrated relationship between LDC

---

[21] *See* section 771(33) of the Act.

[22] *See* 19 CFR 351.102(b)(37).

[23] *See* SAA at 838; *see also* 19 CFR 351.102(b)(3).

[24] *See* SAA at 870; *see also Prestressed Concrete Steel Wire Strand from Malaysia:  Final Results of Antidumping Duty Administrative Review; 2020-2022*, 89 FR 328 (January 3, 2024), and accompanying IDM at Comment 1.

[25] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 32720 (July 9, 2019), and accompanying IDM at Comment 2.

[26] *Id.*

[27] *See Final Determination* IDM at Comment 3.

and Supplier A is the Agreement through which LDC "[






]."[28]

While LDC [


], it is important to distinguish "exclusivity" from "reliance."

In *Chlorinated ISOS from China*, Commerce stated that "{a} party might have an exclusive

relationship with a supplier, customer, or reseller, but still be perfectly capable of acting

independently if the exclusive relationship is no longer in its interests.  What matters is whether

the first party ultimately has other options and thus is not by necessity in the exclusive

relationship with the second party."[29]  There is record evidence that Supplier A [

], for any reason, or [

] of the Agreement.

Chapter [ ] of the Agreement articulates that parties may [

]."[30]  Thus, Supplier

A is not controlled by LDC through the Agreement, because Supplier A [



].  Regarding consequences to a party which elects to [                    ],

articles [

---

[28] *See* LDC's Letter, "Response to Section D of the Antidumping Duty Questionnaire," dated April 11, 2022 (LDC's DQR), at Exhibit D3.
[29] *See Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2017-2018,* 85 FR 10411 (February 24, 2020) (*Chlorinated ISOS from China*), and accompanying IDM at Comment 1.
[30] *See* LDC's DQR at Exhibit D3.

].[31]  Thus, while [

], Supplier A is not tied to LDC [

].

Chapter [   ] of the Agreement outlines the process through which [

], throughout the life of the Agreement.[32]  LDC has [

].[33]  Should

LDC elect to [

] the Agreement "[

]."[34]  Should LDC

[

].[35]

    The CIT cited certain contractual terms which it opined may indicate LDC controls

Supplier A.[36]  However, just because two independent parties agree to certain contractual terms

requiring a specific performance by one party, that is not sufficient to demonstrate that the party

is "reliant" on the other or that the other party exercises "control" over the other.  If Company X

and Company Y enter into a multi-year contract wherein Company Y agrees to sell Company X

a basket of goods each year for $100, absent any other record evidence, we find such an

---

[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *See Remand Order* at 20 n. 13.

arrangement is not sufficient to establish that there is control/affiliation between the parties or that one party unilaterally controls the pricing.[37]  Indeed, the record indicates as described above that [

].

In the scenarios where [

], record evidence indicates there are lemon juice producers in Brazil other than LDC with whom Supplier A could develop a relationship.  Specifically, the U.S. Customs and Border Protection data which Commerce used in the selection of respondents for individual examination in the underlying investigation indicate there are several other lemon juice producers and exporters operating in Brazil.[38]  There is nothing in the record to indicate that Supplier A could not enter into a contract with any of these lemon juice producers, should [

].  Likewise, any of these companies [

], and the Agreement affords Supplier A [

].[39]

Importantly, this discussion of reliance is only the threshold consideration of Commerce's close supplier relationship analysis under section 771(33)(G) of the Act.  As noted above, only if reliance exists does Commerce then determine whether one of the parties is in a position to exercise restraint or direction over the other.[40]  With respect to close supplier relationship, Commerce will not find affiliation unless the relationship has the potential to affect

---

[37] *Id.* at 28.
[38] *See* Memorandum, "Release of U.S. Customs and Border Protection Data," dated January 12, 2022, at Attachment.
[39] *See* LDC's DQR at Exhibit D3.
[40] *See, e.g.*, *Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products from Korea:  Final Results of Antidumping Duty Administrative Reviews*, 62 FR 18404, 18414-18417 (April 15, 1997) (*Carbon Steel Flat Products from Korea*).

decisions concerning the production, pricing, or cost of the subject merchandise or foreign like

product.  Here, as explained above, neither LDC nor Supplier A are [

                                                        ] because [

                                    ], so neither party is reliant upon the other.[41]

Nonetheless, there is no record evidence that either LDC or Supplier A dictated sales terms to, or

otherwise had the ability to control the other company.

    First, regarding the contents of the Agreement, the New Purchase and Sale Contract (the

Contract) accompanying the Agreement establishes that LDC must [

                                    ].[42]  The [                    ] is subject to

[

                        ].[43]  The Contract also declares that both parties are [

                                                                    ],

and that any [                                                        ].[44]  No other

record evidence shows that either LDC or Supplier A can:  (1) dictate the prices at which the

other company purchases inputs or sells products, (2) direct the other company to produce or buy

certain products, or (3) dictate operating procedures or make management decisions for the other

company.[45]

    Therefore, there is record evidence which demonstrates that the relationship between LDC

and Supplier A can be [

---

[41] *See* LDC's DQR at Exhibit D3.
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.*

].  For this reason, we find that Supplier A is not reliant on LDC on the basis of the Agreement under a close supplier relationship analysis within the meaning of section 771(33)(G) of the Act.

## 2.  Whether LDC and Supplier A are Partners

**Background**

In the underlying investigation, Commerce found that LDC and Supplier A are not partners within the meaning of section 771(33)(C) of the Act.[46]  Commerce made this determination based on the nature of LDC's association with Supplier A as a contractual relationship.[47]  We noted that LDC and Supplier A do not jointly own anything pursuant to the terms of the Agreement and do not engage in joint selling activities.[48]  However, the CIT determined that, in analyzing LDC's relationship with Supplier A, pursuant to section 771(33)(C) of the Act, Commerce must apply a definition of "partners" as articulated by the CIT, *i.e.*, whether LDC and Supplier A are engaged in a cooperative business endeavor in which they shared risk and reward.[49]

**Analysis**

Upon further consideration of the record information and points raised by the CIT, we continue to find that LDC and Supplier A are not partners within the meaning of section 771(33)(C) of the Act because LDC and Supplier A are not involved in a cooperative business endeavor in which they share risk and reward.  LDC and Supplier A have entered into a contractual relationship, but the rights, obligations, and penalties for noncompliance outlined within the contractual Agreement indicate that LDC and Supplier A do not share risk or reward

---

[46] *See Final Determination* IDM at Comment 3.
[47] *Id.*
[48] *Id.*
[49] *See Remand Order* at 29.

outside the terms of the contractual Agreement.  Beyond the Agreement, there is no record evidence demonstrating that LDC and Supplier A are involved in a cooperative business endeavor or that risk and/or reward are transferable between parties.

As an initial matter, although we respectfully disagree with the CIT's analysis regarding the degree of deference that is owed to Commerce's interpretation of this statutory provision based on *Loper Bright*, we have complied with the CIT's remand order under respectful protest with respect to this issue.[50]

Regarding the definition of "partners" articulated by the CIT, we first find that record evidence does not support the conclusion that LDC and Supplier A are in a "cooperative business endeavor," such as an association, joint venture, or unincorporated organization.[51]  We continue to find that the Agreement between the parties is merely a contractual relationship not indicating any further "cooperative" aspect of the parties relationship beyond the terms of the contract agreed to by the otherwise independent parties.  Indeed, we find that there is no record evidence that either party held itself out to be in association with the other such that they formed a "cooperative business endeavor."  Such action may be indicative of a cooperative endeavor wherein the success or reputation of one party may be tied to the other party such that there may be potential pricing impacts beyond market considerations; however, we find that mere assent to terms in a contractual agreement [                                    ] to be insufficient to establish a cooperative business endeavor.

Second, we find that there is not sufficient record evidence that LDC and Supplier A have shared risk or reward within the terms of the Agreement, such that the success or failure of one party would be transferred to the other party.  The Agreement describes a relationship in which

---

[50] *See Viraj Group v. United States*, 343 F. 3d 1371 (Fed. Cir. 2003).
[51] *See Remand Order* at 27.

LDC possesses [

]

and LDC must [

].[52]  Within this arrangement, LDC and Supplier A are equally subject to

potential impacts of [

] because these determine [

].  However, these factors have opposing impacts

on each party, *i.e.*, market conditions which [

] benefit Supplier A at the expense of

LDC.  Or, when [                                                  ], LDC must [

] from Supplier A, benefiting Supplier A at the expense of LDC.

Therefore, LDC and Supplier A do not share risk or reward within the basic arrangements of the

Agreement.

Moreover, the Agreement specifies [

] the terms of the Agreement.

Chapter [ ] of the Agreement specifies the [

] described above.[53]  Chapter [ ] specifies the circumstances

for [                                      ].  Namely, any [

---

[52] *See* LDC's DQR at Exhibit D3.
[53] *Id.*

].[54]  In short, LDC is

responsible for [

], and [

].[55]  Thus, LDC alone assumes all risk for any

[

].  Likewise, [

].[56]  The benefits of [

] per the terms of the Agreement.  Chapter [ ] explains the

[

], noting that LDC [

].[57]  Chapter [ ]

explains the [                                                    ] and, principally, that LDC is

[

].[58]  Article [

], while article [

---

[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*

] at the

conclusion of the Agreement.[59]

Finally, Chapter [ ] outlines the contexts in which parties may [

].  For

instance, should Supplier A [

].[60]

Similarly, should LDC [

].[61]  Only in circumstances of [

] by the

other party.[62]

Thus, the Agreement [

] with the terms of the Agreement and establishes the exact

rights and responsibilities for both parties.  LDC has [

].  LDC can [

---

[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.*

], or LDC can

utilize Chapter [     ] mechanism for [

].[63]  Likewise, Supplier A must [

].[64]  Supplier A can [

], or

Supplier A can [

].[65]  In all instances of [

], the Agreement [

].  The parties do not share risk or reward within the framework of the Agreement.

Beyond the Agreement, there is no record evidence demonstrating shared risk or reward between LDC and Supplier A.  As we stated in the *Final Determination*, there is no record evidence that LDC and Supplier A share any joint selling activities or joint ownership.[66]  In essence, any successes and/or failures outside the Agreement would not translate from one party to the other.  No evidence shows that one party would experience any benefits from an increase in the operating revenue of the other party.  Should LDC downsize or experience financial difficulty, this would not impact Supplier A's financing or the [

] of the Agreement.  If one party experienced a financial gain or loss such that it sought [

], LDC [                              ], or

---

[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Id.*; *see also Final Determination* IDM at Comment 3.

Supplier A wanted [                                    ]), that party would [                                    ] and,

as explained above, the parties would be free to pursue a similar relationship with either other

lemon suppliers or other lemon juice producers operating in Brazil.  This we find is a key aspect

of our analysis for differentiating mere contractual instruments themselves and relationships of

shared risk and reward that may impact the pricing considerations in contractual negotiations.

We find that there is no indication of shared risk and reward between the parties outside of the

agreement such that either party would be motivated to not independently assess and negotiate

the initial contractual terms.  Therefore, for this final redetermination, we continue to find that

LDC and Supplier A are not "partners" within the meaning of section 771(33)(C) of the Act

using the CIT's definition of "partners" as parties engaged in a cooperative business endeavor in

which they shared risk and reward.

## IV.    INTERESTED PARTIES' COMMENTS ON THE DRAFT REMAND[67]

### Issue 1:  Whether LDC and Supplier A are Affiliated Within the Meaning of Section 771(33)(G) of the Act

*Interested Parties' Comments on the Draft Remand:*

The following is the petitioner's summary of its argument.[68]  For further details, *see* the

Petitioner's Comments at 2-3.

> {The petitioner} respectfully disagrees with Commerce's continued determination
> that LDC and Supplier A are not affiliated under Section 771(33)(G) of the Act.
> The record contains compelling evidence showing that the agreements between
> LDC and Supplier A have created a close supplier relationship where Supplier A
> has become reliant on LDC's purchases of lemons.  The relationship between LDC
> and Supplier A has also impacted the price of lemons that LDC purchases from
> Supplier A.  Specifically, in the *Preliminary Determination* of the underlying
> investigation, Commerce "adjusted the price of the lemons LDC purchased from
> Supplier A upon finding that "the average transfer price of the lemons LDC {}
> purchased from {Supplier A} were below the market price" (*i.e.*, not "made on an
> arm's length basis"), and "increased {LDC's} reported TOTCOM."

---

[67] *See* Draft Remand.
[68] *See* Petitioner's Comments.

Additionally, in its *Remand Order*, the CIT found that Commerce "ignored evidence that would suggest that, even with the availability of other suppliers, Supplier A may have been reliant upon {} LDC."  Consistent with prior cases – including *OCTG from Korea* – Commerce should find that LDC and Supplier A are affiliated under Section 771(33)(G) of the Act based on their close supplier relationship.

**Commerce's Position:**  We disagree with the petitioner, and continue to find that LDC and Supplier A are not affiliated within the meaning of section 771(33)(G) of the Act because LDC and Supplier A are not in a close supplier relationship, such that either is in control of the other within the meaning of the statute.

As an initial matter, we disagree with the petitioner's understanding of the Court's conclusions regarding the Agreement between LDC and Supplier A and its potential to impact production, pricing, or cost decisions through LDC's purported control over Supplier A.[69]  As we will discuss further, these terms are contractual terms agreed to by the parties.  We find that there is not sufficient evidence to support that either party was in a position to dictate or unduly influence the terms of the contractual Agreement or exert control over the other party, such that there would be any indication that the terms of the Agreement are not the product of market-based negotiations between independent parties.  Further, the terms of the Agreement to which each party is held are always [

].[70]

The petitioner seemingly misapprehends the *Remand Order*, suggesting that the Court has already addressed whether Commerce must show more than the availability of other lemon purchasers to demonstrate that Supplier A is not reliant on LDC.[71]  Rather, in stating that

---

[69] *See* Petitioner's Comments at 4-6.
[70] *See* LDC's DQR at Exhibit D3.
[71] *See* Petitioner's Comments at 5.

Commerce "ignored evidence that would suggest that, even with the availability of other suppliers, Supplier A may have been reliant upon {} LDC,"[72] the Court is saying, as we understand, that reliance does not have to be mutual.  In other words, the fact that LDC is not reliant on Supplier A does not necessarily indicate that Supplier A is not reliant on LDC. Instead, the Court directed Commerce to consider additional information which may be relevant to the analysis of a close supplier relationship vis-à-vis LDC and Supplier A, which we have done in the Draft Remand[73] and further explain here.

A finding of reliance must be predicated on more than just mere contractual terms agreed to by parties, even if either party exclusively contracts with the other.  For instance, the Court has previously held that even if a supplier sells 100 percent of its exports to a single distributor, that fact alone does not establish a finding of a close supplier relationship.[74]  The Court has further ruled that even exclusive sales contracts are insufficient on their own for a finding of affiliation.[75]  Indeed, a commercially successful and convenient relationship between parties may develop and function without either party being able to exercise restraint or direction over the other.[76]  The petitioner's claims that reliance is demonstrated when parties enter into an agreement with fixed sales terms[77] would cover many types of commercial relationships that would not be considered indicative of reliance or control.  Considering that [

],[78] the inquiry should be focused on whether, when the parties were negotiating sales terms, was either party in a position of reliance on the other and

---

[72] See Remand Order at 21.
[73] See Draft Remand at 3-9.
[74] See TIJID vs. United States, 366 F. Supp. 2d 1286, 1295-1300 (CIT 2005) (TIJID 2005).
[75] See Hontex Enters v. United States, 342 F. Supp. 2d 1225, 1243 (CIT 2004) (Hontex Enters) and Carbon Steel Flat Products from Korea 62 FR at 18404, 18441.
[76] See TIJID 2005, 366 F. Supp. 2d at 1295-1300; see also Certain Oil Country Tubular Goods from Taiwan: Final Determination of Sales at Less Than Fair Value, 79 FR 41979 (July 18, 2014), and accompanying IDM.
[77] See Petitioner's Comments at 7 and 11-12.
[78] See LDC's DQR at Exhibit D3.

thus subject to the exertion of undue influence by the other—not whether after entering the Agreement, was either party required to uphold the contractual terms they agreed upon. There is no evidence this was the case, *i.e.*, there is no record evidence indicating that LDC or Supplier A were able to exert control or influence over one another when negotiating the terms of the Agreement. Neither is there any record evidence that either party is rendered reliant on the other by fulfilling their obligations established in the Agreement. To conclude that the obligation to fulfill certain contractual obligations agreed to by independent parties constitutes reliance could potentially turn any manner of sales agreements into bases for affiliation findings.

We began our analysis of the relationship between LDC and Supplier A by clarifying that the parties share no common ownership or any ownership over one another nor any management or staff.[79] We were not attempting to establish that shared ownership or management is a requirement to demonstrate reliance and/or control under Commerce's close supplier relationship analysis. However, such facts are relevant to analyze record evidence regarding the relationship between LDC and Supplier A and whether either party is reliant on the other or in a position to exert control over the other. Indeed, Commerce has considered factors such as shared ownership and stock control in other close supplier relationship analyses.[80] Commerce has considered those factors because, even if a supplier sells 100 percent of its exports to a single distributor, that fact alone does not necessarily support a finding of a close supplier relationship.[81] Thus, all record evidence which explains the nature of the relationship between two parties is helpful to analyze the presence of a close supplier relationship and the extent to which, if at all, one party may be reliant on another. Here, record evidence indicates there are [

---

[79] *See* Draft Remand at 5.
[80] *See Final Results of the Administrative Review of the Antidumping Duty Order on Glycine from Japan; 2022-2023*, 89 FR 101553 (December 16, 2024), and accompanying IDM.
[81] *See TIJID 2005*, 366 F. Supp. 2d at 1295-1300.

],[82] and there is no record evidence indicating that LDC was able to dictate the

terms of the Agreement or that [

][83] through reliance on LDC.

The petitioner attempts to amplify the impact of the Agreement on LDC's and Supplier

A's relationship by equating the present case with *OCTG from Korea*.[84]  However, *OCTG from*

*Korea* is distinguishable from this case.  In *OCTG from Korea*, Commerce determined that the

respondent was affiliated with its supplier within the meaning of section 771(33)(G) of the Act.[85]

In the *OCTG from Korea* IDM, the relationship between the two parties under scrutiny was

described as follows:

> The affiliation between {the respondent, NEXTEEL} and {the steel coil supplier,
> POSCO} extends beyond the companies' close supplier relationship.  For example,
> POSCO has assigned employees to monitor NEXTEEL's inventory of hot-rolled
> coil to ensure that the company is supplied with POSCO-produced steel.  Similarly,
> POSCO employees oversee "the shipping of finished products" from NEXTEEL's
> plant.  In addition, POSCO itself has publicly advertised that it "took charge of
> NEXTEEL's overseas {public relations} campaign" by providing NEXTEEL with
> marketing assistance, research and development capacity, and management
> consulting.  Moreover, {the petitioner in that case, U.S. Steel,} notes that
> NEXTEEL also depends on POSCO for its sales operations and certain other
> production operations.  As such, U.S. Steel notes that NEXTEEL is clearly reliant
> on POSCO, which is in a position to control NEXTEEL in a manner that affects the
> pricing, production, and sale of NEXTEEL's OCTG.[86]

The high level of integration in *OCTG from Korea* between the supplier and the purchaser is

different from the relationship between LDC and Supplier A.  Indeed, in the *OCTG from Korea*

---

[82] *See* Draft Remand at 8.
[83] *See* LDC's DQR at Exhibit D3.
[84] *See* Petitioner's Comments at 8 (citing *Certain Oil Country Tubular Goods from the Republic of Korea: Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances*, 79 FR 41983 (July 18, 2014) (*OCTG from Korea*), and accompanying IDM.
[85] *See* Petitioner's Comments at 8 (citing *OCTG from Korea* IDM).
[86] *See OCTG from Korea* IDM at 69.

IDM, we stated, "given POSCO's involvement as both a supplier and in the sales process, POSCO is in a rather unique position to exercise restraint or control over NEXTEEL."[87]

In the present case, there is no record evidence that LDC or Supplier A have arranged for the exchange of employees or the involvement in the other's inventory monitoring, shipping of finished products, marketing, research and development, or management.[88]  Indeed as determined in the *Final Determination*, LDC and Supplier A are not engaged in joint selling activities.[89]  While the petitioner acknowledges that the exact relationship between LDC and Supplier A is closer to a [                                    ] than to that of NEXTEEL and POSCO in *OCTG from Korea*, the petitioner does not explain or support why this type of relationship must necessarily indicate reliance.[90]  Indeed, the Agreement lays out [



].[91]  The terms of the Agreement do not [



].[92]  Simply because Company Y has agreed to fixed sales terms with Company X does not establish in and of itself that Company Y is now in some way affiliated with Company X because it now has contractual obligations that it freely entered into [                                    ].[93]  The fact that parties have agreed to

---

[87] *Id.* at 73.
[88] *See* LDC's DQR at D3.
[89] *See Final Determination* IDM at Comment 3.
[90] *See* Petitioner's Comments at 9.
[91] *See* LDC's DQR at Exhibit D3.
[92] *Id.*
[93] *Id.*

certain terms in a legal contract between them does not establish that control was exerted or is able to be exerted when agreeing to those terms.

Moreover, the petitioner's conclusion that LDC and Supplier A must share mutual reliance because they [                                                    ] is not persuasive.[94]  The fact that LDC and Supplier A [

], we find instead contradicts the petitioner's conclusion that either LDC or Supplier A are reliant upon the other.  As the petitioner notes, [

].[95]

However, contrary to the petitioner's contentions, these facts rather demonstrate that both parties are independent and do not demonstrate the presence of reliance, much less control.  [

] seemingly indicates that the parties are operating independently, at arms-length, and willing to [

].

The petitioner then suggests that the [        ] temporal aspect of the relationship between LDC and Supplier A, coupled with the petitioner's conclusion that the Agreement impacts the price of subject merchandise, supports a finding of affiliation.[96]  However, we disagree.  As an initial matter, the regulation and relevant case law cited by the petitioner in this argument focus on situations where temporary circumstances detract from a finding of affiliation, not [                                        ] necessarily support or are dispositive of affiliation.[97]  Section 351.102(b)(3) of Commerce's regulations states that in determining

---

[94] *See* Petitioner's Comments at 6-7.
[95] *See* LDC's DQR at Exhibit D3.
[96] *See* Petitioner's Comments at 7.
[97] *Id.* at 9-11.

whether parties are affiliated, Commerce "will consider the temporal aspect of a relationship in determining whether control exists; *normally, temporary circumstances will not suffice as evidence of control.*"[98]  In *China Steel Corp. v. United States*, quoting *Hontex Enters. v. United States*, which the petitioner cites, the Court found that "sporadic or isolated contacts between entities, absent significant impact, would be less likely to lead to a finding of control."[99]  We have considered the [                    ] of the relationship between LDC and Supplier and, [                         ], find that the totality of the record evidence described above continues to support a finding of no affiliation.  In *Hontex Enters. v. United States*, the Court explained that "Commerce is required to weigh the nature of entities' contacts over time, and must determine how such contacts potentially impact each entity's business decisions."[100]  Here, as explained above, there is no record evidence indicating that either LDC or Supplier A are in a position to impact each other's business decisions using the terms of the Agreement or that it importantly impacted either parties' ability to negotiate at arm's length when crafting the contractual agreement.  This includes the fact that either party [

] and the fact that the Agreement [



].[101]  Thus, Commerce and the Court have concluded that when parties have [                         ] commercial relationship, this is insufficient to establish reliance or control by one party over another.

[98] Emphasis added.
[99] *See China Steel Corp. v. United States*, 306 F. Supp. 2d 1291, 1296 (CIT 2004) (*China Steel Corp. v. United States*) (quoting *Hontex Enters., Inc.*, 248 F.Supp.2d at 1344, n.17 (CIT 2003) (*Hontex Enters. v. United States*)).
[100] *See Hontex Enters. v. United States* at 1344.
[101] *See* LDC's DQR at Exhibit D3.

Finally, we find that the petitioner's focus on the price paid by LDC for lemons from Supplier A to be misguided, as this is not a factor in our affiliation analysis.[102] The petitioner notes that we considered LDC's purchases of lemons from Supplier A to be not at "arm's length" for the *Preliminary Determination* of the underlying investigation and concludes this must indicate the relationship between LDC and Supplier A has the potential to impact pricing of the subject merchandise.[103] However, the prices of lemons focuses on the contractual terms of the Agreement and not the positions of the parties to the Agreement or whether either party is controlled by the other. Commerce's arm's-length analysis is only conducted *after* an affirmative determination of affiliation between a respondent and a supplier. It is not applied to all suppliers to test whether the purchaser is affiliated with the supplier; rather, it is employed to determine whether instances of affiliation impact the price a purchaser pays for inputs.[104] To do so, we compare the average purchase price of a specific input from the affiliated supplier to the average purchase price paid to unaffiliated suppliers for the same input. For the *Preliminary Determination*, we conducted the arm's-length test on LDC's lemon purchases because we preliminarily determined that LDC and Supplier A were affiliated.[105] However, the presence of variation between an average purchase price paid to one supplier and the average purchase price paid to other suppliers does not indicate affiliation or the presence of reliance or control, as it is not a factor considered under section 771(33) of the Act. It is reasonable to assume that a respondent pays various prices for a given input in the marketplace depending on myriad factors, and the fact that a purchaser may obtain a favorable per-unit price for certain purchases does not

---

[102] *See* Petitioner's Comments at 13-14.
[103] *Id.* at 14.
[104] *See, e.g., Certain Lemon Juice from Brazil:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 87 FR 47697 (August 4, 2022) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum at 15.
[105] *Id.*

sufficiently indicate the purchaser is affiliated with the seller or that one party to the transaction controls the other. As the petitioner notes, "the statute, regulations, {and} prior cases do not quantify the extent to which a relationship must impact the pricing of subject merchandise to find affiliation based on a close supplier relationship."[106] Thus, the fact that LDC [

] is not dispositive of affiliation nor does it detract from other record evidence indicating that LDC and Supplier A [

]. Therefore, we continue to find that LDC and Supplier A are not affiliated within the meaning of section 771(33)(G) of the Act or that they have a close supplier relationship.

### Issue 2: Whether LDC and Supplier A are Affiliated Within the Meaning of Section 771(33)(C) of the Act

*Interested Parties' Comments on the Draft Remand:*

The following is the petitioner's summary of its argument.[107] For further details, *see* the Petitioner's Comments at 3.

> In the Draft Remand Results, Commerce repeats many of its findings from the underlying investigation and ignores undisputed record evidence showing that LDC and Supplier A have a cooperative business endeavor – involving the production and sale of lemons – for which they share risks and rewards. Commerce continues to find that the agreement between LDC and Supplier A is merely a contractual relationship, but LDC referred to the relationship as a partnership on numerous occasions on the record of the investigation. The definition of "partners" under the statute does not require parties to share risks and rewards equally, and Commerce's reliance on its previous analysis, which has already been found to be faulty, will lead to another remand. The record evidence shows that LDC and Supplier A share risks and rewards commensurate with their contributions to the partnership. In the final remand results, Commerce should find that LDC and Supplier A are affiliated as partners under Section 771(33)(C) of the Act.

---

[106] *See* Petitioner's Comments at 14.
[107] *Id.* at 3.

**Commerce's Position:**  We continue to find that LDC and Supplier A are not affiliated as "partners" within the meaning of section 771(33)(C) of the Act, or in accordance with the Court's definition of "partners" as parties who "more generally form a cooperative endeavor in which they share risk and reward."[108]  As we will discuss below, we find there to be insufficient record evidence that LDC and Supplier A have formed a "cooperative endeavor" or that their relationship constitutes shared risk and reward beyond the contractual terms agreed to by the parties.

As an initial matter, we do not find LDC's usage of the term "partnership" to describe its relationship with Supplier A to be dispositive that the exact nature of the relationship satisfies the statute.  Commerce is tasked with reviewing all the relevant evidence and determining the nature of the relationship between parties to determine if there is affiliation.  Commerce does not end its analysis and rely upon the phrasing or characterization presented by parties when determining if there is affiliation.  Indeed, this principle informed the change in determination regarding LDC's affiliation from the *Preliminary Determination* to the *Final Determination*.[109]  The fact that a party refers to a particular relationship as a "partnership" is one of several pieces of information that can inform our determination.  However, the mere usage of a term is not indicative that the relationship will qualify as such within the meaning articulated in the statute.  Instead, we analyze whether record evidence supports the claim that the relationship is a "partnership," and whether the record evidence supports the determination that the relationship between LDC and Supplier A qualifies as a "partnership" according to the statute, and here, the definition articulated by the Court in the *Remand Order*—namely, whether LDC and Supplier A are "partners" such that they more generally form a cooperative endeavor in which they share risk

---

[108] *See Remand Order* at 29.
[109] *See Final Determination* IDM at Comment 3.

and reward.[110]  Therefore, we disagree with the petitioner's suggestion that LDC's reference of the relationship as a "partnership" constitutes dispositive evidence in our analysis.[111]  To clarify, Commerce is not establishing as a requirement that in all cases parties hold themselves out publicly as an association, or have power to act on behalf of the other or the alleged partnership, or that the parties jointly own anything, but we find that these factors are relevant in evaluating whether a partnership exists, and that here such factors weigh in favor of concluding that the parties are not partners within the meaning of section 771(33)(C) of the Act.  The Court stated that "Commerce's view of the word 'partners' as those who 'jointly own anything' or 'engage in joint selling activities' {...} is helpful but inadequate."[112]  We agree with the Court that such considerations are helpful as part of the total analysis, and we have provided such analysis in the Draft Remand.[113]  We have also further explained, pursuant to the Court's instructions, that there is no indication that the parties have held themselves out externally to be in a cooperative endeavor, that either party has the ability to act on behalf of the other or the alleged partnership, or that either party has obligations beyond the terms of the contract.  All of these factors we find weigh in favor of concluding there is not a cooperative business endeavor, merely a contractual arrangement.  The fact that parties entered a contractual commercial relationship is not analogous to a cooperative business endeavor.  As we have stated above, to conclude that contractual parties meet the definition of "partners" under the statute would pull in almost all types of commercial transactions as affiliated transactions, despite Congress's interest instead only in those transactions where parties' relationship may affect agreed upon pricing terms.[114]

---

[110] *See Remand Order* at 29.
[111] *See* Petitioner's Comments at 16.
[112] *See Remand Order* at 28.
[113] *See* Draft Remand at 10-16.
[114] *See* SAA at 838.

We affirm our determination from the Draft Remand that LDC and Supplier A's actions outside of the terms of the Agreement cannot [

].[115]  The petitioner misapprehends our analysis by deducing that our determination hinges on the fact that "[                                                      ]."[116] We are not establishing any rule that parties must share risk and reward equally to constitute a partnership, nor was such a rule intended to be conveyed in out Draft Remand.  Rather, our point is that there is no shared risk or reward *at all* between the two parties beyond the terms of the Agreement, *i.e.*, if LDC or Supplier A achieve success or experience hardship in areas unrelated to the contract there is no record evidence that either party would have some sort of interest in such occurrence as long as they perform the terms of the contract.  In the event that one party fails to fulfil the contract in any way, this would [

], exactly as outlined in the Agreement.[117]

This is [                                    ], as the Agreement [

].[118]  It cannot be the case that agreed upon contractual terms, regardless of complexity, by their existence create the conditions to establish that parties have entered into a partnership within the meaning of the statute or that laid out by the Court.  Such a broad holding would run the serious risk of turning many complicated commercial contractual agreements that respondent parties often engage in as "partnerships."

The petitioner contends that the ability [

] does not make a partnership invalid, as such an approach would mean that any partnership that [                                  ] would

---

[115] *See* Draft Remand at 15.
[116] *See* Petitioner's Draft Comments at 18.
[117] *See* LDC's DQR at Exhibit D3.
[118] *Id*.

not be a partnership.[119]  We do not intend to say that a partnership cannot exist if [

].  However, the specific

contractual clauses in the Agreement discussed here and in the Draft Remand providing for

[                                        ] as well as the fact that parties [

], and the myriad other reasons discussed

above, ultimately weigh in favor of concluding that this contractual relationship is one between

two independent parties and not partners who have entered into a cooperative business endeavor

sharing risk and reward.  Therefore, based on record evidence and the analysis laid out here, we

continue to find that LDC and Supplier A are not affiliated within the meaning of section

771(33)(C) of the Act, in accordance with the Court's definition of "partners" as parties who

"more generally form a cooperative endeavor in which they share risk and reward."[120]

## VI.    FINAL RESULTS OF REDETERMINATION

In accordance with the Court's *Remand Order*, Commerce has explained:  (1) our

analysis supporting our determination that LDC is not in a position to control Supplier A or that

Supplier A is reliant on LDC within the meaning of section 771(33)(G) of the Act, and (2) our

analysis supporting our determination that LDC and Supplier A are not affiliated as "partners"

within the meaning of section 771(33)(G) of the Act or the Court's definition of "partners" as

parties who "more generally form a cooperative endeavor in which they share risk and

reward."[121]  Accordingly, we have made no changes to the *Final Determination*.

---

[119] *See* Petitioner's Comments at 20.

[120] *See Remand Order* at 29.

[121] We are filing this remand redetermination under respectful protest concerning the Court's analysis of whether Commerce should be afforded deference in its original determination.  *See Viraj Group v. United States*, 343 F. 3d 1371 (Fed. Cir. 2003).

2/13/2025

X *[signature]*

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
 for Policy and Negotiations
 performing the non-exclusive functions and duties
 of the Assistant Secretary for Enforcement and Compliance